1  JENNIFER LEE TAYLOR (CA SBN 161368)
   JTaylor@mofo.com
2  Morrison & Foerster LLP
   425 Market Street
3  San Francisco, California  94105-2482
   Telephone:  415.268.7000
4  Facsimile:   415.268.7522

5  WENDY J. RAY (CA SBN 226269)
   WRay@mofo.com
6  Morrison & Foerster LLP
   707 Wilshire Boulevard
7  Los Angeles, California  90017-3543
   Telephone:  213.892.5200
8  Facsimile:   213.892.5454

9  NICHOLAS E. HAM (CA SBN 294596)
   NHam@mofo.com
10 Morrison & Foerster LLP
   755 Page Mill Road
11 Palo Alto, California 94304-1018
   Telephone: 650.813.5600
12 Facsimile: 650.494.0792

13 Attorneys for Defendant
   DROPBOX, INC.
14

**REDACTED VERSION OF
DOCUMENT PROPOSED TO
BEFILED UNDER SEAL**

15              UNITED STATES DISTRICT COURT

16            CENTRAL DISTRICT OF CALIFORNIA

17

18 IRONHAWK TECHNOLOGIES, INC.,        Case No. 2:18-cv-01481 DDP (JEMx)

19              Plaintiff,              **MEMORANDUM OF POINTS AND
                                        AUTHORITIES IN SUPPORT OF
20      v.                              DROPBOX, INC.'S MOTION TO
                                        PRECLUDE TESTIMONY FROM
21 DROPBOX, INC.,                       PLAINTIFF'S EXPERT WITNESS
                                        ROBERT WUNDERLICH**
22              Defendant.
                                        Hearing Date:  July 15, 2019
23                                      Hearing Time:  10:00 a.m.
                                        Courtroom:  9C
24
                                        Trial Date: September 10, 2019
25                                      Pre-Trial Conference: August 12, 2019
26
                                        Hon. Dean D. Pregerson
27

28

I.     INTRODUCTION .................................................................................... 1

II.    LEGAL STANDARD ............................................................................. 2

III.   ARGUMENT ......................................................................................... 4

       A.   Wunderlich's Opinions as to Reasonable Royalty Damages Should Be
            Excluded Because Reasonable Royalty Damages Are Not Available in
            This Trademark Infringement Action and Even If They Were, His
            Approach Is Too Speculative ..................................................... 4

       B.   Wunderlich's Opinion as to Reasonable Royalty Damages Should Also
            Be Excluded Because Wunderlich Did Not Base His Opinion on
            Principles and Methods that Were Reliably Applied to Sufficient Facts
            and Data ........................................................................................ 6

            1.   Wunderlich's "royalty rate based on hypothetical negotiations"
                 analysis does not support any royalty rate. ......................... 7

            2.   Wunderlich's "comparison agreements" are not at all comparable.. 7

            3.   Wunderlich ignores the most comparable trademark transaction.... 12

            4.   Wunderlich's criteria for selecting his "comparison agreements" are
                 arbitrary. ............................................................................... 13

            5.   Wunderlich concedes his approach supports a wide range of
                 hypothetical royalties. ........................................................... 14

       C.   Wunderlich's Opinion as to Disgorgement of Dropbox's Profits Should
            Also Be Excluded Because Wunderlich Did Not Base His Opinion on
            Principles and Methods that Were Reliably Applied to Sufficient Facts
            and Data ........................................................................................ 15

            1.   Wunderlich's calculations erroneously include revenues from
                 Dropbox customers who never used the Dropbox Smart Sync
                 feature. ................................................................................... 15

            2.   Wunderlich fails to use a reliable methodology to calculate revenue
                 attributable to Smart Sync. .................................................... 16

            3.   Wunderlich's profit analysis fails to account for all deductible
                 expenses. ................................................................................ 16

            4.   Wunderlich's calculation of Dropbox's disgorgable profits is grossly
                 disproportionate to Ironhawk's circumstances. ..................... 17

            5.   Wunderlich's calculations erroneously include revenues from
                 Dropbox users who were customers before Smart Sync existed. ...... 17

IV.    CONCLUSION ...................................................................................... 18

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Cabrera v. Cordis Corp.,*
    134 F.3d 1418 (9th Cir. 1998) ............................................................................. 3

*Cooper v. Brown,*
    510 F.3d 870 (9th Cir. 2007) ............................................................................... 3

*Daubert v. Merrell Dow Pharm., Inc.,*
    43 F.3d 1311 (9th Cir. 1995) ........................................................................... 3, 6

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993) ....................................................................................... 2, 3

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.,*
    772 F.2d 505 (9th Cir. 1985) ............................................................................. 16

*General Elec. Co. v. Joiner,*
    522 U.S. 136 (1997) ..................................................................................... 6, 15

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) ............................................................................................ 2

*Lindy Pen Co. v. Bic Pen Corp.,*
    982 F.2d 1400 (9th Cir. 1993) ......................................................................... 5, 16

