JENNIFER LEE TAYLOR (CA SBN 161368)
JTaylor@mofo.com
Morrison & Foerster LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  415.268.7000
Facsimile:  415.268.7522

WENDY J. RAY (CA SBN 226269)
WRay@mofo.com
Morrison & Foerster LLP
707 Wilshire Boulevard
Los Angeles, California  90017-3543
Telephone:  213.892.5200
Facsimile:   213.892.5454

NICHOLAS E. HAM (CA SBN 294596)
NHam@mofo.com
Morrison & Foerster LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone: 650.813.5600
Facsimile: 650.494.0792

Attorneys for Defendant
DROPBOX, INC.

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IRONHAWK TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> DROPBOX, INC., <br><br> Defendant. | Case No. 2:18-cv-01481 DDP (JEMx) <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DROPBOX, INC.'S MOTION FOR SUMMARY JUDGMENT** <br><br> Hearing Date:  July 15, 2019 <br> Hearing Time:  10:00 a.m. <br> Courtroom:  9C <br><br> Trial Date: September 10, 2019 <br> Pre-Trial Conference: August 12, 2019 <br><br> Hon. Dean D. Pregerson |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................... 1

II.   STATEMENT OF FACTS ................................................................ 1

    A.    Dropbox's Business ............................................................... 1

    B.    The Dropbox Smart Sync Feature ......................................... 2

    C.    The Smart Sync Name ........................................................... 2

    D.    Plaintiff Ironhawk ................................................................. 3

    E.    Dropbox Had No Knowledge of Ironhawk's SMARTSYNC ............. 5

III.  LEGAL STANDARD ....................................................................... 7

    A.    Summary Judgment Under Rule 56(a) .................................. 7

    B.    Likelihood of Confusion ....................................................... 7

IV.  ARGUMENT .................................................................................... 8

    A.    No Genuine Dispute Exists as to Likelihood of Confusion ................. 9

        1.    Ironhawk's SMARTSYNC Mark Is Weak and Entitled to Only a Narrow Scope of Protection ................................ 9

        2.    Dropbox's Products Are Not Related to Ironhawk's ............... 12

        3.    The Parties' Respective Uses Are Not Similar When Viewed As a Whole ........................................................ 14

        4.    There Is No Actual Confusion ............................................ 16

        5.    The Parties Have Disparate Marketing Channels ...................... 17

        6.    Both Parties' Customers Are Highly Sophisticated ................. 18

        7.    Dropbox Did Not Intend to Infringe Ironhawk's Mark ............ 19

        8.    There Is No Evidence that Either Party Will Expand Its Products to Compete with Each Other ............................... 20

    B.    Dropbox Did Not Willfully Infringe Plaintiff's Mark .......... 21

    C.    Ironhawk Is Not Entitled to Disgorge Dropbox' Profits ............. 24

V.   CONCLUSION ............................................................................... 25

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AAA of N. Cal. v. GM LLC*,
  367 F. Supp. 3d 1072 (N.D. Cal. 2019)..........................................................21, 25

*AMF Inc. v. Sleekcraft Boats*,
  599 F.2d 341 (9th Cir. 1979) .............................................................................*passim*

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ....................................................................................................7

*Aurora World, Inc. v. TY Inc.*,
  719 F. Supp. 2d 1115 (C.D. Cal. 2009)......................................................................7

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,
  174 F.3d 1036 (9th Cir. 1999) ..................................................................................10

*Cairns v. Franklin Mint Co.*,
  24 F. Supp. 2d 1013 (C.D. Cal. 1998),
  *aff'd*, 216 F.3d 1082 (9th Cir. 1999) .......................................................................16

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ....................................................................................................7

*Coachella Music Festival, LLC v. Simms*,
  2017 WL 6888716 (C.D. Cal. Oct. 10, 2017) .........................................................23

*Cohn v. Petsmart, Inc.*,
  281 F.3d 837 (9th Cir. 2002) ....................................................................................16

*Dreamwerks Prod. Grp., Inc. v. SKG Studio*,
  142 F.3d 1127 (9th Cir. 1998).............................................................................8, 16

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
  967 F.2d 1280 (9th Cir. 1992)..................................................................................14

*Echo Drain v. Newsted*,
  307 F. Supp. 2d 1116 (C.D. Cal. 2003)..........................................................7, 17 n.9

pa-1894717

*Elec. Design & Sales, Inc. v. Elec. Data Sys. Corp.*,
    954 F.2d 713 (Fed. Cir. 1992) ........................................................................ 18

*Entrepreneur Media, Inc. v. Smith*,
    279 F.3d 1135 (9th Cir 2002) ................................................................ 11, 12

*Glow Indus., Inc. v. Lopez*,
    252 F. Supp. 2d 962 (C.D. Cal. 2002) ........................................................ 10

*Hanginout, Inc. v. Google, Inc.*,
    54 F. Supp. 3d 1109 (S.D. Cal. 2014) ........................................................ 13

*Hero Nutritionals LLC v. Nutraceutical Corp.*,
    2013 WL 4480674 (C.D. Cal. Aug. 16, 2013) ........................................... 10

*Hydramedia Corp. v. Hydra Media Grp. Inc.*,
    392 F. App'x 522 (9th Cir. 2010) .................................................. 21, 23, 24

*Instant Media, Inc. v. Microsoft Corp.*,
    2007 WL 2318948 (N.D. Cal. Aug. 13, 2007) ........................................... 10

*Kern v. Mindsource, Inc.*,
    2000 WL 692199 (9th Cir. May 30, 2000) ................................................. 24

*Lindy Pen Co. v. Bic Pen Corp.*,
    725 F.2d 1240 (9th Cir. 1984) ..................................................................... 14

*Lindy Pen Co. v. Bic Pen Corp.*,
    982 F.2d 1400 (9th Cir. 1993) ....................................................... 21, 23, 24

*M2 Software, Inc. v. M2 Commc'ns, Inc.*,
    450 F.3d 1378 (Fed. Cir. 2006) .................................................................. 13

*M2 Software v. Madacy Entm't*,
    421 F.3d 1073 (9th Cir. 2005) ..................................................................... 20

*Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*,
    290 F. Supp. 2d 1083 (C.D. Cal. 2003),
    *aff'd*, 120 F. App'x 30 (9th Cir. 2005) ....................................... 20, 23 n.12

*Mattel, Inc. v. MCA Records, Inc.*,
    28 F. Supp. 2d 1120 (C.D. Cal. 1998),
    *aff'd*, 296 F.3d 894 (9th Cir. 2002) ........................................................ 17 n.9

*Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*,
856 F.2d 1445 (9th Cir. 1988) ...................................................................... 11, 12

*Multi Time Mach., Inc. v. Amazon.com, Inc.*,
804 F.3d 930 (9th Cir. 2015) ............................................................................ 19

*Network Automation, Inc. v. Hewlett-Packard Co.*,
2009 WL 5908719 (C.D. Cal. Sept. 14, 2009)................................................. 15

*Novadaq Techs., Inc. v. Karl Storz GmbH & Co. K.G.*,
2015 WL 9028123 (N.D. Cal. Dec. 16, 2015) .................................................. 25

*Oculu, LLC v. Oculus VR, Inc.*,
2015 WL 3619204 (C.D. Cal. June 8, 2015)..................................................... 19

*One Indus., LLC v. Jim O'Neal Distrib.*,
578 F.3d 1154 (9th Cir. 2009) .......................................................................... 19

*Poquito Mas Licensing Corp. v. Taco Bell Corp.*,
2014 WL 12772086 (C.D. Cal. Dec. 4, 2014) ............................................ 24 n.13

