BROWNE GEORGE ROSS LLP
Keith J. Wesley (State Bar No. 229276)
  kwesley@bgrfirm.com
Lori Sambol Brody (State Bar No. 150545)
  lbrody@bgrfirm.com
Matthew L. Venezia (State Bar No. 313812)
  mvenezia@bgrfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorneys for Plaintiff and Counterdefendant
Ironhawk Technologies, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| IRONHAWK TECHNOLOGIES, INC., a Delaware Corporation,<br><br>                    Plaintiff and Counterdefendant,<br><br>          vs.<br><br>DROPBOX, INC., a Delaware corporation,<br><br>                    Defendant and Counterclaimant. | Case No. 2:18-cv-01481-DDP-JEM<br><br>**IRONHAWK TECHNOLOGIES, INC.'S OPPOSITION TO DROPBOX, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:   Hon. Dean D. Pregerson<br>Date:    September 23, 2019<br>Time:    10:00 am<br>Crtrm.:  9C<br><br>Trial Date:  October 22, 2019<br>Final Pre-Trial Conf.:  October 7, 2019 |

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1296203.1

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..................................................................................... 1

II. STATEMENT OF FACTS ....................................................................... 3

    A. Ironhawk Markets Its Data Management Software Exclusively Under the SmartSync® Mark for Well over a Decade ........................... 3

    ■ ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ ...................... 5

    C. Dropbox Sought a Name ■■■■■■■■■■■■ for Its New Data Management Software, Ultimately Selecting Smart Sync .................... 6

    D. Dropbox Withholds Key Documents from Its In-House Counsel, and Ignores Advice to Use "Dropbox" in Front of "Smart Sync"........... 6

    E. Dropbox Saturates the Market with Its Smart Sync Resulting in a Strong Brand Association Between Dropbox and Smart Sync .............. 7

    F. Actual Confusion Occurs in the Marketplace, Harming Ironhawk's Existing Business Relationships and Hindering Ironhawk's Efforts to Expand SmartSync®'s Use in the Commercial Sector ................................................................................. 8

III. NINTH CIRCUIT AUTHORITY DISFAVORS SUMMARY JUDGMENT ON THE ISSUE OF LIKELIHOOD OF CONFUSION ........... 9

IV. THERE IS EVIDENCE TO SUPPORT IRONHAWK ON EACH RELEVANT FACTOR ......................................................................... 10

    A. SmartSync® Is an Inherently Distinctive Protectable Mark, and Dropbox Saturated the Market with Its Own Use of Smart Sync ....... 11

        1. SmartSync® Is an Inherently Distinctive, at Minimum Suggestive, Mark ............................................................... 11

        2. SmartSync® Enjoys Commercial Strength in Its Historical Niche Market, Which Could Weigh in Favor of a Likelihood of Forward Confusion ............................................. 13

        3. Dropbox Saturated the Market with Its Use of Smart Sync ....... 13

        4. The Evidence of Third-Party Use is Mostly Irrelevant, and Entirely Inadequate to Support Summary Judgment.................. 14

    B. Dropbox's Smart Sync and Ironhawk's SmartSync® Operate in the Same Data Management Industry .................................................. 16

    C. Smart Sync Is Essentially Identical to the SmartSync® Mark ............. 18

    D. Dropbox's Use of Smart Sync Has Caused Actual Confusion............. 19

    E. Certain Marketing Channels of Ironhawk and Dropbox Overlap ........ 20

1296203.1

1

1

### TABLE OF CONTENTS
#### (Continued)

Page

F.   Ironhawk's Business Partners Do Not Believe the Sophistication of Their Customers Protects from Confusion ........................................ 21

G.   At Minimum, Dropbox Released Its Smart Sync with Full Knowledge of and Disregard for Ironhawk's Rights in the SmartSync® Mark ................................................................... 22

H.   Ironhawk Has Attempted and Continues Its Attempts to Expand the Use of SmartSync® Further Into the Commercial Sector ............. 23

V.   A REASONABLE JUROR, VIEWING THE EVIDENCE IN FAVOR OF IRONHAWK, COULD FIND SUFFICIENT WILLFULNESS TO JUSTIFY DISGORGEMENT OF PROFITS ................................................ 24

VI.   CONCLUSION ................................................................. 25

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## TABLE OF AUTHORITIES

2

### FEDERAL CASES

3

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
4
    237 F.3d 198 (3d Cir. 2000) ................................................................. 18

5

*Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*,
6
    944 F.2d 1446 (9th Cir. 1991) ............................................................. 10

7

*Allstate Ins. Co. v. Kia Motors America, Inc.*,
8
    2017 WL 10311211 (C.D. Cal. Sep. 20, 2017) .................................... 16

9

*Americana Trading Inc. v. Russ Berrie & Co.*,
10
    966 F.2d 1284 (9th Cir. 1992) ............................................................. 18

11

*Au–Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
12
    457 F.3d 1062 (9th Cir. 2006) ............................................................... 9

13

*Brookfield Commc'ns, Inc. v. West Coast Ent. Corp.*,
14
    174 F.3d 1036 (9th Cir. 1999) ............................................................... 1

15

*Chiron Corp. v. Genentech, Inc.*,
16
    268 F. Supp. 2d 1117 (E.D. Cal. 2002) .............................................. 25

17

*Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*,
    214 F.3d 432 (3d Cir. 2000) ............................................................... 10
18

*Dreamwerks Prod. Grp., Inc. v. SKG Studio*,
19
    142 F.3d 1127 (9th Cir.1998) .................................................. 10, 12, 18

20

*Eclipse Assocs., Ltd. v. Data Gen. Corp.*,
21
    894 F.2d 1114 (9th Cir. 1990) ............................................................. 14

22

*Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc.*,
23
    Case 4:17-cv-06393-YGR, Dkt. 14 (N.D. Cal. Nov. 20, 2017.) .................... 20, 22

24

*Fleischmann Distilling Corp. v. Maier Brewing Co.*,
25
    314 F.2d 149 (9th Cir. 1963) ............................................................... 19

26

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
27
    618 F.3d 1025 (9th Cir. 2010) .................................................. 10, 12, 16

28

IRONHAWK TECHNOLOGIES, INC. OPPOSITION TO DROPBOX, INC.'S MOTION FOR SUMMARY JUDGMENT

*GoTo.com, Inc. v. Walt Disney Co.*,
   202 F.3d 1199 (9th Cir. 2000) ................................................................ 11

*His & Her Corp. v. Shake-N-Go Fashion, Inc.*,
   572 Fed. Appx. 517 (9th Cir. 2014) ....................................................... 10

*Icon Enters. Int'l, Inc. v. Am. Products Co.*,
   2004 WL 5644805 (C.D. Cal. Oct. 7, 2004) ........................................... 15

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*,
   80 F.3d 749 (2d Cir. 1996) ..................................................................... 25

*Internet Specialties West, Inc. v. ISPWest*,
   2006 WL 4568796 (C.D. Cal. Sep. 19, 2006) ......................................... 15

*Interstellar Starship Servs., Ltd. v. Epix Inc.*,
   184 F.3d 1107 (9th Cir. 1999) .................................................................. 9

*Jada Toys, Inc. v. Mattel, Inc.*,
   518 F.3d 628 (9th Cir. 2008) .................................................................. 10

*JL Beverage Co., LLC v. Jim Beam Brands Co.*,
   828 F.3d 1098 (9th Cir. 2016) ................................... 10, 14, 16, 18, 23

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
   408 F.3d 596 (9th Cir. 2005) .................................................................. 10

*Kreation Juicery, Inc. v. Shekarchi*,
   2014 WL 7564679 (C.D. Cal. Sep. 17, 2014) ......................................... 13