*Marketquest Grp., Inc. v. BIC Corp.,*
    316 F. Supp. 3d 1234 (S.D. Cal. 2018) ............................................................ 4, 5

*Mukhtar v. Cal. State Univ., Hayward,*
    299 F.3d 1053 (9th Cir. 2002) ............................................................................. 2

*Multimedia Patent Tr. v. Apple Inc.,*
    No. 10-CV-2618-H (KSC), 2012 WL 5873711
    (S.D. Cal. Nov. 20, 2012) .................................................................................... 9

*In re Paoli R.R. Yard PCB Litig.,*
    35 F.3d 717 (3d Cir. 1994) ............................................................................... 3, 6

DROPBOX, INC.'S MPA ISO MOTION TO PRECLUDE WUNDERLICH TESTIMONY

*Spin Master, Ltd. v. Zobmondo Entm't*, LLC,
    944 F. Supp. 2d 830 (C.D. Cal. 2012) ................................................................ 17

*Toyo Tire & Rubber Co. v. Hong Kong Tri-Ace Tire Co.*,
    281 F. Supp. 3d 967 (C.D. Cal. 2017) ................................................................ 18

*Trovan, Ltd. v. Pfizer, Inc.*,
    No, CV-98-00094 LGB MCX, 2000 WL 709149
    (C.D. Cal. May 24, 2000) ....................................................................... 5, 6, 14

*United States v. Hermanek*,
    289 F.3d 1076 (9th Cir. 2002) .............................................................................. 3

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014) .......................................................................... 11

*Winterland Concessions Co. v. Fenton*,
    835 F. Supp. 529 (N.D. Cal. 1993) ..................................................................... 17

**Rules and Statutes**

15 U.S.C. § 1117(a) .......................................................................................... 4, 17

Federal Rule of Evidence 702 ........................................................................ 2, 6, 15

pa-1898721

## I.   INTRODUCTION

Ironhawk retained Robert Wunderlich to offer expert testimony at trial on the damages due to Ironhawk assuming that Dropbox infringed its SMARTSYNC mark.  Wunderlich seeks to offer opinions on reasonable royalties and disgorgement of profits, both of which are fundamentally flawed and should be excluded.

Rather than following the approach of Section 35 of the Lanham Act, Wunderlich posits a damages theory under which Ironhawk is entitled to 1-2% royalty of certain of Dropbox's sales.  This Court has precluded Wunderlich from testifying on this very topic before and should do so again.  As a matter of law, a reasonable royalty model is inappropriate in a trademark case such as this one where the plaintiff has no history of licensing its mark.

Wunderlich also fails to base his reasonable royalty opinion on sufficient facts and data, and to apply reliable principles and methods to the facts of the case. Without performing any mathematical analysis, Wunderlich plucks his 1-2% royalty rate out of thin air, opining that the rate is appropriate because Dropbox enjoys a high profit margin and could easily afford it.  Wunderlich then relies upon inapposite royalty agreements involving famous marks to make his 1-2% royalty appear reasonable, all the while ignoring a much more comparable license agreement for the DROPBOX mark.  He also arbitrarily chose royalty agreements to use as his benchmarks and admits that his methodology would support a wide range of acceptable royalties.  The end result is a fairy tale damages theory that cannot satisfy the relevance and reliability requirements of *Daubert* and Federal Rule of Evidence 702.

Wunderlich's disgorgement of profits analysis is equally unreliable.  His Dropbox revenue calculation erroneously includes revenues from Dropbox users who were customers before Smart Sync existed and customers who never used the Smart Sync feature.  Wunderlich's methodology is also arbitrary in its allocation of

1

revenues among different Dropbox products.  In addition, Wunderlich fails to account for the difference in value to consumers of the Smart Sync *feature* versus the value of its *name*, and he fails to account for all deductible expenses when calculating revenue.  Finally, his suggestion that Ironhawk should receive $█████ █████ in disgorgement of Dropbox's profits is grossly disproportionate to the ███████ of total profit Ironwork made during the alleged infringement period.

Dropbox requests that the Court preclude Wunderlich from testifying at trial.

## II.   LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702, which reflects the U.S. Supreme Court decisions in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999), "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only **relevant**, but **reliable**.'" *Kumho*, 526 U.S. at 147 (quoting *Daubert*, 509 U.S. at 589) (emphasis added). The purpose of this "gatekeeping" function is to protect juries from being exposed to misleading or unreliable scientific testimony.  *Daubert*, 509 U.S. at 592-93, 597; *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063-64 (9th Cir. 2002) ("the aura of authority experts often exude . . . can lead juries to give more weight to their testimony").

The first prong of the *Daubert* inquiry—the relevance requirement—"means that the evidence will assist the trier of fact to understand or determine a fact in

2

issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (citing *Daubert*, 509 U.S. at 591-92).  The test for relevance under Rule 702 is "higher than bare relevance." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994); *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995) ("*Daubert II*") (explaining that Rule 702's "relevance" requirement is not "merely a reiteration of the general relevancy requirement of Rule 402").  Because expert testimony can be "both powerful and quite misleading because of the difficulty in evaluating it," *Daubert*, 509 U.S. at 595, trial courts must exclude proffered expert testimony "unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Daubert II*, 43 F.3d at 1321 n.17.