*Rearden LLC v. Rearden Commerce, Inc.*,
683 F.3d 1190 (9th Cir. 2012)........................................................................ 7 n.6

*Reeves v. Gen. Nutrition Ctrs., Inc.*,
2012 U.S. Dist. LEXIS 200682 (C.D. Cal. Apr. 2, 2012)................................... 7

*Self-Realization Fellowship Church v. Ananda Church of Self-
Realization*,
59 F.3d 902 (9th Cir. 1995) .............................................................................. 17

*Spin Master, Ltd. v. Zobmondo Entm't, LLC*,
944 F. Supp. 2d 830 (C.D. Cal. 2012)............................................................... 25

*Stonefire Grill, Inc. v. FGF Brands, Inc.*,
987 F. Supp. 2d 1023 (C.D. Cal. 2013) .......................................................... 9, 10

*Surfvivor Media, Inc. v. Survivor Prods.*,
406 F.3d 625 (9th Cir. 2005) ................................................................... 8, 16, 20

*Valador, Inc. v. HTC Corp.*,
241 F. Supp. 3d 650 (E.D. Va.),
*aff'd*, 707 F. App'x 138 (4th Cir. Va. 2017) ....................................... 9, 14, 17, 18

pa-1894717

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Walter v. Mattel, Inc.*,
   210 F.3d 1108 (9th Cir. 2000) ...................................................................... 14, 17

*Walter v. Mattel, Inc.*,
   31 F. Supp. 2d 751 (C.D. Cal. 1998),
   *aff'd*, 210 F.3d 1108 (9th Cir. 2000) ...................................................................... 22

**Other Authorities**

2 *McCarthy on Trademarks and Unfair Competition* § 11.85
   (5th ed. 2019) ...................................................................... 11

Fed. R. Civ. P. 56(a) ...................................................................... 6

DROPBOX, INC.'S MPA ISO MOTION FOR SUMMARY JUDGMENT

## I.   INTRODUCTION

This trademark case lays bare Ironhawk's pattern of trying to extort windfall damages from successful businesses under the guise of consumer confusion, where the evidence is clear absolutely none exists.  Ironhawk is a struggling company that sells data compression software to a niche U.S. military market under the SMARTSYNC mark.  It is one of dozens of companies using "smart sync" for software that intelligently synchronizes data.  Dropbox is a well-known company offering cloud-based services to consumers and businesses.  It adopted the name Smart Sync for a product feature without any knowledge of Ironhawk or its mark, and precisely because of the term's descriptiveness.  In the two years Dropbox has used the name, not a single Dropbox or Ironhawk customer has been confused.

Yet, Ironhawk sued Dropbox (and Salesforce, for its own use of SmartSync), claiming Dropbox willfully infringed its SMARTSYNC mark and demanding Dropbox pay its profits.  Discovery has revealed Ironhawk's claim to be a sham.  Ironhawk adduced no evidence that consumers are likely to be confused about the source or affiliation of the companies' products, and even fabricated documentation of confusion where none exists.  An analysis of the *Sleekcraft* factors conclusively demonstrates that Ironhawk *cannot* prove likelihood of confusion.  The Court should grant summary judgment for Dropbox.  Alternatively, because Dropbox acted in good faith when selecting the Smart Sync feature name, the Court should grant summary judgment that Dropbox did not willfully infringe Ironhawk's mark and that Ironhawk may not pursue Dropbox's profits.

## II.   STATEMENT OF FACTS

### A.   Dropbox's Business

Founded in 2007, publicly-traded Dropbox, Inc. has become one of the leading innovators in the world.  (Sheehan Decl. ¶ 2.)  The company created a groundbreaking software application that enables people to store, access, modify, and share their files with ease from anywhere in the world via any of their devices.

1

1  (*Id.* ¶ 2.)  Today, the company offers a full range of cloud-based file storage,

2  synchronization, and collaboration services to over 500 million users.  (*Id.*)  Each

3  day, over a billion files are saved with the company's service.  (*Id.*)

4      Dropbox offers several subscription-based plans for individuals (Plus and

5  Professional) and businesses (Standard, Advanced, and Enterprise).  Each provides

6  powerful file management features.  (Statement of Undisputed Facts ("UF") 5.)

7  This case is about the name Dropbox chose for one of those features, Smart Sync.

8              **B.      The Dropbox Smart Sync Feature**

9      Dropbox launched the Smart Sync feature in January 2017 to help users save

10  space on their hard drives.  (UF 6.)  With Smart Sync, users can choose whether

11  files and folders are stored on their local computers or online only; files stored

12  online remain visible and accessible from the user's desktop, while taking up

13  minimal hard drive space.  (UF 8-9.)  The Smart Sync feature cannot be purchased

14  on its own.  Rather, it is only available on certain paid Dropbox subscription plans,

15  including the "Plus"[1] and "Professional" plans for individuals, and the "Business

16  Standard," "Business Advanced," and "Business Enterprise" plans for businesses.

17  (UF 12.)  The standard subscription packages including the Smart Sync feature

18  range in cost from a minimum of $120/year to as much as $240/year per user.[2]  (UF

19  14.)

20              **C.      The Smart Sync Name**

21  Dropbox originally developed its intelligent synchronization feature as part of

22  what it called "Project Infinite."  But ██████████████████████████████

23  ████████████████████████████████████████████, Dropbox sought

24  another name to describe the new feature prior to launching it.  (UF 16-17.)

25  ██████████████████████████████████████████

26

27      [1] The Smart Sync feature was added to Dropbox Plus in May 2019.  (UF 13,

28  20.)
    [2] The minimum Business package comes with three licenses.  (UF 15.)

1    ██████████████████████████████████████████████████████.

2    (UF 18-19.)  After several months of discussion, Dropbox's naming team arrived at

3    "Smart Sync" as the preferred name for the new feature because the phrase

4    immediately conveyed the feature's benefit and function.  (UF 21.)

5            Dropbox was hardly alone in its view of the descriptive nature of the Smart

6    Sync name.  Dozens of other companies use the name to refer to products or

7    services that offer intelligent synchronization.  A simple Google search today

8    reveals at least 44 other distinct users, at least 18 of which employ "smart sync" in

9    connection with data synchronization and software.  (UF 22.)  These third parties

10   include a company called SmartSync Software, which began using the name

11   SmartSync Pro for its backup and synchronization software, offered at

12   www.smartsync.com, *before* Ironhawk first used SMARTSYNC.  (UF 23.)  Others

13   include SMARTSync Data Integration Platform (iTristan Media's product for

14   syncing users' data); Smart Sync software (Micro-Star International's product for

15   wirelessly transferring and syncing data); and SmartSync Synchronization (a

16   feature of 2BrightSparks' SyncBack backup software).  (UF 24-27.)  Numerous

17   third parties have also sought to register "smart sync" at the USPTO for software-

18   related goods or services.  Forty trademark applications for "smart sync" and

19   variations thereof have been filed, eighteen of which have registered.  (UF 28.)

20   There are also thousands of registrations for software that include "smart" as a

21   prefix or "sync" in the mark.  (UF 29.)

22           Because of the many other uses of "smart sync," and because Dropbox's

23   Smart Sync feature cannot be purchased on its own, Dropbox always prominently

24   features the DROPBOX mark and logo in its marketing materials and website and

25   frequently includes the DROPBOX mark right next to "Smart Sync" when it is

26   promoting the Smart Sync feature.  (UF 30-37.)

27           **D.      Plaintiff Ironhawk**

28           One of the dozens of users of "smart sync" is Ironhawk Technologies Inc., a

                                            3

pa-1894717

1   ███████ company based in Los Angeles.  (Ray Decl. Ex. 4 at 41:8-13; UF 38.)