*Lindy Pen Co., Inc. v. Bic Pen Corp.*,
   982 F.2d 1400 (9th 1993) ....................................................................... 25

*M2 Software, Inc. v. Madacy Ent.*,
   421 F.3d 1073 (9th Cir. 2005) ........................................................... 15, 24

*Marketquest Group, Inc. v. BIC Corp.*,
   862 F.3d 927 (9th Cir. 2017) ............................................................. 10, 22

*Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*,
   290 F. Supp. 2d 1083 (C.D. Cal. 2003) .................................................. 24

*Moldex-Metric, Inc. v. McKeon Products, Inc.*,
   596 Fed. Appx. 567 (9th Cir. 2015) ....................................................... 10

-2-

*Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.*,
  57 F. Supp. 3d 1203 (C.D. Cal. 2014)................................................................ 12

*Rearden LLC v. Rearden Commerce, Inc.*,
  683 F.3d 1190 (9th Cir. 2012) ......................................................... 10, 13, 15, 24

*Rebelution, LLC v. Perez*,
  732 F. Supp. 2d 883 (N.D. Cal. 2010)............................................................... 15

*Solar Sys. & Peripherals, Inc. v. Solarcom Holdings*,
  44 Fed. Appx. 186 (9th Cir. 2002) ............................................................... 10, 23

*Valador, Inc. v. HTC Corp.*,
  242 F. Supp. 3d 650 (E.D. Va. 2017) ........................................................... 18, 21

*Walter v. Mattel, Inc.*,
  210 F.3d 1108 (9th Cir. 2000) ........................................................................... 11

*Xen, Inc. v. Citrus Systems, Inc.*,
  2012 WL 5289609 (C.D. Cal. Oct. 25, 2012) (Pregerson, J.)............................... 9

*Zobmondo Ent., LLC v. Falls Media, LLC*,
  602 F.3d 1108 (9th Cir. 2010) ........................................................................... 11

**FEDERAL STATUTES**

15 U.S.C. §1052(f)................................................................................................ 13

Lanham Act..................................................................................................... 19, 25

**OTHER AUTHORITIES**

6 McCarthy on Trademarks and Unfair Competition § 23:10 ................................. 11

6 McCarthy on Trademarks and Unfair Competition § 32:120 (5th ed.)................. 10

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiff Ironhawk Technologies, Inc. ("Ironhawk") is the senior user of the SmartSync® trademark, having built its business around the mark for approximately 15 years and having owned a federal registration for the mark for use in "computer software for replicating files" since January 2007. In January 2017, despite having actual notice of Ironhawk's trademark use and registration, defendant Dropbox, Inc. ("Dropbox") began using the same mark (albeit spelled as "Smart Sync"), on the same goods ("computer software for replicating files"), marketed to the same potential customers (any entity with the need to transmit large quantities of computer data across devices). Under these circumstances, as the Ninth Circuit has observed, "likelihood of confusion would follow as a matter of course." *Brookfield Commc'ns, Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036, 1056 (9th Cir. 1999).

In stark contrast, defendant Dropbox asks this Court to hold that no reasonable juror, *even when construing the evidence and all inferences in favor of Ironhawk*, could find a likelihood of confusion caused by the parties' concurrent use of the SmartSync® mark. As a general proposition, granting summary judgment to a defendant that uses a nearly identical mark on similar goods as the plaintiff is a recipe for reversal, particularly in this circuit. And here, Ironhawk presents evidence on each and every relevant factor the Court must consider. For example:

- Dropbox says the marks are not actually similar because Dropbox uses its house mark (Dropbox) in conjunction with its Smart Sync. But Ironhawk has offers evidence that Dropbox often does *not* use its house mark in conjunction with Smart Sync, and regardless, courts recognize that in the reverse confusion context – *i.e.*, where a much larger junior user saturates the market with its use of the senior user's mark – use of a house mark can actually exacerbate the problem.

- Dropbox says Ironhawk's SmartSync® is conceptually weak, but Ironhawk

IRONHAWK TECHNOLOGIES, INC. OPPOSITION TO DROPBOX, INC.'S MOTION FOR SUMMARY JUDGMENT

presents evidence that it obtained a registration on the basis of inherent distinctiveness and Dropbox's own internal documents acknowledge that the mark is "evocative" and would "resonate with customers."

- Dropbox says there are many third parties who also use "Smart Sync," but many of the claimed uses appear to be for unrelated goods and services (and thus are irrelevant), and there is no admissible evidence showing the scope or nature of any of the arguably relevant third-party uses.

- Dropbox says that Ironhawk only sells to military customers, but the evidence shows that Ironhawk sells to commercial customers as well, and even Ironhawk's military customers are familiar with and potentially confused by Dropbox's use of the same mark.

- Dropbox says that it adopted the mark innocently and without knowledge of Ironhawk's use. ██████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████████ █████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ (Venezia Decl., Exh. J (Han Depo.), P. 139:9–17 & Exh. 101; Exh. H (Sheehan Depo.), PP. 92:16–93:8 & Exh. 52.)

The list could go on and on. Dropbox attempts to present evidence to support a narrative that it innocently adopted a weak mark that it uses to sell to different customers than Ironhawk. Ironhawk presents evidence to support its position that Dropbox adopted an inherently distinctive and commercially important mark, knowing of Ironhawk's use and registration of the same mark for the same category of goods, thus trampling on the identity Ironhawk had spent well over a decade

1  cultivating and cabining Ironhawk's potential growth.

2      In sum, this case exemplifies why the Ninth Circuit time and time again

3  reminds district courts that summary judgment on the issue of likelihood of

4  confusion should rarely be granted. There is evidence in support of both narratives.

5  But whichever narrative this Court believes is closer to the truth should be irrelevant

6  at this stage. Therefore, summary judgment should be denied.

7  **II.**    **STATEMENT OF FACTS**

8      **A.**    **Ironhawk Markets Its Data Management Software Exclusively**

9          **Under the SmartSync® Mark for Well over a Decade**

10      Ironhawk was founded in 2001 with the goal of providing a solution for the

11  management of large amounts of data in bandwidth-challenged environments.

12  (Gomes Decl., ¶ 2.) Ironhawk created a unique data management software allowing

13  for efficient data transfer by using compression and replication, known as

14  SmartSync®. (*Id.* at ¶ 3.) SmartSync®'s usefulness in the field of data management

15  is evident – SmartSync® is a go to for ▮▮▮▮▮▮▮▮▮▮ when they need a

16  solution to transfer large amounts of data. (*Id.* at ¶ 4.)

17      Ironhawk engaged a branding expert in selecting the SmartSync name, which

18  was catchy and would be remembered by customers. (*Id.* at ¶ 6.) Ironhawk started

19  marketing its software under that name in 2004. (*Id.* at ¶ 5.) On February 17, 2005,

20  Ironhawk applied for a trademark for SmartSync, and on January 16, 2007, received

21  its federal registration for the SmartSync® mark without proof of secondary

22  meaning. (*Id.* at ¶ 7 & Exh. A.) Since 2004, Ironhawk has continuously marketed its

23  software using the mark. (*Id.* at ¶ 5.) Today, Ironhawk's business is focused *entirely*

24  upon products branded as SmartSync®. (*Id.* at ¶ 3.)

25      SmartSync®'s historical implementations have involved the transfer of data

26  from one node, or location, to another in a one-way transfer. (Gill Decl., ¶ 4.) This

27  transfer is achieved by the compression and replication of data, and does *not* involve

28  synchronization as commonly understood by IT users, *i.e.*, data does not get updated

to match at each location upon a transfer. (*Id.*) Ironhawk has however developed one implementation of SmartSync® that supports bi-directional synchronization, referred to as its cloud store function, and SmartSync® could be integrated within a cloud storage environment such as Dropbox to be the engine that drives its data replication and transfer. (*Id.* at ¶¶ 5, 7–8.)