The second prong of the *Daubert* inquiry—the reliability requirement—focuses on the expert's "principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594-95.  Before admitting proffered expert testimony, "the court must assure that the [expert's] methods are adequately explained." *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002) (citing *Daubert II*, 43 F.3d at 1319).  "[A]*ny* step that renders the analysis unreliable . . . renders the expert's testimony inadmissible.  This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *In re Paoli*, 35 F.3d at 745; *see also Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1422-23 (9th Cir. 1998) (experts were properly excluded when their opinions represented unsupported and untested conclusions).

As the proponent of Wunderlich's testimony, Ironhawk bears the burden of proof of showing that both prongs of the *Daubert* inquiry are satisfied. *Daubert II*, 43 F.3d at 1315, 1316, 1318 n.10.  Ironhawk cannot meet its burden with respect to either prong.

## III. ARGUMENT

### A. Wunderlich's Opinions as to Reasonable Royalty Damages Should Be Excluded Because Reasonable Royalty Damages Are Not Available in This Trademark Infringement Action and Even If They Were, His Approach Is Too Speculative

Section 35 of the Lanham Act, which provides the measure of damages in trademark actions, states:

> [T]he plaintiff shall be entitled . . . to recover (1) the defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. . . .  In assessing profits, the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.

15 U.S.C. § 1117(a).

For Ironhawk's claim of damages, Wunderlich offers an opinion that a reasonable royalty rate should be applied to Dropbox's revenues from the sale of certain products.  Wunderlich is wrong.  Indeed, Wunderlich tried offering similar testimony in *Neurovision Medical Products, Inc. v. Nuvasive, Inc.*, Case No. 09-cv-6988 R (JEMx) (C.D. Cal.), a trademark infringement action, and was precluded from offering most of his testimony, including his testimony "as to a theory of damages based on a 'hypothetical' or 'reasonable' royalty."  (Declaration of Nicholas E. Ham in Support of Dropbox's Motion to Preclude Testimony from Plaintiff's Expert Witness Robert Wunderlich ("Ham Decl.") Ex. 1.)  History should repeat itself here.

There is no provision in the Lanham Act referring to a reasonable royalty as an appropriate measure of damages.  Courts within the Ninth Circuit have rejected the use of reasonable royalties in trademark actions except where the loss of a royalty *constitutes actual damages*, i.e., where the plaintiff is in the business of licensing its marks, and an appropriate royalty rate has been established by prior trademark licenses.  *See, e.g., Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1300 (S.D. Cal. 2018) ("[R]oyalties generally require that the parties have

4

shown a willingness to license the mark. 'Where a plaintiff has failed to present evidence of an intent to license its trademark, a reasonable royalty analysis necessarily is speculative,' and there is an insufficient basis on which to calculate reasonable royalty damages." (citation omitted)). This is because "[t]rademark remedies are guided by tort law principles," and "damages which result from a tort must be established with *reasonable certainty*." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407-08 (9th Cir. 1993) (emphasis added). "There is no question that an award of reasonable royalty, lacking any previous negotiations among the parties, 'rests on a legal fiction.'" *Trovan, Ltd. v. Pfizer, Inc.*, No, CV-98-00094 LGB MCX, 2000 WL 709149, at *18 (C.D. Cal. May 24, 2000) (quoting *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1159 (6th Cir. 1978), and vacating the jury's reasonable royalty award as having "no basis in reality, much less any basis in fact"); *see also Marketquest*, 316 F. Supp. 3d at 1301 (no evidence to establish a reasonable royalty "and any attempt to discern one is completely speculative"). Here, there is no evidence that Ironhawk ███████████ ███████████████████ (Ham Decl. Ex. 2 at 26:16-18 (Q. ███ ███████████████████████████████████████████████████ ██████████████████)) ██████████████████████████████████, Wunderlich has no established royalty rate to determine a reasonably royalty for his damages calculation. Instead, Wunderlich selected a random handful of publicly-available trademark agreements between third parties to serve as "comparison agreements" for determining the royalty rate to be applied under his reasonable royalty theory. As discussed in Section B.2, infra, these agreements bear no relationship to a hypothetical license in this case. Ignoring this, and with essentially no analysis, Wunderlich relies on these agreements to conclude that a royalty rate of 1%-2% is reasonable.

This case precisely illustrates why a reasonable royalty measure of damages

is inappropriate where there is no history of licensing the trademark: because Wunderlich's royalty rate determination—which is based upon agreements involving completely different trademarks and companies—"has no basis in reality, much less any basis in fact," and "cannot be said to have been made 'with reasonable certainty.'"  *Trovan*, 2000 WL 709149, at *18 (quoting *Sanchez-Corea v. Bank of Am.*, 38 Cal. 3d 892, 907 (1985)).