2   Ironhawk has sold software products called SMARTSYNC to ███████

3   ███████████████, and has registered SMARTSYNC as a mark for

4   "computer software for replicating files, the software is not field or content

5   specific."  Ironhawk's business is failing: it has ███████

6   █████████████████████ (UF 62, 64.)  Ironhawk sells each

7   license for approximately ████.  (UF 63.)

8        Unlike Dropbox, Ironhawk does not provide cloud-based software services.

9   (UF 39, 40.)  Rather, its software enables users to "distribute large amounts of data

10  in limited bandwidth environments" with a "focus on speed that enables intelligent

11  decision making in the theater of operations."  (UF 41.)  Its "one sole purpose … is

12  to efficiently … replicate and synchronize, [and] distribute all variety of data across

13  challenged networks, which include satellite networks, cellular networks, dial-ups,

14  even broadband when you may have intermittent issues."  (UF 45.)  Ironhawk's

15  software is middleware that is generally "not visible to the user."  (UF 42-43.)

16  Thus, most end users do not see the SMARTSYNC mark when using Ironhawk's

17  software.  (UF 44.)

18        Ironhawk's market is comprised ███████████

19  ████████████████████████████.  (UF 51,

20  66-72.)  Recently, its ███████████████████████.

21  (UF 51.)[3] ███████████████

22  ██████████████████ (UF 50, 61, 114.)  The certification and bidding

23  process for military applications can take years (UF 52-55), and because

24  Ironhawk's software is designed for highly specialized applications, Ironhawk

25  develops custom configurations for each customer's system.  (UF 46-48.)

26        Ironhawk does ███████████████████████

27  _____

28        [3] Since at least 2015, ████ of the revenue associated with Ironhawk's SmartSync software is associated with military customers.  (UF 49-50.)

4

pa-1894717

1   ███████████████████████ (UF 115.) ███████████████████

2   ████████████████████████████████████████████████████████

3   ████████████████████████████ (UF 66-72, 109, 182.)[4]  Beyond that,

4   it relies on ██████████████████████████████████████████

5   ████. (UF 73.)

6        **E.**    **Dropbox Had No Knowledge of Ironhawk's SMARTSYNC**

7   Given Ironhawk's very limited profile, it is unsurprising that none of the

8   people involved in Dropbox's conception of the Smart Sync name for its feature

9   had ever heard of Ironhawk, its software, or its trademark.  (UF 76-79.)  Given that

10  they knew nothing of the company or its product, they obviously had no intention

11  of profiting from Ironhawk's name recognition, if any existed.  Rather, as noted,

12  they chose the name to describe the functionality and benefit of the new feature.[5]

13  In accordance with Dropbox's standard procedures, Dropbox's naming team

14  submitted their proposed Smart Sync name for review by the company's legal team.

15  Dropbox's in-house counsel, Nina Han,████████████████████████

16  █████████████████████ (UF 88-89.) ██████████████████████

17  ██████████████████████████████████████████████████ (UF

18  90-91.) ███████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████████

21  ██████████████████████████ (UF 92, 181.)  Indeed, Dropbox

22

23      [4] Ironhawk also has a partnership with CACI, an information technology company that

24  serves the Departments of Defense and Homeland Security, but to date CACI has not successfully sold any Ironhawk software.  (UF 108-109.)

    [5] Over one year prior, and unbeknownst to the naming team, Ironhawk reached out

25  through an investment bank to Dropbox's corporate development team, hoping to generate interest in an acquisition of Ironhawk.  (UF 80.)  Thereafter, a junior member of that team had a

26  brief call with Ironhawk.  (UF 82.)  The following week, Dropbox passed on the opportunity and never discussed Ironhawk again.  (UF 83.)  None of the corporate development employees

27  discussed Ironhawk, or mentioned the SMARTSYNC name or mark to anyone on the naming team.  (UF 75-79.)  Indeed, their work was kept confidential even within Dropbox.  (UF 169-

28  170.)

5

1  lacked and continues to lack the authorization required to sell to the military.  (UF

2  93, 126-128.)  Based on her analysis, Ms. Han opined ███████████████████

3  ███████████████████████████████  (UF 94.)  Dropbox did so, and

4  announced the new feature in January 2017.

5          In the two years since it began offering the Smart Sync feature, Dropbox has

6  heard nothing from its customers suggesting the remotest possibility of confusion

7  between its feature and Ironhawk's product.  (UF 96-98.)  No one has contacted

8  Dropbox about Ironhawk's SMARTSYNC product, or informed Dropbox that they

9  mistakenly contacted Ironhawk looking for Dropbox's feature.  (UF 98-99.)

10  Indeed, there is no evidence whatsoever that any sale by, or even any inquiry to,

11  either party has ever been prompted by any confusion over the Smart Sync name.

12          Despite the total absence of confusion, on February 23, 2018, Ironhawk sued

13  Dropbox alleging that Dropbox's use of the Smart Sync name was likely to cause

14  confusion and constituted trademark infringement.  (Dkt. No. 1.)  Ironhawk

15  candidly admitted that in filing suit, it was seeking an ████████████████

16  ████████████████.  (Ray Decl. Ex. 25 at 1.)  And Dropbox was not Ironhawk's

17  only deep-pocketed target.  It filed a virtually identical lawsuit against Salesforce

18  Inc. in November 2017, which it then settled.  (Ray Decl. Ex. 45.)

19          Ironhawk has fabricated evidence in an attempt to demonstrate actual

20  confusion.  Ironhawk points to three emails to show that Ironhawk's purported

21  customers were confused by Dropbox's use of the term Smart Sync.  (UF 101.)  But

22  discovery has revealed that these allegations are demonstrably false.  The emails

23  were ghost-written by *Ironhawk's* CEO, David Gomes, who provided draft emails

24  to the alleged customers for them to send back to him.  (UF 102-105, 139-140.)

25  Moreover, the individuals who sent these emails were not even customers of

26  Ironhawk.  At least one of them is a paid *Ironhawk* sales agent, and two are

27  Ironhawk partners who do not buy software from Ironhawk.  (UF 106-107.)

28

pa-1894717

## III.   LEGAL STANDARD

### A.   Summary Judgment Under Rule 56(a)

Summary judgment is proper where the moving party can show "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party's burden is discharged once it shows that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The nonmoving party then "must make a showing sufficient to establish a genuine issue of material fact with respect to" claims on which it bears the burden. *Echo Drain v. Newsted*, 307 F. Supp. 2d 1116, 1120 (C.D. Cal. 2003).  A mere "scintilla" of evidence is insufficient to defeat a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 265 (1986).  Rather, "the nonmoving party must introduce some significant probative evidence tending to support the complaint." *Echo Drain*, 307 F. Supp. 2d at 1120-21 (citation omitted).