Although historically utilized by the armed forces, SmartSync® is also useful for commercial purposes, and Ironhawk regularly pursues such implementations of SmartSync®. (Gomes Decl., ¶¶ 8, 13–14.) For instance, SmartSync® was previously utilized by ▇▇▇ to transfer point of sale data. (*Id.* at ¶ 13.) In recent years, Ironhawk has discussed potential SmartSync® implementations in the cloud storage industry with ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇ (*Id.* at ¶¶ 13–14.) Ironhawk has further discussed implementations with ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, and ▇▇▇▇. (*Id.* at ¶ 13.)

Ironhawk's exclusive marketing of its products under the SmartSync® mark for well over a decade has led to a strong recognition of the SmartSync® brand by Ironhawk's customers. (*Id.* at ¶¶ 9–11.) Indeed, many of Ironhawk's customers know Ironhawk simply as "the SmartSync® guys." (Gomes Decl., ¶ 11; *see also* Venezia Decl., Exh. A (Peyton Depo.), PP. 189:19–192:3.) For example, in a recent meeting, where Ironhawk's CTO was introduced to a ▇▇▇▇▇▇▇▇▇▇ as being from Ironhawk, the ▇▇▇▇▇▇▇▇▇▇ made the connection on his own to SmartSync®. (Gill Decl., ¶ 11.)

Ironhawk's partners understand the value of the SmartSync® brand when reselling the SmartSync® software to military purchasers. In this regard, one of Ironhawk's "value added resellers" named CACI International ("CACI") testified that the inclusion of SmartSync® in CACI's solutions would increase their scoring by the ▇▇▇▇▇▇▇▇▇. (Venezia Decl., Exh P (Indermill Depo. II), PP. 82:1–84:9.) Similarly, IBM testified that Ironhawk developed good will with "several customers within [its] customer base." (*Id.* at Exh. A (Peyton Depo.), PP. 134:9–14.)



1

2

3

4 . (Venezia Decl.,

5 Exh. S (Oppenheimer Prod.), OPCO0206–37; Exh. L (Hirou Depo.), PP. 119:11–

6 120:11; Exh. M (Gomes Depo.), PP. 294:22–296:4; Exh. N (Gill Depo.); PP.

7 189:12–190:20.)

8

9

10 (Venezia Decl., Exh. S (Oppenheimer Prod.), OPCO0206–37.)

11

12

13 (*Id.* at Exh. S

14 (Oppenheimer Prod.), OPCO0701–11.)

15

16 (*Id.* at Exh. S (Oppenheimer Prod.), OPCO0701.)

17 Ironhawk cannot know exactly what happened next because

18 (*Id.* at

19 Exh. H (Sheehan Depo.), PP. 133:10–21.)

20

21

22 . (*Id.* at Exh. F (Xuezhao Depo.), P. 49:11–

23 15 & Exh. 27; Exh. H (Sheehan Depo., 143:1–22 & Exh. 61; ¶ 18 & Exh. T.)[1]

24

25 [1] Relevant Dropbox corporate development employees who, according to documentary evidence, participated in at least some of the discussions testified that they

26 . (Venezia Decl., Exh. F (Xuezhao Depo.), PP. 27:3–6, 35:19–21; Exh. G

27 (Lightcap Depo.), PP. 20:9–11, 34:2–11, 55:11–14.)                       , Dropbox cites to these witnesses testimony in support of certain of their "undisputed" facts. (*See* Dropbox's UF

28 86–87, 162–63.) At the summary judgment stage, Dropbox may not rely on testimony



**C.**      **Dropbox Sought a Name ██████████████ for Its New Data Management Software, Ultimately Selecting Smart Sync**

██████████████████████████████████████

███████████████████████████████████

██████████████████████████████ (Venezia Decl., Exh. H (Sheehan Depo.), P. 25:15–25 & Exh. 40.) Dropbox's claim that it chose Smart Sync "because the phrase immediately conveyed the feature's benefit and function" is belied by the evidence. (*See, e.g., id.* at Exh. H (Sheehan Depo.), PP. 56:10–57:7 & Exh. 46 ██████████████████████

████████████████████████████████

████████████████████.)

███████████████████████████████

████████████. (*Id.* at Exh. H (Sheehan Depo.), Exh. 40 ██████████

████████████████████████████████

████████████████.) In this regard, Dropbox's CEO █████████

████████████████████(*Id.* at Exh. O (Houston Depo.), P. 19:8–11.) And as to the "Smart Sync" name, ██████████

██████████████████████████

████████████████████████████████

██████████████. (*Id.* at Exh. H (Sheehan Depo.), PP. 43:17–23 & Exh. 43; Exh. D (Watt Depo.), P. 36:24–37:7; Exh. E (Rowell Depo.), P. 45:17–46:4.)

**D.**      **Dropbox Withholds Key Documents from Its In-House Counsel, and Ignores Advice to Use "Dropbox" in Front of "Smart Sync"**

Ironhawk fully briefed Dropbox's failure to rely on competent advice of counsel in its Motion for Partial Summary Judgment as to Dropbox's Advice of Counsel Defense (the "Ironhawk MSJ"), and incorporates by reference that briefing

---

contradicted by contemporaneous documents, nor should testimony of witnesses ████████████████ be credited.

1   and all evidence cited in support thereof. (Dkt. 89.) Ironhawk will not rehash the

2   substance of that motion, however, by way of summary:  (1) Dropbox withheld key

3   documents from junior in-house counsel Nina Han; (2) Ms. Han's advice was not

4   communicated to decision makers at Dropbox; and (3) Dropbox did not follow Ms.

5   Han's advice to precede its use of Smart Sync with Dropbox.

6       Additionally ███████████████████████████████████████

7   ████████████████████████████████████████████████████████████████

8   ████████████████████████████ (Venezia Decl., Exh. H (Sheehan Depo.), PP.

9   70:10–71:18, Exh. 49.) ██████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████

12  ████████████████████████████████. (*Id.* at Exh. K (Lyman Depo.), P.

13  33:6–20; Exh. H (Sheehan Depo.), PP. 72:22–73:11, 117:8–119:1 & Exh. 55.)

14      Months after this approval, on the brink of Smart Sync's release, ████████

15  ████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████

17  ██████████████████████████. (*Id.* at Exh. J (Han Depo.), P. 139:9–17 &

18  Exh. 101; Exh. H (Sheehan Depo.), PP. 92:16–93:8 & Exh. 52.) █████████

19  ████████████████████████████████████████████████████████████████

20  ██████████████████████████████████████████████████████████

21  ██████████████████████████████████████████ (*Id.*)

22      **E.**     **Dropbox Saturates the Market with Its Smart Sync Resulting in a**

23          **Strong Brand Association Between Dropbox and Smart Sync**

24      Dropbox expended considerable resources saturating the market with its

25  Smart Sync, ███████████████████████████████████████████████

26  ██████████████████████████████████████ (*Id.* at Exh. O (Houston Depo.), PP.

27  111:25–112:3 & Exh. 148.) █████████████████████████████████

28          ████████████████████████████████ (*Id.* at Exh. I (Doyle Depo.), PP. 55:23–

1    57:25 & Exh. 79.) And Dropbox brags about its ████████████ Google Adwords

2    spend for 2017-2018 (Motion, P. 10:10), with approximately $7,000 per month

3    targeting keyword variants that include "smart sync." (Stricchiola Decl., Exh. A, ¶

4    40.) According to Dropbox's own rebuttal SEO expert ████████████████████

5    ████████████████████████████████████████████████████

6    ██████████████ (*Id.* at Exh. R (Huffman Depo.), PP. 82:12–83:10.)