Dropbox respectfully submits that Wunderlich should not be permitted to opine on a reasonable royalty as damages for infringement of Ironhawk's asserted mark.  Fed. R. Evid. 702 (expert's specialized knowledge must "help the trier of fact . . . to determine a fact in issue").

### B.   Wunderlich's Opinion as to Reasonable Royalty Damages Should Also Be Excluded Because Wunderlich Did Not Base His Opinion on Principles and Methods that Were Reliably Applied to Sufficient Facts and Data

Wunderlich's reliance on a damages theory which, as a matter of law, is unavailable in a trademark action like this one, is reason enough to preclude his testimony at trial.  *Daubert II*, 43 F.3d at 1321 n.17.  But here, Wunderlich's hypothetical reasonable royalty opinions are also inadmissible because Wunderlich's calculations were not based upon principles and methods reliably applied to the facts of this case, and were not based upon sufficient facts and data. Fed. R. Evid. 702.

There are at least *five* examples of why Wunderlich's hypothetical reasonable royalty model is fatally flawed.  These flaws show "there is simply too great an analytical gap between the data and the opinion proffered," and that Wunderlich's opinion is "connected to [the] existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *cf. In re Paoli*, 35 F.3d at 745 ("*any* step that renders the analysis unreliable . . . renders the expert's testimony inadmissible").

6

1.   ***Wunderlich's "royalty rate based on hypothetical negotiations" analysis does not support any royalty rate.***

Even assuming that the parties would have been willing to negotiate, Wunderlich still does not provide any factual or economic basis for his 1-2% royalty rate.  Wunderlich purports to evaluate "the negotiations from the perspectives of both parties," but does not provide any analysis into the calculation of a 1-2% royalty rate.  (Ham Decl. Ex. 3 at 15.)  Wunderlich opines that "Ironhawk had invested significant effort over several years to develop and sell its SmartSync product."  (*Id.*)  But he does not explain how much Ironhawk invested, or how this factors in to his 1-2% royalty rate.  Wunderlich then states that Dropbox's ███████████████████████████████████████ ██████  (*Id.*)  Again, he does not quantify this effort or explain why it leads to a 1-2% royalty rate.

The only reason that Wunderlich provides to support his choice of a 1-2% royalty rate is that "Dropbox would earn significant gross profits, easily enabling Dropbox to pay a royalty of 1% - 2% of sales."  (*Id.* at 15, 17.)  Affordability is not the standard.  Wunderlich fails to provide any scientific support for his conclusion that Dropbox and Ironhawk would have agreed to a 1-2% royalty rate "based on hypothetical negotiations."

2.   ***Wunderlich's "comparison agreements" are not at all comparable.***

Purporting to do the same kind of work as a professional appraiser—which he is not, nor is he qualified to be—Wunderlich selected 15 "comparison agreements" from "surveys of trademark royalty rates," RoyaltySource, ktMine, and "reviews of SEC filings" to serve as his benchmarks for the hypothetical royalty that Dropbox and Ironhawk would have agreed upon in January 2017. (Ham Decl. Ex. 3 at 18-19.)  Without explaining why, he omits discussion of five of these agreements, which he characterizes as "related party transactions."  The

7

entirety of Wunderlich's analysis and conclusion regarding the remaining agreements is stated in two sentences in his report:

> The ten agreements reflecting third-party transactions indicated royalty rates ranging from 1% to 20% of sales, with an overall average of 6.3%. The higher values would correspond to situations in which the mark or name would have significant good will associated with it.

(*Id*. at 19.)  There is no calculation, no adjustment, and no effort to compare the economic terms.  Wunderlich does not even explain why he believes these "comparison agreements" confirm his purported reasonable royalty rate of 1%-2%.

Wunderlich's 10 "comparison agreements" are not at all analogous to the trademark at issue in this case.  For example, they include trademark licenses for the use of famous marks such as Cingular, AT&T, Xbox, and Harvard.  (*Id*. at Schedule E1.)  These are all wildly successful names in very different market segments—cellular service, videogames, and higher education.  Licenses to these famous marks are not at all comparable to a hypothetical license for the SMARTSYNC mark, negotiated in 2017, when Ironhawk ███████████████ ███████████████████████████████████████████████ █████████████████████████████████████ (Ham Decl. Ex. 4.)  Wunderlich ignores these details.

Of the 10 "third-party transactions" that Wunderlich relies on, three are not agreements or transactions at all.  Instead, they are high-level ranges of royalties for broad industry categories, including "Software Programs," "Trademarks/Brands," and "Video Games/Software."  (Ham Decl. Ex. 3 at Schedule E1.)  Wunderlich does not describe these in any detail in his report other than to say they "are derived from surveys of trademark royalty rates published in *Licensing Royalty Rates*, 2018

---

[1] "Middleware" is software in which the customer does not see the software or the mark.  Ham Decl., Ex. 7 at 11:20-12:9, 201:12-202:17.