### B.   Likelihood of Confusion

"Summary judgment is appropriate in a trademark infringement case where the parties do not seriously dispute the underlying material facts and where the court is able to conclude as a matter of law that there is no likelihood of confusion." *Reeves v. Gen. Nutrition Ctrs., Inc.*, 2012 U.S. Dist. LEXIS 200682, at *24-25 (C.D. Cal. Apr. 2, 2012) (compiling Ninth Circuit cases).  To avoid summary judgment on its trademark infringement and unfair competition claims, Ironhawk must provide sufficient evidence that confusion is "probable, not merely possible." [6] *Aurora World, Inc. v. TY Inc.*, 719 F. Supp. 2d 1115, 1165 (C.D. Cal. 2009) (quotations and citation omitted).  The likelihood of confusion analysis considers eight factors: (1) strength of mark; (2) proximity of goods; (3) similarity of marks;

---

[6] Ironhawk asserts two claims: (1) Lanham Act trademark infringement, and (2) common law unfair competition.  (Dkt. No. 1 at ¶¶ 36-46.)  Both rely on the likelihood of confusion standard.  *See Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1221 (9th Cir. 2012).

pa-1894717

1   (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods

2   and degree of care likely to be exercised by purchaser; (7) defendant's intent; and

3   (8) likelihood of expansion of product lines.  *See AMF Inc. v. Sleekcraft Boats*, 599

4   F.2d 341, 348-49 (9th Cir. 1979).  "The factors should not be rigidly weighed," but

5   are instead meant to "guide the court" in assessing the likelihood of confusion.

6   *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998)

7   (citation omitted).

8           Ironhawk's complaint fails to specify whether it is asserting forward or

9   reverse confusion; however, summary judgment is warranted under either theory.

10  "Forward confusion occurs when consumers believe that goods bearing the junior

11  mark came from, or were sponsored by, the senior mark holder." *Surfvivor Media,*

12  *Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005).  "By contrast, reverse

13  confusion occurs when consumers dealing with the senior mark holder believe that

14  they are doing business with the junior one." *Id*.  To overcome summary judgment,

15  Ironhawk must therefore raise a material issue of fact regarding whether Dropbox's

16  consumers likely think Ironhawk is the source or sponsor of Dropbox's Smart Sync

17  feature, or whether Ironhawk's consumers likely think Dropbox is the source or

18  sponsor of Ironhawk's SMARTSYNC software. *Id*.  It can do neither.

19      **IV.   ARGUMENT**

20          The Court should grant summary judgment of non-infringement as there is

21  no genuine dispute that Dropbox's use of "Smart Sync" creates no likelihood of

22  confusion among either Dropbox's or Ironhawk's consumers.[7]  The Court should

23  also grant summary judgment that (1) there is no genuine dispute that Dropbox did

24  not willfully infringe Ironhawk's mark, and (2) Ironhawk may not seek

25  disgorgement of Dropbox's profits in either a forward confusion case because

26

27          [7] To the extent the Court finds in Dropbox's favor on some *Sleekcraft* factors, but not
    others, the Court should grant partial summary judgment on those factors to narrow the issues for
28  the jury in assessing likelihood of confusion.

Dropbox did not willfully infringe, or in a reverse confusion case because disgorgement is not an available remedy as a matter of law.  The Court need reach these two issues only if it grants in part or denies summary judgment of non-infringement.

>    **A.    No Genuine Dispute Exists as to Likelihood of Confusion**

Based on the undisputed factual record, no reasonable jury could find a likelihood of either forward or reverse confusion from Dropbox's use of the Smart Sync feature name.  The Court's *Sleekcraft* analysis should be guided by *Valador, Inc. v. HTC Corp.*, in which the district court, on similar facts, found no likelihood of either forward or reverse confusion and granted summary judgment for the defendant.  241 F. Supp. 3d 650, 670-71 (E.D. Va.) (plaintiff alleged infringement of its VIVE mark for computer software and consulting services, which it offered primarily to federal agencies pursuant to government contracts), *aff'd*, 707 F. App'x 138 (4th Cir. Va. 2017).  As here, the *Valador* plaintiff's mark was conceptually and commercially weak; the defendant sold an entirely different product (virtual reality headsets) to different consumers (electronics users, not government agencies); and the defendant used different marketing channels while prominently displaying its house mark alongside the disputed mark (as in "HTC Vive").  The *Valador* court found that there was no likelihood of confusion because, "[a]t bottom, the parties sell different things through different channels to different customers."  *Id.* at 671.  This is precisely the case here, and the Court should likewise find no likelihood of confusion.

>    **1.    Ironhawk's SMARTSYNC Mark Is Weak and Entitled to Only a Narrow Scope of Protection**

Under the first *Sleekcraft* factor, courts assess the strength of the plaintiff's mark to determine whether it should be entitled to a narrow or wide scope of protection.  599 F.2d at 349 (an "inherently distinctive" mark "will be afforded the widest ambit of protection").  The Ninth Circuit has a two-prong test for the

9

1  strength of a mark: conceptual and commercial strength. *Stonefire Grill, Inc. v.*
2  *FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1047 (C.D. Cal. 2013). In a forward
3  confusion case, only the overall strength of the plaintiff's mark is assessed. *Id.* at
4  1049. In a reverse confusion case, courts compare the *conceptual* strength of the
5  plaintiff's mark to the *commercial* strength of the defendant's mark. If the
6  plaintiff's mark is conceptually weak, it will "offset" even a commercially strong
7  mark of the defendant. *Id.*; *see Instant Media, Inc. v. Microsoft Corp.*, 2007 WL
8  2318948, at *12 (N.D. Cal. Aug. 13, 2007) ("Absent a conceptually strong senior
9  mark, the reverse confusion plaintiff will be unable to establish a likelihood of
10  confusion, even if the junior user's commercial strength is likely to overwhelm the
11  plaintiff in the marketplace."); *accord Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d
12  962, 992 (C.D. Cal. 2002) (finding this factor favored junior user because the
13  plaintiff's mark was conceptually weak and occupied a crowded field). Under
14  either a forward or reverse confusion case, this factor undisputedly favors Dropbox
15  because Ironhawk's SMARTSYNC mark is conceptually and commercially weak
16  based on its descriptive nature, the crowded field it occupies, and its lack of
17  marketplace recognition.

18  First, Ironhawk's SMARTSYNC mark is *conceptually* weak because it
19  directly describes Ironhawk's software. Ironhawk admits that its SMARTSYNC
20  software performs ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (UF 110), which
21  it achieves ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
22  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
23  ▆▆▆▆▆▆ (UF 111). Put simply, Ironhawk's SMARTSYNC software provides
24  intelligent synchronization. The terms "smart" and "sync" each describe
25  Ironhawk's software. Because a mark that "describe[s] either [a] software product
26  or its purpose" is inherently weak, *Brookfield Communications, Inc. v. West Coast*
27  *Entertainment Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999), Ironhawk's
28  SMARTSYNC mark is entitled to only the narrowest protection. *See, e.g., Hero*

10

pa-1894717

*Nutritionals LLC v. Nutraceutical Corp.*, 2013 WL 4480674, at *4-5 (C.D. Cal.
Aug. 16, 2013) (finding YUMMI BEARS for bear-shaped vitamins is a weak mark
and entitled to only a narrow scope of protection because "it takes little to no
imagination to understand the significance of the reference").  That Ironhawk owns
an incontestable registration is not probative, as "incontestable status does not
establish a strong mark."  *Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856
F.2d 1445, 1449 (9th Cir. 1988) (finding an incontestable MRS. OF THE WORLD
mark weak because "the beauty pageant industry's marks [are viewed] as a
crowded field").