7          Dropbox's extensive marketing of Smart Sync has resulted in a high level of

8    brand recognition and visibility in online search engines. <u>First</u>, an Ironhawk

9    customer searching for "smartsync" on Google would receive results that

10   prominently feature Dropbox's Smart Sync marketing materials. (Stricchiola Decl.,

11   Exh. A, ¶ 49; Venezia Decl., ¶ 19 & Exhs. U & V.) Contrarily, when Dropbox-

12   related results are removed from the search results, Ironhawk's SmartSync® result

13   appears on the first page of results (Venezia Decl., ¶ 20 & Exh. W) – a position that

14   Dropbox's own expert testified is valuable to a company and their brand. (*Id.* at

15   Exh. R (Huffman Depo.), PP. 111:18–112:1.) <u>Second</u>, Dropbox's own survey expert

16   found that, when querying a pool of IT professionals as to what company offers

17   Smart Sync, 81.5 percent responded that Smart Sync was offered by Dropbox. (Dkt.

18   101-1 (Poret Report), P. 41.) <u>Third</u>, Dropbox's own marketing expert noted

19   Dropbox's "500 million registered users" and "aided brand awareness levels in

20   excess of 70 percent" to support his argument that "a consumer encountering the

21   Smart Sync feature on Dropbox's website or in Dropbox's marketing materials will

22   attribute this feature to Dropbox[.]" (Dkt. 97 (Pham Decl.), ¶ 61.)

23         **F.      <u>Actual Confusion Occurs in the Marketplace, Harming Ironhawk's</u>**

24                   **<u>Existing Business Relationships and Hindering Ironhawk's Efforts</u>**

25                   **<u>to Expand SmartSync®'s Use in the Commercial Sector</u>**

26         Approximately three months after Dropbox's launch of Smart Sync,

27   confusion bubbled up amongst two of Ironhawk's important value added resellers –

28   CACI and IBM – who expressed concern to Ironhawk over third-party uses of Smart

Sync. (Gomes Decl., ¶ 15.) While Dropbox impugns Mr. Gomes' integrity by accusing him of fabricating evidence, neutral third-party witnesses at CACI and IBM testified that they asked Mr. Gomes to provide draft e-mails documenting their concerns about third-party use of Smart Sync. (Venezia Decl., Exh. B (Indermill Depo.), PP. 122:8–123:2; Exh. A (Peyton Depo.), PP. 10:25–13:7.)

Similar concerns have been expressed since that time, with the below constituting a non-exhaustive list:

- ██████████████████████████████████████████ ██████████████████████████████ (Gomes Decl., ¶ 16.)
- ███████████████████████████████████████ ███████████████████████████████ (*Id.* at ¶ 17.)
- ████████████████████████████████████████████ █████████. (*Id.* at ¶ 16.)
- ████████████████████████████████████████████ ███████████████████████████████████████████████ █████████████████████████████████████ █████████████████████████████████████████ ███████████████████████████████████████ (*Id.* at ¶ 18.)

III.  <u>**NINTH CIRCUIT AUTHORITY DISFAVORS SUMMARY JUDGMENT ON THE ISSUE OF LIKELIHOOD OF CONFUSION**</u>

Dropbox's Motion ignores overwhelming Ninth Circuit authority recognizing that the test for trademark infringement "is fact intensive, and it thus is rarely appropriate for deciding on summary judgment." *Xen, Inc. v. Citrus Systems, Inc.*, 2012 WL 5289609, *3 (C.D. Cal. Oct. 25, 2012) (Pregerson, J.), *citing Au–Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1075 (9th Cir. 2006); *see also Interstellar Starship Servs., Ltd. v. Epix Inc.,* 184 F.3d 1107, 1111–12 (9th Cir. 1999) (reversing grant of summary judgment on trademark infringement claim);

*Solar Sys. & Peripherals, Inc. v. Solarcom Holdings*, 44 Fed. Appx. 186, 191 (9th Cir. 2002) (same); *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 608–09 (9th Cir. 2005) (same); *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 633–634 (9th Cir. 2008) (same); *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1038-39 (9th Cir. 2010) (same); *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1221 (9th Cir. 2012) (same); *His & Her Corp. v. Shake-N-Go Fashion, Inc.*, 572 Fed. Appx. 517, 518 (9th Cir. 2014) (same) *Moldex-Metric, Inc. v. McKeon Products, Inc.*, 596 Fed. Appx. 567, 567–68 (9th Cir. 2015) (same); *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1112 (9th Cir. 2016) (same); *Marketquest Group, Inc. v. BIC Corp.*, 862 F.3d 927, 935 (9th Cir. 2017) (same); 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:120 (5th ed.) ("The Ninth Circuit has been the most negative of all the circuits about summary dismissal of a trademark infringement case.").

This case is not the exception to the rule set forth above. Ironhawk has persuasive evidence as to every *Sleekcraft* factor.

## IV.   THERE IS EVIDENCE TO SUPPORT IRONHAWK ON EACH RELEVANT FACTOR

"[L]ikelihood of confusion will be found whenever consumers are likely to assume that a mark is associated with another source or sponsor because of similarities between the two marks." *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991). Forward confusion occurs where "the junior user is palming off its products as those of the senior user." *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129–30 (9th Cir.1998). Contrarily, reverse confusion occurs where "consumers doing business with the senior user might mistakenly believe that they are dealing with the junior user." *Id.* at 1130; *Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 445 (3d Cir. 2000) ("the doctrine of reverse confusion is designed to prevent the calamitous situation we have here—a larger, more powerful

company usurping the business identity of a smaller senior user.").

Summary judgment is inappropriate on either theory of confusion.

### A.   SmartSync® Is an Inherently Distinctive Protectable Mark, and Dropbox Saturated the Market with Its Own Use of Smart Sync

In a forward confusion analysis, to determine the strength of the senior mark, both its conceptual strength and commercial strength are considered. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). However, in a reverse confusion analysis, the commercial strength of the junior user's mark, *i.e.*, whether "the junior user saturates the market and overwhelms the senior user[,]" is the key consideration. 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:10 (internal quotations omitted); *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 n. 2 (9th Cir. 2000) ("In a reverse confusion case . . . the inquiry focuses on the strength of the junior mark because the issue is whether the junior mark is so strong as to overtake the senior mark.").

### 1.   SmartSync® Is an Inherently Distinctive, at Minimum Suggestive, Mark

Ironhawk's SmartSync® was registered on the principal register without proof of secondary meaning. (Gomes Decl., ¶ 7 & Exh. A.) This registration raises a strong presumption that SmartSync® is inherently distinctive – *i.e.*, at minimum suggestive – "and the burden on [Dropbox] necessary to overcome that presumption at summary judgment is a heavy one." *Zobmondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1115 (9th Cir. 2010). In determining whether a mark is at least suggestive or merely descriptive, the primary criterion is the imagination test, which "asks whether imagination or a mental leap is required in order to reach a conclusion as to the nature of the product being referenced." *Id.* at 1115–16 (internal quotations and citations omitted) ("WOULD YOU RATHER …?" could be found to be suggestive, because "one may infer that there is a question, but only imagination can tell us that the question will serve up a bizarre or humorous choice."); *see also*

1 | *Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.*, 57 F. Supp. 3d 1203, 1218

2 | (C.D. Cal. 2014) (inferential step required to determine MOROCCANOIL is hair

3 | care product with argan oil creates genuine dispute as to whether the mark is

4 | suggestive or descriptive).

5 |     The mark SmartSync® may allow a customer to determine that something is

6 | being synchronized in an intelligent manner, but imagination or a mental leap is

7 | needed to determine the nature of the product being referenced. Indeed, at

8 | deposition Ms. Han was asked ██████████████████████████████

9 | ██████████████████████████ (Venezia Decl., Exh. J (Han Depo.), PP.