DROPBOX, INC.'S MPA ISO MOTION TO PRECLUDE WUNDERLICH TESTIMONY

pa-1898721

Edition and *The Licensing Letter Royalty Trends 2018 Report*." (*Id.* at 18.)  A closer look at the source materials reveals that the results are not based on actual transactions. (Ham Decl. Ex. 5 at 5, 18; Ex. 6 at 5-6.)  Instead, these broad royalty ranges are the results of survey questionnaires sent to executives and industry experts. (*Id.*)  There is no supporting data about the actual royalties reviewed (if any), what companies were considered, or any information about how the figures were quantified. (*Id.*)  The little information that is provided shows that they involve companies and industries completely unrelated to Dropbox and Ironhawk. For example, the "representative properties" in the "Trademarks and Brands" category include the likes of Cadillac, Coca-Cola, McDonalds, and ESPN. (Ham Decl. Ex. 5 at 58-59.)  And the "Video games/software/interactive" category includes unrelated products such as interactive games, arcade games, casino games, electronic games, and pinball games. (*Id.* at 61.)  The "black box" nature of the surveys makes it impossible to reliably perform an economic comparison to a hypothetical agreement between Dropbox and Ironhawk. *See Multimedia Patent Tr. v. Apple Inc.*, No. 10-CV-2618-H (KSC), 2012 WL 5873711, at *9 (S.D. Cal. Nov. 20, 2012) (excluding expert testimony on industry surveys because "generic industry data is not tethered to the relevant facts and circumstances of the present case").

Four of Wunderlich's "third-party transactions" should have been categorized as "related party transactions," and therefore, should not have been considered under Wunderlich's own analysis[2]—a fact he admitted multiple times in his deposition. (*E.g.*, Ham Decl. Ex. 2 at 159:10-14 (Q. Do you still consider the AT&T and Kiri agreement to be a third-party transaction?  A. I would look into that more. It's possible it should be put into the related-party transaction category.);

---

[2] Presumably, because related party transactions cannot be characterized as negotiated at arm's length, though Wunderlich fails to elucidate this logic.

9

1   160:20-161:5 (Q. Do you still consider the Cingular-Salmon agreement to be a

2   third-party transaction?  A. I -- I -- I think that one's a little bit mixed because

3   Cingular actually does not have control over Salmon. But I -- I -- I could see the

4   argument for saying that it's a related-party transaction.  Q. Well, what's your view

5   in terms of whether it's a related-party transaction?  A. I think you put it altogether,

6   it probably is in the related-party bucket."))  Moreover, the two "transactions"

7   involving United Online—one with Classmates Online, Inc. and one with FTD

8   Group Inc.—are fundamentally different from a hypothetical negotiation because in

9   neither of those instances there was there an arms-length agreement for a trademark

10  license.  Instead, United Online acquired these two companies and performed an

11  accounting allocation for the trademarks as a portion of the total purchase price.

12  (Ham Decl. Ex. 8 at 48; Ex. 9 at F-17 – F-18.)[3]  The Cingular Wireless/Salmon

13  PCS and AT&T/Kiri "third-party transactions" suffer from a similar problem.  As

14  of September 2001, Cingular owns 85% of Salmon and recognizes Salmon's losses

15  on its consolidated financial statements.  (Ham Decl. Ex. 10 at 75.)  Similarly,

16  AT&T entered into the license agreement with Kiri upon consummation of a

17  merger in which AT&T owned 60% of Kiri's common stock.  (Ham Decl. Ex. 11 at

18  3, 23; Ex. 12 at 185.)  These four "transactions" are not comparable to an arms-

19  length agreement between Ironhawk and Dropbox.

20          The final three "third-party transactions" that Wunderlich relies on are not

21  comparable at all.  The Microsoft/Activision agreement relates to the gaming

22  industry, in which Microsoft licensed the Xbox name to Activision in connection

23  with Activision's development of video games.  (Ham Decl. Ex. 13 at 1-2.)

24  Activision derives a substantial portion of its revenues from sales of video games

25  on consoles manufactured by third parties like Microsoft's Xbox.  (Ham Decl. Ex.

26  _____

27      [3] Furthermore, Classmates Online and FTD Group were in different
    industries than Dropbox and Ironhawk (social media and floral products,
    respectively).