       The conceptual weakness of Ironhawk's mark is further established by the
fact that dozens of companies have used or applied to register variants of the "smart
sync" phrase.  "In a 'crowded' field of look-alike marks, each member of the crowd
is relatively 'weak' in its ability to prevent use by others in the crowd."  2
*McCarthy on Trademarks and Unfair Competition* § 11.85 (5th ed. 2019); *accord
Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir 2002) ("[T]hat the
marketplace is replete with products using a particular trademarked word indicates
not only the difficulty in avoiding its use but also, and directly, the likelihood that
consumers will *not* be confused by its use.").  Here, Google searches reveal that
44 third parties have adopted use of the "smart sync" phrase, and at least 18 have
used it in reference to data synchronization software.  (UF 22.)  These include
SmartSync Pro backup and synchronization software (by SmartSync Software[8]);
SMARTSync Data Integration Platform synchronization software (by iTristan
Media Group); SmartSync Synchronization for SyncBack backup software (by
2BrightSparks); and Smart Sync data synchronization software (by Micro-Star
Int'l).  (UF 24-27.)  In addition, USPTO records show 40 applications and 18
registrations for "smart sync," and 1,996 registrations for marks that include

       [8] SmartSync Software began using the name "SmartSync" and offering its software at
www.smartsync.com *before* Ironhawk's first use of the name.  (UF 23.)

1    "smart" or "sync" for software-related goods or services. (UF 28-29.) Extensive

2    third-party use of "smart" and "sync" throughout the software industry makes it

3    more likely that consumers will discern different uses of "smart sync" and will view

4    the phrase as merely describing a software function. *See Miss World*, 856 F.2d at

5    1449 (in a crowded field, "customers will not likely be confused between any two

6    of the crowd and may have learned to carefully pick out one from the other").

7        Second, Ironhawk's SMARTSYNC mark is *commercially* weak because

8    Ironhawk conducts almost no advertising or marketing activities, and has sold its

9    software to a limited number of customers. (UF 113-114.) Ironhawk has averaged

10   only ▮▮▮▮ per year on marketing and advertising since 2012, and never surpassed

11   ▮▮▮▮ in any year since 2014. (UF 115.) Over half of its already-small outlay

12   from 2004-2018 ▮▮▮▮ was spent in a ▮▮▮▮. (UF 65, 116.)

13   In addition, because Ironhawk's SMARTSYNC software is middleware, not user-

14   facing, Ironhawk's ordinary end users do not even see the SMARTSYNC mark

15   when using the software. (UF 42-44.) It is no surprise then that Ironhawk's mark

16   has garnered almost no attention from third parties, and has never been featured

17   prominently in search engine results. (UF 117.) Ironhawk's social media profiles

18   are also outdated, generating almost no consumer engagement, and Ironhawk's

19   website traffic is so low that Google cannot even rank it. (UF 118.) Finally,

20   Ironhawk itself has produced no evidence of any meaningful marketplace exposure.

21       Accordingly, this factor decisively favors Dropbox under either a forward or

22   reverse confusion theory. *See Entrepreneur*, 279 F.3d at 1144, 1153 (where

23   plaintiff had not demonstrated extensive advertising to strengthen an otherwise

24   weak mark, this factor "alone" weighed heavily against confusion).

25                    **2.    Dropbox's Products Are Not Related to Ironhawk's**

26       The proximity of the parties' products is measured by whether the products

27   are similar in use and function, offered to the same class of purchasers, and

28   complementary. *Sleekcraft*, 599 F.2d at 350. Analysis of this factor is the same for

12

1  forward or reverse confusion, and definitively favors Dropbox.

2       First, Dropbox's and Ironhawk's products serve vastly different purposes.

3  Ironhawk's SMARTSYNC software is middleware technology that is integrated

4  with other software applications, and allows end users to compress, transmit, and

5  access data from remote, limited-bandwidth environments.  (UF 41, 56, 119.)

6  Because its software is designed for highly specialized applications, such as Navy

7  combat ships, Ironhawk develops custom configurations for each customer's

8  system.  (UF 46-48.)  In contrast, Dropbox's Smart Sync helps users save hard

9  drive space when using Dropbox's cloud storage by allowing them to designate

10  whether files are stored locally or online only, while still being able to view and

11  access their online-only files.  (UF 121.)  Dropbox's Smart Sync is an "off-the-

12  shelf" feature that comes with standard subscription plans that are purchased from

13  www.dropbox.com.  (UF 120.)  Unlike Ironhawk's software, Dropbox's Smart

14  Sync does not perform data compression and is not designed to facilitate efficient

15  data transfers from challenged networks.  (UF 22.)  Indeed, there is little

16  commonality between the parties' products besides the fact that they are both types

17  of software, but that is not nearly enough to show relatedness.  *See, e.g., Hanginout,*

18  *Inc. v. Google, Inc.*, 54 F. Supp. 3d 1109, 1126 (S.D. Cal. 2014) (no proximity

19  between Google's HANGOUTS software and plaintiff's HANGINOUT software

20  due to "differences that change the functionality of the products"); *M2 Software,*

21  *Inc. v. M2 Commc'ns, Inc.*, 450 F.3d 1378, 1383 (Fed. Cir. 2006) (cannot presume

22  relatedness "given the pervasiveness of software and software-related goods in

23  society").

24       Second, Ironhawk and Dropbox serve entirely different customers.  Ironhawk

25  sells its software to ███████████████████████████████

26  ████████████████████████████████  (UF 66-72.)  In contrast, Dropbox serves

27  ordinary consumers and businesses.  (UF 124.) Dropbox does not target the military

28  as a customer and lacks the FedRAMP certification required to sell to the military.

1   (UF 93, 125-128.)  Ironhawk's and Dropbox's products simply do not compete

2   among the same consumers.  This is clear from the testimony of Ironhawk's

3   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, the Navy: "I don't think [Dropbox] was really an option from a

4   product standpoint . . . I don't remember ever looking at that nor anybody bringing

5   it up . . . I don't even know if Dropbox had a product that was usable at the DOD at

6   the current time." (UF 129-132.)  As in *Valador*, the fact that the parties sell to

7   "significantly different customer bases" weighs heavily against a finding of

8   likelihood of confusion.  241 F. Supp. at 665-67 (plaintiff performed contracts for

9   government agencies and produced no evidence of similar business models).

10      Third, Ironhawk has presented no evidence that Ironhawk's SMARTSYNC

11  product and Dropbox's Smart Sync feature are complementary.  For goods to be

12  complementary, they must be commonly promoted or sold together.  *See E. & J.*

13  *Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992) (finding

14  wine and cheese are complementary goods because they are "frequently served"

15  together).  Here, there is no evidence that Ironhawk's SMARTSYNC and

16  Dropbox's Smart Sync have *ever* been promoted or sold together.  In short, the

17  second *Sleekcraft* factor conclusively favors Dropbox.

18                    **3.    The Parties' Respective Uses Are Not Similar When**
                             **Viewed As a Whole**
19

20      Ironhawk must show that the parties' respective uses of SMARTSYNC and

21  Smart Sync are similar in sight, sound, and meaning "as they are encountered *in the*

22  *marketplace*." *Sleekcraft*, 599 F.2d at 351 (emphasis added).  Courts have found

23  that textual similarity of the alleged infringing use is insufficient, as the appearance

24  of other visual elements can dispel any likelihood of confusion.  *See, e.g.*, *Walter v.*

25  *Mattel, Inc.*, 210 F.3d 1108, 1111 (9th Cir. 2000) (identical marks not confusingly

26  similar in light of defendant's prominent BARBIE mark); *Lindy Pen Co. v. Bic Pen*

27  *Corp.*, 725 F.2d 1240, 1245 (9th Cir. 1984) (AUDITOR'S and AUDITOR'S FINE

28  PRINT not confusingly similar because each accompanied by house marks);

1    *Valador*, 241 F. Supp. 3d at 664 (finding this factor "decisively" for defendant

2    because the alleged infringing mark "almost always appears" next to other marks).