10 | 138:17–139:5.) She responded, █████████████████████████

11 | ████████ (*Id.*) Further, in the historical implementations of SmartSync®, data is

12 | transferred from one node to another in a one-way transfer, *i.e.*, it is *not*

13 | "synchronized" between two nodes. (Gill Decl., ¶ 4.)

14 |     The third-party use of the phrase "smart sync" cited by Dropbox, while

15 | drastically overstated (as explained below), actually reinforces that SmartSync® is

16 | *not* descriptive. The cited use of "smart sync" is largely for unrelated products such

17 | as a baby monitor, skin cream, and an adjustable bed. (Dkt. 97-7 (Pham Decl., Exh.

18 | 8).) Such use demonstrates that the phrase "is used in too many different ways to

19 | suggest any particular meaning to the reasonable consumer." *Dreamwerks Prod.*

20 | *Grp.*, 142 F.3d at 1130 (Dreamwerks deserves broad protection because "DREAM"

21 | can have a multitude of meanings).

22 |     Finally ████████████████████████████████████

23 | ████████████████████████████████████████████████ (Venezia

24 | Decl., Exh. H (Sheehan Depo.), PP. 36:2–45:4, 56:10–57:7 & Exhs. 40, 43, 46; Exh.

25 | J (Han Depo.), PP. 103:13–104:5 & Exh. 89; Exh. D (Watt Depo.), PP. 36:24–37:7,

26 | 55:8–17; Exh. E (Rowell Depo.), PP. 45:17–46:4, 68:4–20.)

27 |     A reasonable juror, when viewing the evidence in Ironhawk's favor, could

28 | find that the mark is conceptually strong. *See Fortune Dynamic*, 618 F.3d at 1034

("[B]ecause the decision as to whether a mark is descriptive or suggestive is frequently made on an intuitive basis rather than as a result of a logical analysis susceptible of articulation, we think a jury should assess the conceptual strength of Fortune's mark in the first instance") (internal citations and quotations omitted).

> ## 2. **SmartSync® Enjoys Commercial Strength in Its Historical Niche Market, Which Could Weigh in Favor of a Likelihood of Forward Confusion**

A trademark may be strong within its niche market without enjoying nationwide commercial recognition. *See Kreation Juicery, Inc. v. Shekarchi*, 2014 WL 7564679, *6–7 (C.D. Cal. Sep. 17, 2014) (health-conscious local Mediterranean restaurant held commercially strong despite niche appeal to health-conscious consumers in Los Angeles). Here, Ironhawk has continuously used SmartSync® for a decade-and-a-half. 15 U.S.C. §1052(f) (presumptive distinctiveness of mark in continuous and substantially exclusive use for five years). During that time, Ironhawk has generated revenue in excess of ███████ (Gomes Decl., ¶ 12.) Ironhawk's SmartSync® enjoys commercial strength at the very least within its historical niche market of United States military software, resulting from both out-of-pocket marketing experiences, but more importantly, countless man hours of promotion and sales. (*Id.* at ¶¶ 9-10; *see also* Venezia Decl., Exh P (Indermill Depo. II), PP. 82:1-84:9; Exh. A (Peyton Depo.), PP. 134:9–14).) A reasonable juror, viewing the evidence and all inferences in Ironhawk's favor, could find that SmartSync® is commercially strong in its historical niche market. *See Rearden*, 683 F.3d at 1211 (reversing summary judgment where mark at issue was "suggestive" and strengthened by "efforts to promote the mark").

> ### 3. **Dropbox Saturated the Market with Its Use of Smart Sync**

███████████████████████████████

███████████████████████████████

███████████████████████████████

1    ████████████████████████████████████. (*Id.* at Exh. O (Houston Depo.),

2    PP. 111:25–112:3 & Exh. 148; Exh. I (Doyle Depo.), PP. 55:23–57:25 & Exh. 79;

3    Stricchiola Decl., Exh. A, ¶ 40.) This extensive marketing by Dropbox has resulted

4    in a strong association between Dropbox and "Smart Sync."

5         Dropbox's survey expert found that, when querying a pool of IT professionals

6    as to what company offers Smart Sync, 81.5 percent responded Smart Sync was

7    offered by Dropbox. (Dkt. 101-1 (Poret Report), P. 41.) Similarly, Dropbox's

8    marketing expert opined that with Dropbox's strong brand recognition, consumers

9    encountering "Smart Sync" are likely to associate the phrase with Dropbox. (Dkt. 97

10   (Pham Decl.), ¶ 61.) And as noted above, Ironhawk consumers searching for

11   "smartsync" on Google receive results that prominently feature Dropbox's Smart

12   Sync marketing materials. (Stricchiola Decl., Exh. A, ¶ 49; Venezia Decl., ¶ 19 &

13   Exhs. U & V.)

14        Dropbox's saturation of the market with its Smart Sync weighs heavily in

15   support of finding a likelihood of reverse confusion. See *JL Beverage Co, LLC*, 828

16   F.3d at 1109 (reversing summary judgment on reverse confusion and noting that

17   "[t]he national recognition of the Jim Beam mark increases the likelihood that

18   consumers will believe they are doing business with Jim Beam, not JL Beverage,

19   when they purchase Johnny Love Vodka").

20        **4.    The Evidence of Third-Party Use is Mostly Irrelevant, and**

21             **Entirely Inadequate to Support Summary Judgment**

22        Dropbox argues that the SmartSync® mark is weakened by a "crowded field"

23   of third parties using the same mark. There are several problems with Dropbox's

24   argument.

25        First, third-party use of "smart sync" may only be relevant to the strength of

26   the SmartSync® mark insofar as that use is in the same or a related industry as

27   Ironhawk. *Eclipse Assocs., Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1119 (9th Cir.

28   1990) ("Evidence of other unrelated potential infringers is irrelevant to claims of

trademark infringement and unfair competition under federal law."); *see also Rearden*, 683 F.3d at 1211 (affirming rejection of argument that appellants' marks were weak because over 840 different companies used the mark or some variation thereof because only four of those entities were in the plaintiff's industry); *M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1087–88 (9th Cir. 2005) (affirming district court's exclusion of evidence of unrelated third party marks). Here, Dropbox's own exhibit showing third-party use states that only 18 of the 44 uses of "Smart Sync" are in a related field. (Dkt. 97-7 (Pham Decl., Exh. 8).) And those 18 purportedly related uses include several plainly unrelated products such as a clock synchronization system and music-related software, leaving only a small handful of potentially relevant uses.[2] (*Id.*)

Second, Ironhawk's evidentiary objections demonstrate that Dropbox offers *no admissible evidence* substantiating any third-party use of "Smart Sync" in the data management field. Dropbox relies solely upon a Google search performed by its marketing expert witness, who has no personal knowledge as to the use of any of the identified marks. *See Internet Specialties West, Inc. v. ISPWest*, 2006 WL 4568796, *1 (C.D. Cal. Sep. 19, 2006) (excluding printouts of website purporting to show third party use of the mark at issue where defendant lacked corresponding testimony from someone with knowledge of the site); *Icon Enters. Int'l, Inc. v. Am. Products Co.*, 2004 WL 5644805, *31 (C.D. Cal. Oct. 7, 2004) (excluding Thomson and Thomson search report because no evidence of how marks were used and whether they were used in relevant industry). Without the underlying foundational evidence, even purported evidence of third-party use in the same general field is, at best, inadequate to compel summary judgment, and, more likely, irrelevant to the strength of the mark. *Rebelution, LLC v. Perez*, 732 F. Supp. 2d 883, 893 (N.D. Cal. 2010) ("without evidence of the scope of use by third-parties, the degree to which

---

[2] Certain of those allegedly relevant users have been sent cease and desist letters by Ironhawk, with many agreeing to discontinue their use of Smart Sync. (Venezia Decl., ¶ 28 & Exh. Z.)

plaintiff's mark was weakened by these users cannot be determined"). This evidentiary objection is not merely theoretical, for instance, Dropbox puts forth smartsync.com as an example of third party use while failing to cite evidence showing that smartsync.com is owned by a Russian company or the non-competitive nature of its goods.[3] (Venezia Decl., Exh. M (Gomes Depo.), P. 220:10–17; Exh. N (Gill Depo.), PP. 181:13–182:3, 183:3–12.)