28

14 at 15.)  Wunderlich makes no effort to compare the strength of the Xbox brand
to the SMARTSYNC mark, and does not consider the relationship between
Microsoft and Activision.  (Ham Decl. Ex. 2 at 162:8-20.)  The Bethesda/Interplay
agreement also relates to the gaming industry.  Bethesda and Interplay had an
established licensing relationship in which Interplay originally licensed the
FALLOUT trademark to Bethesda to produce the FALLOUT series video games.
(Ham Decl. Ex. 15 at 1.)  After Interplay filed for bankruptcy in 2006, Bethesda
acquired the rights to the name and subsequently licensed the trademark back to
Interplay.  (Ham Decl. Ex. 16 at 1.)  Once again, Wunderlich does not take this past
relationship into account.  (Ham Decl. Ex. 2 at 162:21-163:8.)  The final agreement
presented by Wunderlich is a 2002 license agreement between Harvard College and
Serif Holdings, in which Serif licensed the HARVARD mark to use in connection
with its graphics presentation software products.  (Ham Decl. Ex. 17 at 18-28
(Exhibit B: Trademark License Agreement).)  Wunderlich made no effort to
distinguish the very strong HARVARD mark to Ironhawk's weak SMARTSYNC
mark, nor did he analyze the difference in entities (private nonprofit university) or
industry (graphics presentation software).  (Ham Ex. 2 at 163:9-164:13.)  Even in
patent cases where a reasonable royalty is standard, plaintiffs cannot rely on
methodologies that fail to "differentiate between different industries, technologies,
or parties." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1332 (Fed. Cir. 2014).

Wunderlich attempts to shroud his 1% - 2% hypothetical royalty with the
appearance of modesty by arguing that it is "near the bottom of the overall range"
of the royalty rates for the 10 "comparison agreements."  (Ham Ex. 2 at 188:11-22.)
But this argument ignores whether the 10 transactions are properly considered as
benchmarks *at all*.  Wunderlich's analytical gap is too great, and his purported
explanation betrays his unreliable methodology.

DROPBOX, INC.'S MPA ISO MOTION TO PRECLUDE WUNDERLICH TESTIMONY

pa-1898721

### 3. *Wunderlich ignores the most comparable trademark transaction.*

Wunderlich acknowledges that Dropbox has previously executed a trademark agreement with a company called Officeware.  (Ham Decl. Ex. 3 at 16.)  But he includes this fact to demonstrate that Dropbox "is willing to pay a royalty to secure its rights to a mark that it desires."  (*Id.*)  Wunderlich limits his discussion of the Dropbox/Officeware agreement to identifying the underlying litigation and describing the basic nature of the agreement, including that Dropbox wanted to acquire all rights and interests, including ownership, in the DROPBOX mark.  (*Id.*)  Wunderlich notes that Officeware agreed to stop using the DROPBOX mark in exchange for "a one-time payment of a redacted amount."  (*Id.*)  Wunderlich provides no further analysis of the agreement.

While Wunderlich failed to disclose the consideration paid by Dropbox, public documents indicate that Dropbox paid $950,000 for rights and ownership to the DROPBOX mark from Officeware.  (Ham Decl. Ex. 18 at 4.)  In exchange for its payment, Officeware assigned and transferred all rights to the DROPBOX mark, DROPBOX design, Officeware Design, Officeware Application, and agreed to permanently stop using the DROPBOX mark and designs it transferred to Dropbox.  (*Id.*)

The Dropbox/Officeware agreement is the most comparable trademark transaction to establish a hypothetical royalty Dropbox would pay for the SMARTSYNC mark for at least four reasons: (1) Dropbox is the assignee, (2) Officeware provided similar services and of similar scale as Ironhawk would have, (3) the agreement occurred in April 2013, less than four years prior to the hypothetical negotiation, and (4) the agreement is an actual arms-length transaction. Wunderlich's failure to consider the only arguably comparable agreement in evidence is a result of his cherry-picking of data points to justify a grossly disproportionate damages claim.

12

### 4.  *Wunderlich's criteria for selecting his "comparison agreements" are arbitrary.*

Wunderlich selected his 15 "comparison agreements" after initially searching for licensing agreements in the "software, data storage or sharing, and on-line data access/services" industries and coming up with 90 records.  From these 90 records, Wunderlich purportedly selected agreements that involved licensing the trademark and/or names *only*, and purportedly "excluded agreements in which the agreement also gave rights to use technology, to use patents, to sell the licensor's products, or provided rights that went beyond the use of a trademark, name, or image."  (Ham Decl. Ex. 3 at 18.)

Wunderlich's decision to exclude prior license agreements on this basis but not on others was arbitrary.  For example, he failed to exclude agreements where the licensor had previously licensed the trademark (Ham Ex. 2 at 143:12-14) although this would have been a step in the right direction in finding comparable licensing agreements, as ███████████████████████████████████ ████████████████████████ at the time of the hypothetical negotiation outlined in Wunderlich's report.  He also failed to exclude agreements where the licensor and licensee had a previous or current business relationship.  This also would have been appropriate given that Ironhawk and Dropbox have never conducted any business in the past.