3       When viewed in the requisite marketplace context, Dropbox's Smart Sync

4    feature name is not similar to Ironhawk's mark because it appears in proximity to a

5    house mark. Dropbox's marketing materials consistently feature a house mark (the

6    DROPBOX word mark or Dropbox logo) near "Smart Sync," and the two often

7    appear right next to one another, as shown below:



16    (UF 183.) Even where "Dropbox" does not immediately precede Smart Sync,

17    Dropbox intentionally displays the DROPBOX word mark and/or logo in close

18    proximity, for example, at the top of most of its webpages at www.dropbox.com,

19    and often in a fixed header that remains visible to users as they scroll down the

20    webpage. (UF 30-37.) It is important for Dropbox's mark and logo to appear

21    prominently and in proximity to the name "Smart Sync" because Smart Sync is not

22    sold as a standalone product, and customers must understand that they can only

23    obtain it by purchasing a Dropbox subscription plan. It also makes clear that the

24    feature is being offered by Dropbox and not some other company. *See Network*

25    *Automation, Inc. v. Hewlett-Packard Co.*, 2009 WL 5908719, at *8 (C.D. Cal. Sept.

26    14, 2009) (branding strategy of incorporating a house mark "reinforces the

27    dominance of the [house mark]" and reduces potential confusion by "condition[ing]

28    consumers to recognize Defendant as the source of its software products").

1    Ironhawk likewise clearly brands its SMARTSYNC software with its house

2    mark, IRONHAWK, or indicates that it is provided by "Ironhawk Technologies" in

3    marketing materials and on its website.  (UF 133-137.)  The prominent use of each

4    party's house mark with its respective use of SMARTSYNC or Smart Sync

5    establishes that the marks are not actually similar as used in the marketplace.  Thus,

6    Dropbox prevails on this factor as well.  *See Cohn v. Petsmart, Inc.*, 281 F.3d 837,

7    843 (9th Cir. 2002) (in affirming summary judgment for defendant, noted a critical

8    factor was that each party's mark was accompanied by a distinctive business name

9    in the marketplace).

10                   **4.     There Is No Actual Confusion**

11    To demonstrate actual confusion in a forward confusion case, Ironhawk must

12    show that Dropbox consumers have mistakenly believed that Ironhawk is the

13    source or sponsor of Dropbox's "Smart Sync" product feature.  Ironhawk has

14    produced no evidence of forward confusion whatsoever.  In contrast, Dropbox

15    offers compelling evidence that actual forward confusion has not, and will not,

16    occur.  Dropbox's expert, Hal Poret, conducted a survey among potential Dropbox

17    customers, and *not a single respondent* out of hundreds mentioned Ironhawk or its

18    SMARTSYNC product in response to questions designed to elicit confusion.

19    (UF 138.)  Courts have found this factor favors the defendant even when a survey

20    showed modest confusion.  *See, e.g.*, *Surfvivor*, 406 F.3d at 633 (survey showing

21    confusion by less than two percent of respondents deemed an "absence of

22    significant confusion"); *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1040

23    (C.D. Cal. 1998) ("[S]urvey evidence clearly favors the defendant when it

24    demonstrates a level of confusion much below ten percent." (citations omitted)),

25    *aff'd*, 216 F.3d 1082 (9th Cir. 1999).  Here, Mr. Poret found *zero* confusion.  This

26    factor conclusively favors Dropbox under a forward confusion theory.

27    In a reverse confusion case, confusion is assessed from the view of Ironhawk

28    consumers.  *See Dreamwerks*, 142 F.3d at 1131.  Here too, there is no evidence of

actual confusion.  Ironhawk claims that confusion has occurred among its customers—but as evidence, it offers three emails ghost-written *by Ironhawk's CEO*, who asked its sales agent and two resellers to send the emails back to Ironhawk.  (UF 102-105, 139-140.)  Ironhawk's ruse to manufacture confusion is apparent from the face of these emails, none of which were sent by *actual* Ironhawk customers (such as the Navy), yet purport to express customer concerns: "David, you had asked me to memorialize concerns that the Navy might have with 'SmartSync' being used by Dropbox . . . "  (UF 139.)  Such contrived-for-litigation evidence has no probative value.  *See Mattel, Inc.*, 210 F.3d at 1111 ("Attestations from persons in close association and intimate contact with [the senior user] do not reflect the views of the purchasing public." (citation omitted)); *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 910 (9th Cir. 1995) (sworn statements from plaintiff's employees and wholesalers had "little probative value regarding the assessment of consumer perception").  Indeed, the "author" of one ghost-written email admitted that no consumer or potential consumer had ever told him that they were confused about *Dropbox's* use of "Smart Sync," even though his email purported to raise concerns about Dropbox.  (*Id*.)  Ironhawk has nothing else that hints at actual confusion, and nothing at all when this evidence is properly disregarded.[9]

### 5.    The Parties Have Disparate Marketing Channels

There is no overlap between the parties' marketing channels.  This factor too

---

[9] Ironhawk has attempted to generate additional instances of confusion based on vague anecdotes from unspecified employees.  Even if such self-serving anecdotes were probative of confusion, the evidence would at most be *de minimis*.  A few isolated, unsubstantiated instances of confusion do not create a triable issue of likelihood of confusion to overcome a motion for summary judgment.  *See, e.g.*, *Echo Drain*, 307 F. Supp. 2d at 1126 (disregarding confusion evidence "consist[ing] of four letters from friends and a few unauthenticated e-mails and postings to its website"); *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1133 (C.D. Cal. 1998) ("The fact that there may be a few confused consumers does not create a sufficiently disputed issue of fact regarding likelihood of confusion so as to make summary judgment improper." (citation omitted)), *aff'd*, 296 F.3d 894 (9th Cir. 2002).  Ironhawk produced no evidence that an *actual* consumer purchased Ironhawk's SMARTSYNC software under the mistaken belief that Dropbox was its source or sponsor.

1   is in Dropbox's favor.  Like in *Valador*, the parties' marketing approaches and

2   investments differ significantly.  *See* 241 F. Supp. 3d at 667-78 (finding this factor

3   "firmly favors" the defendant).  Ironhawk primarily sells to the military through a

4   lengthy bidding process, and attends military trade shows as a primary means of

5   reaching its consumers.  (UF 57-60, 143.)  Not surprisingly, since its sales are

6   derived from government contract bids, Ironhawk's marketing activities are almost

7   nonexistent.  *See supra* at Section IV.A.1.

8        By contrast, Dropbox's marketing activities are conducted primarily on the

9   Internet, as the vast majority of its customers self-register through its website.

10  (UF 144.)  It spent over ███████ on Google AdWords in 2017-2018 alone.  (UF

11  145.)  This is in stark contrast with Ironhawk, who ████████████████████

12  ██████████████████████████████████████████████████

13  ████████████████████████  (UF 146.)  There is no dispute that each

14  party has its primary marketing channel almost entirely to itself.

### 6.    Both Parties' Customers Are Highly Sophisticated

16       The sophistication of the parties' customers further eliminates any possibility

17  of confusion in this case under either a forward or reverse theory.  Ironhawk's

18  potential customers are highly sophisticated government agencies that must make

19  purchasing decisions pursuant to an exhaustive bidding and procurement process.