In sum, "there are genuine disputes of material fact as to what constitutes the relevant 'field,' whether the field is 'crowded,' and the effect of the foregoing on the likelihood of confusion analysis." *JL Beverage*, 828 F.3d at 1108.

**B.    Dropbox's Smart Sync and Ironhawk's SmartSync® Operate in the Same Data Management Industry**

Goods that do not operate in the same manner but serve the same ultimate purpose may be found to be in proximity. *Allstate Ins. Co. v. Kia Motors America, Inc.*, 2017 WL 10311211, *8 (C.D. Cal. Sep. 20, 2017) (Allstate's driver behavior monitor and Kia's autonomous driving product could be found in close proximity because "both function as ways to improve driver safety."); *see also Fortune Dynamic*, 618 F.3d at 1035 (noting that "related" or "complementary" goods also increase a likelihood of confusion).

██████████████████████████████████████████ ████████████████████████████████████████ (Venezia Decl., Exh. H (Sheehan Depo.), PP. 45:8–46:16.) While Dropbox emphasizes Smart Sync's ability to help users save hard drive space, Dropbox's press release announcing Smart Sync makes clear the feature is intended to facilitate file sharing amongst teams. (*Id.* at Exh. O (Houston Depo.), Exh. 144 ("Smart Sync works on all files and folders in a Dropbox Business account. Paired with the recently released Dropbox team folders, Dropbox becomes a centrally manageable, secure hub for

---

[3] Dropbox's materials show other users of "smart sync" (iTristan Media Group, 2BrightSparks, and Micro-Star International) are headquartered internationally. (Dkt. 97-7; 97-10, PP. 17, 42.)

teams to work together on all their files.")

Similarly, Ironhawk's SmartSync® allows for the efficient transfer of files between multiple locations and users. (Gomes Decl., ¶ 4; Gill Decl., ¶ 6.) In other words, both Dropbox's and Ironhawk's data management software facilitate access to files by multiple users in multiple locations – they only differ insofar as there are different ways to skin that cat. And Dropbox's utilization of a cloud-based system to share files between users is not unique, one implementation of SmartSync® previously identified ███████████████████████████ utilizes a Dropbox-like shared folder. (Gill Decl., ¶ 5.)

For this reason Ironhawk views Dropbox as a competitor, but previously also viewed Dropbox as a potential business partner. (Gomes Decl., ¶ 19.) That is, for Dropbox's Smart Sync feature to work, allowing users to open files locally and without delay that are only saved on a cloud drive, Dropbox must necessarily use data replication to move the data in the cloud to the local computer. (Gill Decl., ¶ 7.) Ironhawk's SmartSync® could be integrated within Dropbox's architecture to be the engine that powers that data replication. (*Id.* at ¶ 8.) And because SmartSync® has been similarly integrated within other systems for its historical customers, Dropbox using the name Smart Sync implies that it is powered by SmartSync®, when it in fact is not.[4] (*Id.* at ¶ 9.) For an analogous situation, one need look no further than stickers reading "Intel Inside" on computers and similar devices. The computer may be manufactured by Dell or Microsoft or others, but the consumer recognizes that technology inside comes from Intel.

Lastly, Dropbox's argument that Dropbox and Ironhawk serve different customers is vastly overstated. While Dropbox may not currently sell enterprise solutions directly to the United States military, its products are offered to

---

[4] That Ironhawk's business development activities within the commercial sector have involved ████████████████████████████████████ – further reinforces the competitive nature between Ironhawk and Dropbox. (Gomes Decl., ¶¶ 13–14.)

1   government and military purchasers through third-party resellers on the GSA

2   website. (Venezia Decl., ¶ 21 & Exh. X.) And as discussed above, SmartSync® is

3   not entirely a military product, SmartSync® has been used commercially, and

4   Ironhawk actively seeks to expand SmartSync®'s use in the commercial sector.

5   (Gomes Decl., ¶¶ 8, 13–14.)

6       **C.   Smart Sync Is Essentially Identical to the SmartSync® Mark**

7       "Similarity of the marks has always been considered a critical question in the

8   likelihood-of-confusion analysis." *JL Beverage*, 828 F.3d at 1109.

9       Dropbox cannot seriously dispute that its use of Smart Sync is virtually

10  identical to Ironhawk's SmartSync® mark in terms of sight, sound, and meaning.

11  The words appear exactly the same except for one inconsequential space, sound

12  exactly the same, and being the same words, have the same meaning to customers.

13  This similarity weighs strongly towards finding a likelihood of confusion.

14  *Dreamwerks Prod. Grp.*, 142 F.3d at 1131 ("Dreamwerks" and "DreamWorks"

15  similar); *AMF Inc.*, 599 F.2d at 351–52 ("Sleekcraft" and "Slickcraft" are "quite

16  similar on all three levels").

17      Instead, Dropbox argues that its use of a house mark, Dropbox, in close

18  proximity to "Smart Sync" renders the marks dissimilar. But because the calling

19  card of reverse confusion is a strong association between the junior user and the

20  mark at issue, the use of a house mark "aggravate[s], rather than mitigate[s], reverse

21  confusion[.]" *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198,

22  230 (3d Cir. 2000) (use of Victoria's Secret in close proximity to "miracle" could

23  aggravate reverse confusion); *Americana Trading Inc. v. Russ Berrie & Co.*, 966

24  F.2d 1284, 1288 (9th Cir. 1992) (same proposition).[5]

25      Even setting aside evidence that Dropbox does not use its house mark in close

26

27  ───────────────
[5] Dropbox's authority, *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 650, 663–64 (E.D. Va. 2017),
28  a cherry picked outlier case from the Eastern District of Virginia, contradicts binding Ninth
    Circuit authority such as *Americana Trading*.

proximity to Smart Sync (Dkt. 89-2, ¶¶ 6–10; Dkt. 89-6, PP. 61–67, 81–92), the use of a "house mark" does not eliminate the likelihood of forward confusion either. The Lanham Act protects against not just "source confusion," but also confusion as to an affiliation or endorsement. Dropbox's use of the Dropbox mark does nothing to eliminate or mitigate the likelihood that consumers who know Ironhawk would mistakenly believe that Dropbox licensed the SmartSync® mark from Ironhawk or incorporated Ironhawk's SmartSync® software into Dropbox products. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 155 (9th Cir. 1963) ("[i]t is not material whether [a consumer] would think that the makers of the Scotch whisky were actually brewing and bottling this beer, or whether it was being produced under their supervision or pursuant to some other arrangement with them").

A reasonable juror, viewing the evidence in Ironhawk's favor, could find the similarity between the marks to be so striking as to counsel strongly in favor of a likelihood of confusion, whether forward or reverse.

### D.    Dropbox's Use of Smart Sync Has Caused Actual Confusion

"Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely." *AMF Inc.*, 599 F.2d at 352. However, given the difficulty of collecting such evidence, "the failure to prove instances of actual confusion is not dispositive[,]" and "this factor is weighed heavily only when there is evidence of past confusion[.]" *Id.* at 353. Here, there is significant evidence of actual confusion caused by Dropbox's use of Smart Sync.