Moreover, Wunderlich did not even consistently apply his purported criteria for selecting the benchmark agreements.  He claims that he limited his selection to agreements that involved only trademarks, but several of Wunderlich's "comparison agreements" went beyond a simple license for trademarks.  For example, the Microsoft/Activision agreement is a publisher license agreement that allows Activision to make games for the Xbox.  (Ham Decl. Ex. 13 at 1-2.)  A license to use the XBOX mark is only one piece of the agreement, and the $7 per unit royalty that Wunderlich relies on is not just for the trademark use.  (*Id.* at 4-6,

13

8-9.)  Wunderlich also claims that he excluded agreements "that did not pertain to related product areas," (Ham Decl. Ex. 3 at 18), yet as explained above, Wunderlich cannot show that any of his purported "comparison agreements" relate to Dropbox's or Ironhawk's products.  Wunderlich also considered as comparable any "industry areas that are relatively similar, having to do with online sales, having to do with Internet, having to do with software."  (Ham Ex. 2 at 144:10-19.)  Such lax requirements for comparison make his results meaningless.  Finally, Wunderlich admitted that certain comparison marks were stronger than the Ironhawk mark (*id*. at 176:9-19), which makes even a 1% royalty rate excessive.

### 5.     *Wunderlich concedes his approach supports a wide range of hypothetical royalties.*

In his report, Wunderlich opines that a reasonable royalty would be "in the range of $⬛ per user per year of Dropbox's Smart Sync," which he says is "approximately equivalent to a royalty of 1% - 2%."  (Ham Decl. Ex. 3 at 13.) At his deposition, Wunderlich conceded his analysis would support a "reasonable range" of royalty rates, and that there would even be an "imprecise boundary" outside this range.  (Ham Ex. 2 at 188:11-189:8.)  While this range might appear small, Wunderlich's own testimony concedes that the difference within this range is nearly $⬛.  (Ham Decl. Ex. 3 at 13; Ex. 2 at 129:19-25.)  Although an expert is not required to opine on damages with laser-like precision, Wunderlich admits that his purported methodology could support damages that would vary drastically from $⬛ million.  His damages calculation therefore "cannot be said to have been made 'with reasonable certainty.'"  *Trovan*, 2000 WL 709149, at *18 (quoting *Sanchez-Corea*, 38 Cal. 3d at 907).

*        *        *

These five fatal flaws are only a few striking examples of why Wunderlich has failed to apply any reliable methodology reliably to the facts of this case—in fact, he merely pulled numbers out of the air.  Accordingly, his reasonable royalty

14

1    opinions should be excluded.  FED. R. EVID. 702.

2        **C.    Wunderlich's Opinion as to Disgorgement of Dropbox's**
         **Profits Should Also Be Excluded Because Wunderlich Did**
3        **Not Base His Opinion on Principles and Methods that Were**
         **Reliably Applied to Sufficient Facts and Data**
4

5        Wunderlich's opinion as to disgorgement is also inadmissible because his

6    calculations were not based upon principles and methods reliably applied to the

7    facts of this case and were not based upon sufficient facts and data.  Fed. R.

8    Evid. 702.  Wunderlich's disgorgement calculations are flawed in at least ***five ways,***

9    making his entire analysis on this issue unreliable.  *See Joiner*, 522 U.S. at 146.

10           **1.    *Wunderlich's calculations erroneously include revenues***
                  ***from Dropbox customers who never used the Dropbox***
11                ***Smart Sync feature.***

12       Logically, Dropbox would not have benefitted from alleged infringement if

13   users did not use the Smart Sync feature.  Yet Wunderlich's calculations rely on

14   revenue from all Dropbox Business and Professional users—including those that

15   *never used or even activated Smart Sync*.  (*See* Ham Decl. Ex. 3 at Schedule C1.)

16   Up until approximately April 2018, Smart Sync was not offered to all Business

17   customers.  (Declaration of Patrick Kennedy in Support of Dropbox's Motion to

18   Preclude Testimony from Plaintiff's Expert Witness Robert Wunderlich ("Kennedy

19   Decl.") ¶ 4; Exs. B and C.)  Instead, Business users had to activate Dropbox Smart

20   Sync under the Early Access Program.  However, during the period leading up to

21   April 2018, Wunderlich includes profits associated with one hundred percent of

22   Dropbox's Business Standard and Business Advanced users.  (*See* Ham Decl. Ex. 3

23   at Schedules A2, C1.)  It is unreasonable to assume Dropbox financially benefited

24   from alleged use of the SMARTSYNC mark for these Business users that did not

25   activate or use the Dropbox Smart Sync feature.  After April 2018, Dropbox Smart

26   Sync was automatically activated in Dropbox Business accounts.  (Kennedy Decl. ¶

27   4; Ex. C.)  Logically, any increase in usage of Smart Sync after that time could be

28   fairly attributable to its wider access, and not to use of the SMARTSYNC mark.

Yet, Wunderlich also fails to account for this potential in his calculations; he admits that he was not even aware of it when he wrote his report.  (Ham Ex. 2 at 97:25-98:5.)  His revenue calculations are therefore based on insufficient facts and data.  *See Lindy Pen*, 982 F.2d at 1407 (Infringement damages are "measured by any direct injury which a plaintiff can prove.").