20  (UF 147.)  As in *Valador*, where the plaintiff's consumer base included NASA and

21  the Department of Veteran Affairs, Ironhawk's military consumers are "especially

22  sophisticated."  241 F. Supp. 3d at 670.  Experienced agency officials will not

23  mistakenly believe that they are purchasing Ironhawk's products from Dropbox, or

24  vice versa.  *See Sleekcraft*, 599 F.2d at 353 ("[w]hen the buyer has expertise in the

25  field, a higher standard is proper"); *Elec. Design & Sales, Inc. v. Elec. Data Sys.*

26  *Corp.*, 954 F.2d 713, 718-19 (Fed. Cir. 1992) (no likelihood of confusion where

27  services were "expensive and are purchased *only* by experienced corporate officials

28  after significant study and contractual negotiation").  Indeed, testimony from the

1  Navy that Dropbox was not "really an option from a product standpoint"

2  demonstrates that Ironhawk's consumers are sophisticated enough to distinguish

3  between Ironhawk and Dropbox.  (UF 148.)  And unsurprisingly, Ironhawk has not

4  identified a *single* customer who purchased Ironhawk's product and believing it

5  came from Dropbox.

6       Dropbox's customers too are amply sophisticated to recognize the obvious

7  distinction between the parties' products.  Dropbox's standard subscription plans

8  that include the Smart Sync feature range from a minimum of $120/year to as much

9  as $240/year per user.  (UF 14.)  Purchasers of technology products, particularly

10  those sold at a high price point like Dropbox's, are not at all likely to be confused

11  into believing that they are purchasing products of a different company.  *See Oculu,*

12  *LLC v. Oculus VR, Inc.*, 2015 WL 3619204, at *16 (C.D. Cal. June 8, 2015)

13  (business IT and tech-savvy professionals are sophisticated purchasers unlikely to

14  be confused); *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 939 (9th

15  Cir. 2015) ("as a matter of law, the relevant consumer [is] a reasonably prudent

16  consumer" when goods cost "hundreds of dollars").  The sophistication of the

17  parties' customers forecloses any possibility of confusion.

18              **7.    Dropbox Did Not Intend to Infringe Ironhawk's Mark**

19       Ironhawk has not produced any evidence that Dropbox adopted "Smart

20  Sync" with the intent to cause confusion with Ironhawk's mark, because no such

21  evidence exists.  As addressed fully in Section C below, Dropbox's naming team

22  independently came up with the Smart Sync feature name and had never heard of

23  Ironhawk, its software, or its mark.  The team then consulted with competent

24  trademark counsel, who ███████████████████████████████████████

25  ████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████

27  ████████████████  Dropbox reasonably relied on advice of its counsel.  There is

28  simply no evidence of an intent to infringe, as highlighted by Dropbox's careful

19

pa-1894717

1  naming and clearance process.  *See One Indus., LLC v. Jim O'Neal Distrib.*, 578

2  F.3d 1154, 1163 (9th Cir. 2009) ("affirming district court's grant of summary

3  judgment given "lack of evidence of any deceptive intent on [defendant's] part");

4  *M2 Software v. Madacy Entm't*, 421 F.3d 1073, 1085 (9th Cir. 2005) (same).  This

5  factor completely weighs in Dropbox's favor.

### 8.  There Is No Evidence that Either Party Will Expand Its Products to Compete with Each Other

8  For the final *Sleekcraft* factor, Ironhawk must show "a *strong* possibility of

9  expansion" into the other party's market.  *Madacy*, 421 F.3d at 1085 (citation

omitted) (plaintiff must offer concrete evidence of expansion plans); *see also*

11  *Surfvivor*, 406 F.3d at 634 ("Although [plaintiff] expressed interest in expanding

his product line, mere speculation is not evidence."); *Matrix Motor Co., Inc. v.*

13  *Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1096 (C.D. Cal. 2003)

14  (plaintiff must show plans to expand "at the time the junior user began using its

trademark"), *aff'd*, 120 F. App'x 30 (9th Cir. 2005).

16  Again, there is nothing in Ironhawk's favor.  Ironhawk's expansion plans are

nonexistent, or at best speculative.  Ironhawk is admittedly "not interested" in

18  expanding to compete with Dropbox's cloud storage services (Ray Decl. Ex. 7 at

19  202:4-17), and Ironhawk's other ███████████████████████

███████████████████████ to Dropbox's market.  (*See, e.g.*, *Id.*, Ex. 12 at

21  64:10-65:9, 94:22-95:3, 127:1-20, 128:13-19, 169:13-18.)  Ironhawk also has not

22  shown that Dropbox has any plans to expand into the government contracts

23  industry, or to offer highly specialized software to the U.S. military to compete with

Ironhawk's SMARTSYNC software.

25  \*            \*            \*

26  In conclusion, the *Sleekcraft* factors overwhelmingly refute Ironhawk's

27  opportunistic claim that Dropbox's Smart Sync feature has created a likelihood of

28  confusion.  On this record, as in *Valador*, *Stonefire Grill*, and *Madacy* (each

20

1   granting summary judgment on likelihood of both forward and reverse confusion),

2   no reasonable juror could find for Ironhawk.  Because Ironhawk cannot

3   demonstrate that there is a genuine issue of material fact on the central issue of

4   confusion, Dropbox is entitled to judgment as a matter of law.[10]

5   ## B.   Dropbox Did Not Willfully Infringe Plaintiff's Mark

6   To the extent the Court reaches this issue, the record establishes that, as a

7   matter of law, Dropbox did not willfully infringe Ironhawk's mark.  "Willful

8   infringement carries a connotation of deliberate intent to deceive" and "require[s] a

9   connection between a defendant's awareness of its competitors and its actions at

10   those competitors' expense." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1406

11   (9th Cir. 1993) (citation omitted).  To prevail, Ironhawk must prove that Dropbox

12   "willfully calculated to exploit the advantage of an established mark." *Id.* at 1405.

13   "Courts in the Ninth Circuit routinely grant summary judgment on the issue of

14   willfulness where the undisputed facts demonstrate that the defendant selected the

15   disputed mark without knowledge of the plaintiff's mark." *AAA of N. Cal. v. GM*

16   *LLC*, 367 F. Supp. 3d 1072, 1104 (N.D. Cal. 2019) (citing cases).

17   In *Hydramedia Corp. v. Hydra Media Group Inc.*, a case with nearly

18   indistinguishable facts, this Court's finding of no willfulness on summary judgment

19   was affirmed by the Ninth Circuit, which explained:

20   Defendant initially adopted the contested mark, HYDRAMEDIA,
21   before it knew that Plaintiff even existed.  When Defendant discovered
    Plaintiff's use of a similar mark, it relied on in-house counsel's opinion
22   that there was little likelihood of confusion based on the companies'
    distinct services.  Defendant enjoyed a strong reputation and there was
23   no evidence that it sought to mislead consumers or usurp any goodwill
24   associated with Plaintiff's mark.  Under such circumstances,
    Defendant's infringement was not willful.

25

26

27   _____

[10] To the extent the Court finds that Ironhawk has failed to raise a genuine dispute as to
one confusion theory (e.g., forward confusion), but not the other, the Court should grant partial
28   summary judgment for Dropbox on that theory to streamline the case for trial.

21

1    392 F. App'x 522, 523 (9th Cir. 2010).  For the same reasons, the Court should

2    reach the same conclusion here.

3         In April 2016, Dropbox began considering names for a new feature being

4    developed that would eventually become Dropbox Smart Sync.  After the first

5    name, ███████████████████████████████████████████████████

6    ████████████████████ (UF 155), the naming team considered dozens of alternatives

7    (UF 19).  ████████████ was an early promising candidate (UF 157, 158), but

8    because it did not resonate with everyone involved in the naming process, the

9    naming team also considered ████████████████████████████████████████

10   ██████████████████████████████████ (UF 159.)

11        Qualitative testing showed that ██████████████████████

12   ██████████████████████████████████████████████████████

13   ████████████████████████████████████ (UF 160.)