As outlined above, two of Ironhawk's key value added resellers – CACI and IBM – expressed concern regarding confusion that had arisen from Dropbox's use of Smart Sync. (Gomes Decl., ¶ 15.) Dropbox's accusations that such evidence was manufactured are unfounded – neutral third party testimony from both CACI and IBM confirms that Mr. Gomes was asked by CACI and IBM to provide drafts of the e-mails documenting customer confusion. (Venezia Decl., Exh. B (Indermill Depo.), PP. 122:8–123:2; Exh. A (Peyton Depo.), PP. 10:25–13:7.)

Since that time, additional instances of actual confusion have arisen. (Gomes Decl., ¶¶ 16–18.) Dropbox attempts to write off such confusion as "self-serving anecdotes," however, Dropbox's own counsel recently argued that instances of confusion at trade shows evidenced only by the declaration of their client were "classic examples of reverse confusion." *Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc.*, Case 4:17-cv-06393-YGR, Dkt. 14 at PP. 22–24 (N.D. Cal. Nov. 20, 2017.) Ironhawk agrees.

Dropbox's survey purporting to provide evidence to the contrary, according to Dropbox's expert, Mr. Poret, is solely a forward confusion survey and thus irrelevant to reverse confusion. (Dkt. 101-1 (Poret Report), P. 4; Venezia Decl., Exh. Q (Poret Depo.), PP. 17:17–18:6.) Mr. Poret's survey was also fatally flawed to the extent it purported to study forward confusion. Mr. Poret ignored that an Eveready survey requires the survey population to have top-of-mind knowledge of the senior mark, a key take away from the article cited by Mr. Poret in support of his choice to conduct an Eveready survey. (Dkt. 101-1 (Poret Report), P. 9; Venezia Decl., Exh. Y (Swann Article), P. 733;.) Mr. Poret surveyed potential Dropbox customers whom he stated "would have no meaningful likelihood of encountering and considering Ironhawk's products[,]" *i.e.*, the knowledge required to conduct an Eveready survey. (Dkt. 101-1 (Poret Report), P. 8.) In any event, a juror should be the arbiter of the credibility and persuasiveness of the Poret survey in the context of this case.

### E.   Certain Marketing Channels of Ironhawk and Dropbox Overlap

The marketing channels used by Ironhawk and Dropbox converge in key respects. Ironhawk utilizes its employees as salespeople in seeking accounts for the business. (Gomes Decl., ¶ 9.) While Dropbox implies that it attracts customers solely through online advertising ████████████████████████████████ ████████████████████ (Venezia Decl., Exh. K (Lyman Depo.), PP. 11:21–12:1, 25:4–17, 28:4–13 & Exh. 109 (████████████████████████████

1296203.1

-20-

1  ███████████████████████████████████████████

2  ████████████████████ ").) Further, both Ironhawk and Dropbox maintain

3  websites to market their products. (Gomes Decl., ¶ 9.) While Dropbox argues that

4  Ironhawk does not sell its product directly through its website, Ironhawk's website

5  provides brand awareness, a purpose Dropbox's SEO rebuttal expert describes as

6  "totally legitimate." (Venezia Decl., Exh. R (Huffman Depo.), PP. 75:11–76:9.).[6]

7  And both Ironhawk's SmartSync® and Dropbox's paid plans are available for sale

8  on the GSA website. (*Id.* at ¶ 21 & Exh. X; Gomes Decl., ¶ 20 & Exh. B.)

9      **F.    Ironhawk's Business Partners Do Not Believe the Sophistication of**

10          **Their Customers Protects from Confusion**

11      Two of Ironhawk's value added resellers, CACI and IBM, earn billions in

12  revenue selling the type of integrated software solutions that include SmartSync®,

13  giving them particular expertise as to whether the sophistication of such software

14  customers would prevent confusion. In this regard, CACI testified:

15          "[I]f there was another competitor that was using the name

16          . . . you dilute the benefits that you bring to your end

17          customer and you dilute your score, raising the potential

18          for you to not win the bid."

19  (Venezia Decl., Exh. P (Indermill Depo. II), PP. 76:24–77:8.) IBM explained:

20          [W]hen you're talking about someone at a higher level, all

21          they hear are buzzwords. That's the problem. They just

22          hear buzzwords. They don't understand the technology,

23          the drivers, the customers or the solutions behind it[.]"

24  (*Id.* at Exh. A (Peyton Depo.), PP. 57:2–59:14.)

25      Furthermore, the parties' respective goods are not so expensive as to mitigate

26  ────────────────

27  [6] Dropbox attempts to analogize the Ninth Circuit's "marketing channels" factor to the Fourth Circuit's "similarity in advertising" factor. *Valador*, 242 F. Supp. 3d at 667. But there are material

28  differences. *Valador* explains that the amount spent on advertising and appearance of ads are key considerations; *Sleekcraft* does not. *Id.* at 667–68; *AMF Inc.*, 599 F.2d at 353.

against a likelihood of confusion. Ironhawk sells SmartSync® products for as low as ███████████████, and Dropbox's packages with Smart Sync are sold for as low as $12.50 per month. (Gomes Decl., ¶ 21 & Exh. C.)

## G. At Minimum, Dropbox Released Its Smart Sync with Full Knowledge of and Disregard for Ironhawk's Rights in the SmartSync® Mark

When considering intent in a forward confusion case, the question is "whether defendant in adopting its mark attempted to capitalize on plaintiff's good will." *Marketquest Grp., Inc.*, 862 F.3d at 934. However, in a reverse confusion case, the Court may consider several indicators of intent, ranging from a deliberate effort to push a company out of the market to actions that "culpably disregarded the risk of reverse confusion." *Id.* at 934–35.

There is substantial evidence from which a juror could find that Dropbox either acted deliberately or at least "culpably disregarded the risk of reverse confusion." *Id.* Dropbox adopted the same exact mark for the same category of goods ███████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ (Venezia Decl., Exh. S (Oppenheimer Prod.), OPCO0701–11; Exh. J (Han Depo.), P. 139:9–17 & Exh. 101; Exh. H (Sheehan Depo.), PP. 92:16–93:8 & Exh. 52.) ██████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████[7] Even after being sued, Dropbox continued to use its Smart Sync

---

[7] As Dropbox's counsel has argued, "the decision to move forward in the face of this knowledge imputes at best a gross disregard of [plaintiff's] rights and at worst, a deliberate intent to push [plaintiff] out of the market." *Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc.*, Case 4:17-cv-06393-YGR, Dkt. 14 at PP. 22–24 (N.D. Cal. Nov. 20, 2017.)

1296203.1

1   without even attempting to mitigate the harm. ███████████████████

2   ████████████████████████████████████████████████████

3   ██████████████████████████████████████████. (*Id.*

4   at Exh. R (Huffman Depo.), PP. 82:12–83:10.)

5          In summary, there is evidence from which a juror could find that Dropbox

6   deliberately appropriated the Smart Sync mark, as opposed to paying to acquire

7   Ironhawk or its rights. Alternatively, there is evidence from which a juror could find

8   that Dropbox recklessly proceeded with its launch of Smart Sync, knowing of but

9   assuming the risk of flooding the market with its Smart Sync and thus creating

10  reverse confusion to the detriment of Ironhawk. *See JL Beverage*, 828 F.3d at 1112

11  (finding disputed issue of fact necessitating denial of summary judgment where Jim

12  Beam's legal team was aware of plaintiff's trademark prior to nationwide rollout,

13  but denied an intent to infringe).