### 2. *Wunderlich fails to use a reliable methodology to calculate revenue attributable to Smart Sync.*

Wunderlich attributes incremental revenue of $▮ per user per month to Smart Sync, for both Professional and Business users.   (Ham Decl. Ex. 3 at 3, 20.) Wunderlich arrives at this figure by attributing 15 percent of the price premium between Dropbox's Plus and Professional individual plans to Dropbox Smart Sync. (*Id*.)  Wunderlich provides no analysis and presents no proven methodology to demonstrate how he arrived at his 15 percent apportionment figure.  (*Id*.; Ham Ex. 2 190:4-191:18.)  Instead, he bases his calculation on nebulous factors like "the prominence that Dropbox gives to Smart Sync" and testimony that Smart Sync is "designed to attract users."  (Ham Decl. Ex. 3 at 20.)  It is also unreasonable to attribute the same value of incremental revenue to both Dropbox Professional and Dropbox Business users, given that Professional users paid a premium for access to additional features like Smart Sync, while Business users received it with their plan. *See Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 518 (9th Cir. 1985) ("When an infringer's profits are attributable to factors in addition to use of plaintiff's work, an apportionment of profits is proper.").  In short, this amorphous, unscientific approach does not constitute a reliable methodology for determining the amount of incremental revue that is attributable to Smart Sync, nor do these nebulous factors constitute sufficient facts or data.  *Id.*

### 3. *Wunderlich's profit analysis fails to account for all deductible expenses.*

Wunderlich only deducted the direct costs of goods sold from his

16

apportioned revenue figures. (Ham Decl. Ex. 3 at 21.)  He did not account for any
additional costs incurred in producing, distributing and selling Smart Sync, such as
research and development costs or marketing costs.  It is unreasonable to believe
Dropbox incurred none of these expenses in bringing Smart Sync to its customers,
and any calculation that ignores these costs is flawed.  *See Winterland Concessions
Co. v. Fenton*, 835 F. Supp. 529, 533 (N.D. Cal. 1993) (In calculating profit, a
defendant may deduct overhead expenses incurred "in the production, distribution,
or sale of the infringing product." (citation omitted)).

### 4.    *Wunderlich's calculation of Dropbox's disgorgable profits is grossly disproportionate to Ironhawk's circumstances.*

Wunderlich concludes that Ironhawk should receive $███ million of
Dropbox's profits (Ham Decl. Ex. 3 at 20).  This award would be grossly
disproportionate to Ironhawk's circumstances:  the amount is ***more than*** ███
████████████████████████████████████████ profit Ironwork made during the
alleged infringement period.  (Kennedy Decl. ¶ 8; Exs. E and F.)  The Lanham Act
specifically provides that the sum to be recovered by the plaintiff "shall constitute
compensation and not a penalty."  15 U.S.C. § 1117(a).  Such a disproportionate
award cannot reasonably be considered simple "compensation" to Ironhawk.  *See
Spin Master, Ltd. v. Zobmondo Entm't*, LLC, 944 F. Supp. 2d 830, 848 (C.D. Cal.
2012) (holding that the Lanham Act prohibits disgorgement where it would act as
"a penalty to the infringer and a windfall to the trademark holder").

### 5.    *Wunderlich's calculations erroneously include revenues from Dropbox users who were customers before Smart Sync existed.*

By calculating revenue based on total number of Dropbox Business users,
Wunderlich's analysis assumes one can fairly attribute revenue from all of
Dropbox's Business customers to the use of the SMARTSYNC mark.  (*See* Ham
Decl. Ex. 3 at Schedule C1.)  At the time of the first alleged infringement, however,
Dropbox already had over ██████████████████ customers.  (Kennedy Decl.

¶ 9, Ex. G.)  Clearly, those customers were not enticed to use Dropbox Business because of Smart Sync.  Astonishingly, Wunderlich admits that he was not even *aware* of that Smart Sync was unavailable to Dropbox Business customers at that point.  (Ham Ex. 2 at 97:21-24.)  Further, Wunderlich has not been able to identify any evidence indicating Dropbox Smart Sync improved Dropbox's retention rate of its Business customers.  (*Id*. at 100:20-101:2.)  It is therefore erroneous to assume that Dropbox benefited in any way from the SMARTSYNC mark for those customers that it had acquired prior to the release of Dropbox Smart Sync in late January 2017.  *See Toyo Tire & Rubber Co. v. Hong Kong Tri-Ace Tire Co.*, 281 F. Supp. 3d 967, 991 (C.D. Cal. 2017) ("To establish the amount of the defendant's profits to be disgorged, '[t]he trademark holder has the burden to prove the defendant infringer's gross revenue *from the infringement*.'" (emphasis added, citation omitted)).  Wunderlich's calculation is not supportable.

## IV.   CONCLUSION

For the foregoing reasons, the Court should preclude Wunderlich from testifying at trial.


Dated:   June 17, 2019

JENNIFER LEE TAYLOR
WENDY J. RAY
NICHOLAS E. HAM
MORRISON & FOERSTER LLP

By:   */s/ Wendy J. Ray*
Wendy J. Ray

Attorneys for Defendant
DROPBOX, INC.