14   Accordingly, the naming team recommended Smart Sync, which was subsequently

15   approved by the marketing committee, various executives, and this time ███████

16   ██████████, Ms. Han.  (UF 161.)  Dropbox announced the Smart Sync feature in

17   January 2017.  Dropbox's independent conception of the name based on "pragmatic

18   marketing concerns" was imminently reasonable.  *See Walter v. Mattel, Inc.*, 31 F.

19   Supp. 2d 751, 761 (C.D. Cal. 1998), *aff'd*, 210 F.3d 1108 (9th Cir. 2000).

20        Ironhawk's entire theory for willfulness, which parrots its complaint against

21   Salesforce, is that over a year earlier, in 2015, Ironhawk attempted to pitch its

22   company to Dropbox and had a telephone call with one or more employees on

23   Dropbox's corporate development team.  The corporate development employees

24   who may have been on the call have no memory of it,[11] or of Ironhawk's outreach

25   in general, and in any event, they passed on the opportunity shortly thereafter and

26

27        [11] This is unsurprising given that the number of potential acquisitions evaluated by the
    corporate development team.  Even Ironhawk's witnesses had only vague memories of the call.
28   (UF 80-81, 166-168.)

had no further engagement with Ironhawk. (UF 162-165.)  However, the undisputed evidence shows that those employees never discussed Ironhawk with members of the naming team, who were in an entirely different organization within Dropbox. (UF 84.)  Indeed, the corporate development employees testified that their work was kept confidential even within Dropbox. (UF 169-170.)  And the members of Dropbox's naming team testified that they had never heard of Ironhawk or its SMARTSYNC mark at the time they were naming Dropbox's feature, and in particular, had never discussed the Smart Sync name with any members of the corporate development team. (UF 171-173.)  Instead, the undisputed facts demonstrate that the Dropbox naming team carefully considered an array of options and independently selected a name for its new feature that conveyed its functionality and benefit and performed well in qualitative testing. (UF 160, 174.)

That a few Dropbox employees other than the naming team knew of Ironhawk is wholly insufficient to demonstrate that Dropbox acted in a manner "willfully calculated to exploit the advantage of an established mark."[12] *Lindy Pen*, 982 F.2d at 1406 (citation omitted).  Because Dropbox had no intent to trade on Ironhawk's goodwill, the Court should grant summary judgment to Dropbox on the issue of willfulness. *Id.*

In addition, Dropbox's reliance on the advice of its trademark counsel is a separate basis to grant summary judgment to Dropbox on this issue. *See Coachella Music Festival, LLC v. Simms*, 2017 WL 6888716, at *7 (C.D. Cal. Oct. 10, 2017) (reliance on opinion of counsel is separate and independent basis to defeat willfulness).  Ms. Han, Dropbox's trademark counsel, found and considered the SMARTSYNC trademark registration and cleared Dropbox's use of the name Smart Sync after concluding that there would be no likelihood of confusion. (UF

---

[12] *See Matrix*, 290 F. Supp. 2d at 1095 (rejecting claim that employee's knowledge should be imputed to Toyota where employee with that knowledge "had no involvement in Toyota's selection of the TOYOTA MATRIX trademark").

177-179.) In the Ninth Circuit, a party's reasonable reliance on counsel's advice constitutes evidence that a party did not act willfully. *See Hydramedia*, 392 F. App'x at 523 (affirming district court's grant of summary judgment on willfulness to defendant who adopted mark before it knew of plaintiff's mark and relied on in-house counsel's advice); *Kern v. Mindsource, Inc.*, 2000 WL 692199 (9th Cir. May 30, 2000) (affirming lower court's grant of summary judgment for defendant who reasonably relied on advice of counsel).[13]

There are no disputed issues of fact, and no reasonable juror could find that Dropbox acted willfully in commencing use of the Smart Sync feature name. Accordingly, the Court should find that, as in *Hydramedia*, "there [is] no evidence that [Defendant] sought to mislead consumers or usurp any goodwill associated with Plaintiff's mark. Under such circumstances, Defendant's infringement [is] not willful." 392 F. App'x at 523.

### C. Ironhawk Is Not Entitled to Disgorge Dropbox' Profits

Because Ironhawk has not raised a genuine dispute of willful infringement, as discussed in Section B above, it may not disgorge Dropbox's profits if it pursues a forward confusion case. In the Ninth Circuit, disgorgement of the defendant's profits is only available "in those cases where the infringement is 'willfully

---

[13] Some cases further assess the competence of the counsel's advice and reasonableness of the company's reliance. Here, too, the Court should find as a matter of law that Ms. Han's advice was competent and Dropbox's reliance on her advice was reasonable. Competence of counsel's advice is evaluated under "a totality of the circumstances." *Poquito Mas Licensing Corp. v. Taco Bell Corp.*, 2014 WL 12772086, at *3 (C.D. Cal. Dec. 4, 2014) (citation omitted). Ms. Han

(UF 88, 177.)

(UF 177-179.) In reaching her conclusion, Ms. Han

(UF 175.) Finally, Ms. Han

Relying on and consistent with Ms. Han's advice, Dropbox proceeded to use the "Smart Sync" name. (UF 95, 180, 184.)

24

1  calculated to exploit the advantage of an established mark,'" or "where the

2  defendant is 'attempting to gain the value of an established name of another.'"

3  *Lindy Pen*, 982 F.2d at 1405, 1406 (citation omitted).  There is no simply evidence

4  that Dropbox acted with any intent to exploit or capitalize on Ironhawk's mark.

5       In addition, disgorgement is not a remedy in a reverse confusion case.  "An

6  intent to exploit an existing mark 'is necessarily absent in a reverse confusion case,'

7  and *Lindy Pen* thus precludes an accounting of profits even if the defendant was

8  willfully blind to the possibility of infringement."  *Novadaq Techs., Inc. v. Karl*

9  *Storz GmbH & Co. K.G.*, 2015 WL 9028123, at *2 (N.D. Cal. Dec. 16, 2015)

10  (citation omitted); *accord Spin Master, Ltd. v. Zobmondo Entm't, LLC*, 944 F.

11  Supp. 2d 830, 848 (C.D. Cal. 2012) (rejecting disgorgement of infringer's

12  significant profits in reverse confusion case, as it amounts to a "penalty to the

13  infringer and a windfall to the trademark owner, who has only a 'relatively obscure

14  name' to appropriate"); *AAA*, 367 F. Supp. 3d at 1103 ("AAA has identified no

15  authority, nor has the Court found any, where a court has disgorged a defendant's

16  profits in a reverse confusion case based only on mere knowledge.").

17       Accordingly, the Court should grant summary judgment that Ironhawk

18  cannot pursue Dropbox's profits regardless of whether it presents a forward

19  confusion or reverse confusion case.

20  **V.   CONCLUSION**

21       For the foregoing reasons, Dropbox respectfully requests the Court grant

22  summary judgment to Dropbox on Ironhawk's trademark infringement and unfair

23  competition claims because no triable issues of material fact exist.

24       In the event the Court only grants in part, or denies, summary judgment of

25  non-infringement, Dropbox requests the Court grant summary judgment that

26  (a) Dropbox did not willfully infringe Ironhawk's mark, and (b) Ironhawk is not

27  entitled to disgorge Dropbox's profits, regardless of whether Ironhawk asserts a

28  forward or reverse confusion case at trial.

1 Dated: June 17, 2019    JENNIFER LEE TAYLOR
WENDY J. RAY
2            MORRISON & FOERSTER LLP

3            By: /s/ Wendy J. Ray
4               Wendy J. Ray

5             Attorneys for Defendant
DROPBOX, INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DROPBOX, INC.'S MPA ISO MOTION FOR SUMMARY JUDGMENT

pa-1894717