14  **H.    Ironhawk Has Attempted and Continues Its Attempts to Expand**

15  **the Use of SmartSync® Further Into the Commercial Sector**

16         "The likelihood of confusion is greater if either party might expand its

17  business to compete with the other." *Solar Sys. & Peripherals*, 44 Fed. Appx. at

18  190. Significant evidence and common sense supports the proposition that

19  Dropbox's use of Smart Sync has and will continue to interfere with Ironhawk's

20  attempts to expand SmartSync®'s use in the commercial sector.

21         Ironhawk has historically and continues to attempt to expand the use of

22  SmartSync® in the commercial sector, including with Dropbox itself. (Gomes Decl.,

23  ¶¶ 8, 13–14, 19.) Ironhawk has ongoing negotiations with ███████████████

24  ██████████████████ – concerning an implementation of SmartSync® within

25  its cloud storage architecture. (*Id.* at ¶ 14.) Ironhawk is also pursuing

26  implementations of SmartSync® within the oil and gas industry by way of ████

27  ████████, and the pharmacy industry by way of ████████. (*Id.* at ¶ 8.) Ironhawk

28  recently discussed an implementation of SmartSync® with ██████████████

1    ███████. (*Id.*)

2    Dropbox's authorities are distinguishable. In *M2 Software*, 421 F.3d at 1085,

3    *Surfvivor*, F. 3d at 634, and *Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki*

4    *Kaisha*, 290 F. Supp. 2d 1083, 1096 (C.D. Cal. 2003) the courts held that the

5    expansion plans were unrealistic, unsupported by specific evidence, and speculative,

6    respectively. No such deficiencies exist here, *i.e.*, Ironhawk's attempts to expand

7    SmartSync®'s use in the commercial sector are longstanding, substantiated by

8    historic success, subject to current negotiations with potential business partners, and

9    supported by the evidence cited above. *See also Rearden*, 683 F.3d at 1219 ("In the

10   end, it is for the jury to decide whether the parties really intend to expand into—or

11   are already operating in—the same product line or lines").

12   Summary judgment on liability should be denied.

13   **V.    <u>A REASONABLE JUROR, VIEWING THE EVIDENCE IN FAVOR</u>**

14   **<u>OF IRONHAWK, COULD FIND SUFFICIENT WILLFULNESS TO</u>**

15   **<u>JUSTIFY DISGORGEMENT OF PROFITS</u>**

16   Dropbox argues that no reasonable juror, viewing the evidence and all

17   inferences in Ironhawk's favor, could find willful infringement, and thus the Court

18   should summarily adjudicate the remedy of wrongful profits.

19   As an initial matter, the U.S. Supreme Court recently granted a cert petition

20   that will decide whether willfulness is required at all for purposes of a disgorgement

21   of profits. Ironhawk recognizes that this Court is currently bound by Ninth Circuit

22   precedent requiring a finding of willfulness, but respectfully submits that the better

23   reasoned authority in other circuits holds that willfulness is not required.

24   Regardless, a reasonable juror, viewing the evidence and all inferences in

25   Ironhawk's favor, could find the intent necessary to predicate a profit award even

26   under current Ninth Circuit law. The evidence showing willfulness and/or bad faith

27   is discussed *supra* at Sections II.B. and IV.G., and thus will not be repeated.

28   Ironhawk will, however, address Dropbox's claim that a profit award is never

available in a reverse confusion case. Dropbox cites to *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1405–06 (9th 1993) as support for its argument. To be fair, as Dropbox notes, some district courts within the Ninth Circuit have construed *Lindy Pen* as wholly eliminating the possibility of a profit award in a reverse confusion case. However, *Lindy Pen* was not a reverse confusion case, and neither *Lindy Pen* nor the Ninth Circuit has ever expressly held that disgorgement of profits is categorically unavailable as a remedy for reverse confusion. In better reasoned authority, such as *Sands, Taylor & Wood*, the Seventh Circuit held that an award of profits could be available in a reverse confusion case "to make violations of the Lanham Act unprofitable[,]" subject to equitable considerations such as whether the infringer engaged in bad faith. 978 F.2d at 961 (internal citation omitted).

Ultimately the Court in *Sands, Taylor & Wood* found that there was not sufficient bad faith to justify an award of profits in that case, noting the infringer's reasonable reliance on counsel. *Id.* at 961–62. But here, Dropbox did not reasonably rely on counsel, with its failure to provide key documents and follow counsel's advice in fact evidencing bad faith.[8] Further, given Dropbox's extensive knowledge of Ironhawk's SmartSync®, Ironhawk's position as a competitor in the data management space, and the potential for implementations of SmartSync® with Dropbox's biggest competitors in the cloud storage industry, a reasonable jury could find Dropbox is attempting to put the smaller competitive Ironhawk out of business. *See Marketquest Grp.*, 862 F.3d at 934–35 (no requirement in reverse confusion cases to demonstrate intent to "siphon off the other's goodwill" to prove intentional infringement). Analysis of the availability of a profit award should wait until trial.

## VI.   **CONCLUSION**

For the reasons set forth above, the Court should deny Dropbox's Motion for Summary Judgment in its entirety.

---

[8] *Chiron Corp. v. Genentech, Inc.*, 268 F. Supp. 2d 1117, 1123–25 (E.D. Cal. 2002); *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 754 (2d Cir. 1996).

IRONHAWK TECHNOLOGIES, INC. OPPOSITION TO DROPBOX, INC.'S MOTION FOR SUMMARY JUDGMENT

1    Dated:  July 8, 2019                                  BROWNE GEORGE ROSS LLP

2                                                                   Keith J. Wesley
                                                                        Lori Sambol Brody
3                                                                   Matthew L. Venezia

4
                                                                By:        /s/Matthew L. Venezia
5                                                                       Matthew L. Venezia
                                                               Attorneys for Plaintiff and Counterdefendant
6                                                              Ironhawk Technologies, Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-26-
IRONHAWK TECHNOLOGIES, INC. OPPOSITION TO DROPBOX, INC.'S MOTION FOR SUMMARY JUDGMENT

### CERTIFICATE OF SERVICE

I hereby certify that on this ___ day of June, 2019, I electronically filed the foregoing **IRONHAWK TECHNOLOGIES, INC.'S OPPOSITION TO DROPBOX, INC.'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: **SEE SERVICE LIST ATTACHED**

_____
Andrea A. Augustine

1

<u>**SERVICE LIST**</u>

2

***Ironhawk Technologies, Inc. vs. Dropbox, Inc.***
**USDC CD CA Case No. 2:18-cv-01481-DDP(JEMx)**

3

4
5
6
7
8
9
10
11
12

Jennifer Lee Taylor
Sabrina A. Larson
Esther Kim Chang
Nicolas T. Herrera
Joyce Liou
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105
Telephone:   415.268.7000
Facsimile:    415.268.7522
Email:
     jtaylor@mofo.com;
     slarson@mofo.com
     echang@mofo.com
     nherrera@mofo.com
     jliou@mofo.com
     Dropbox_MoFo@mofo.com

Attorneys for Defendant and
Counterclaimant
Dropbox, Inc.

13
14
15
16
17

Wendy J. Ray
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, California 90017
Telephone:  213.892.5200
Facsimile:   213.892.5454
Email:       wray@mofo.com

18
19
20
21

Nicholas Ham
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California  94304
Telephone:  650.813.5600
Facsimile:   650.494.0792
E-mail:       nham@mofo.com

22
23
24
25
26

David H. Kramer
WILSON SONSINI GOODRICH
& ROSATI, P.C.
650 Page Mill Road
Palo Alto, California  94304
Telephone:  650.493.9300
Facsimile:   650.565.5133
E-mail:       dkramer@wsgr.com

27

28

1296203.1

IRONHAWK TECHNOLOGIES, INC. OPPOSITION TO DROPBOX, INC.'S MOTION FOR SUMMARY JUDGMENT