1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                        WESTERN DIVISION

4                            - - -

5        HONORABLE DEAN D. PREGERSON, DISTRICT JUDGE PRESIDING

6

7     IRONHAWK TECHNOLOGIES, INC.,      )
                                        )
8            Plaintiffs,                )
                                        )
9                                       )
                                        )
10          vs.                         ) No. CV 18-01481-DDP
                                        )
11                                      )
                                        )
12    DROPBOX, INC.,                    )
                                        )
13          Defendants.                 )
      _____  )

14

15

                     REPORTER'S TRANSCRIPT OF PROCEEDINGS

16

                            *MOTION HEARING*

17

                        LOS ANGELES, CALIFORNIA

18

                       MONDAY, OCTOBER 7, 2019

19

20    _____

21                        MARIA R. BUSTILLOS
                       OFFICIAL COURT REPORTER
22                          C.S.R. 12254
                      UNITED STATES COURTHOUSE
23                       350 WEST 1ST STREET
                            SUITE 4455
24                 LOS ANGELES, CALIFORNIA 90012
                          (213) 894-2739
25

1                    **A P P E A R A N C E S**

2

3

4        **ON BEHALF OF THE PLAINTIFFS,**
         **IRONHAWK TECHNOLOGIES, INC.:**    BROWN GEORGE ROSS, LLP
5                                            BY:  KEITH J. WESLEY, ESQ.
                                             2121 AVENUE OF THE STARS
6                                            SUITE 2800
                                             LOS ANGELES, CA 90067
7                                            (310)274-7100

8
                                             BROWNE GEORGE ROSS, LLP
9                                            BY:  MATTHEW L. VENEZIA,
                                             ESQ.
10                                           2121 AVENUE OF THE STARS
                                             SUITE 2800
11                                           LOS ANGELES, CA 2800
                                             (310)274-7100

12

13

14       **ON BEHALF OF THE DEFENDANTS,**
         **DROPBOX, INC.:**                  COVINGTON & BURLING, LLP
15                                           BY:  CLARA J. SHIN
                                             415 MISSION STREET
16                                           SUITE 5400
                                             SAN FRANCISCO, CA 94105
17                                           (415) 591-6000

18                                           COVINGTON & BURLING, LLP
                                             BY:  MATTHEW Q. VERDIN, ESQ.
19                                                JEFFREY M. DAVIDSON
                                             45 MISSION STREET
20                                           SUITE 5400
                                             SAN FRANCISCO, CA 9105
21                                           (415)591-6000

22

23

24

25

1                            **I N D E X**

2

3                                                          PAGE

4    MOTION HEARING:                                         4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED  STATES  DISTRICT  COURT

4

| | |
|---|---|
| 1 | LOS ANGELES, CALIFORNIA; MONDAY, OCTOBER 7, 2019 |
| 2 | -o0o- |
| 3 | (COURT IN SESSION AT 11:17 A.M.) |
| 4 | COURTROOM DEPUTY:  Calling item number two, |
| 5 | CV 18-01481-DDP: Ironhawk Technologies, Inc. v. Dropbox, Inc. |
| 6 | Counsel, please make your appearances. |
| 7 | MS. SHIN:  Good morning, Your Honor.  Clara Shin |
| 8 | for Dropbox, Inc., Covington and Burling.  With me are my |
| 9 | colleagues, Jeff Davidson and Matthew Verdin.  We also have |
| 10 | two client representatives from Dropbox, |
| 11 | Anita Kalra and Elena DiMuzio. |
| 12 | THE COURT:  Good morning. |
| 13 | MR. WESLEY:  Good morning, Your Honor. |
| 14 | Keith Wesley for the plaintiff, and I'm joined by my |
| 15 | colleague, Matthew Venezia. |
| 16 | THE COURT:  Good morning.  Okay.  I'll hear from |
| 17 | the Defense side first. |
| 18 | MS. SHIN:  Thank you, Your Honor.  We'll start with |
| 19 | Dropbox's motion for summary judgment. |
| 20 | THE COURT:  Sure.  And just as a reminder before |
| 21 | you start, just sort of pace yourself and don't speak too |
| 22 | quickly. |
| 23 | MS. SHIN:  Thank you.  I won't be pressured by the |
| 24 | time then. |
| 25 | THE COURT:  Please don't be pressured by the time. |

 1    Thank you.

 2            MS. SHIN:  So, Your Honor, the question on summary

 3    judgment is whether it's probable, and not just possible but

 4    probable that a reasonable jury can find that consumers are

 5    likely to confuse the parties --

 6            THE COURT:  Yeah, I don't need -- I don't need any

 7    law.  Let's just -- you want to talk about the *Sleekcraft*

 8    factors and the likelihood of confusion, go ahead.

 9            MS. SHIN:  I'll do that.  I'll go through each of

10    the factors -- each of the eight factors.

11            First, let me set the table and talk about what the

12    offerings are and that can frame the context for each of the

13    *Sleekcraft* factors.  In 2007, Dropbox made a key innovation,

14    and that innovation was to build a first of its kind software

15    application that enables any of us to store all of our files

16    in the cloud and then access them from anywhere in the world

17    from any of our devices.  So in other words, those files are

18    synced.  And today, there are over 500,000,000 Dropbox

19    subscribers, and over a billion files are saved on a daily

20    basis, again, in the cloud.  So in January 2007, Dropbox

21    announced a new innovation and that was called "Smart Sync."

22    It is a product feature that allows Dropbox subscribers -- so

23    it's not offered on its own -- it is only offered to Dropbox

24    subscribers to see all the cloud files -- so all the files

25    saved on the cloud on their hard drives without having to

1   download those files, unless they want to work on them, in

2   which case, they can; and that product feature is called

3   "Smart Sync."

4          Now, it's undisputed that Iron Hawk's Smart Sync

5   product is a bandwidth reduction product.  So in other words,

6   it compresses data, so that large amounts of it can be

7   distributed to very limited bandwidth environments, including

8   navy ships and feeders of war.  And those are not examples

9   that I'm making up.  That's it.  It's two customers today:

10  Are the navy and then a company that offers products to the

11  navy.  So it's 100 percent of its revenues derived from the

12  military.

13         So with that, let me start with the *Sleekcraft*

14  factors.  And I want to begin first with the strength of the

15  mark.  Both, the commercial and the conceptual strength of

16  the mark, it's weak.  Let me begin with the terms "smart" and

17  "sync" and how that describes Iron Hawk software.  And with

18  each of these *Sleekcraft* factors, I'm going to focus on facts

19  that are undisputed.  This is not a case where the parties

20  are disputing the facts.  This is a case where the parties

21  are disputing the impact of the consequences.  And each of

22  the eight *Sleekcraft* factors weigh in favor of Dropbox.  So

23  let me talk about how Iron Hawk itself describes its

24  software.  One of its -- it's own materials -- marketing

25  materials says, quote -- and this is in re Exhibit 36.  It

1    says "Smart Sync dynamically chooses from a large library of

2    compression techniques to reduce data transmissions eyes of a

3    variety of enterprise data types and formats.  Its CEO when

4    asked at his deposition, Question, the ultimate item that you

5    want the navy to procure is a Smart Sync software that

6    assisted with its synchronization of data"; correct?

7            Answered, "That's correct.  I'd like to add it's

8    not just synchronization, but it's synchronization

9    replication and distribution.  And that's at the undisputed

10   facts 110.

11           It's also a crowded field.  Let me say that

12   Iron Hawk itself is not even the first to use the term

13   "Smart Sync" in the software field.  And again, let me focus

14   the Court's attention to re Exhibit 5.  There's an e-mail

15   dated 2009 where folks within Iron Hawk are discussing other

16   companies that uses Smart Sync name, and they found one in

17   the field of "shareware file synchronization."  And that

18   company used the term "Smart Sync" as early as 2000.  There

19   are 40 trademark applications and 18 registrations for

20   Smart Sync for software-related goods or services.  Google

21   searches show that nearly -- well, at least 45 third parties

22   use Smart Sync and at least 18 for data synchronization

23   software.  Iron Hawk itself recognized that it was a crowded

24   field.

25           In the Venezia declaration Exhibit Z, there are

1    numerous cease and desist letters that Iron Hawk sent out,

2    claiming that use -- the use of the term "Smart Sync" was

3    likely to cause confusion with Iron Hawk, and that included a

4    company that used Smart Sync to describe technology that

5    permits users to synchronize and transfer data between

6    computer

7    devices --

8              THE COURT:  Does Iron Hawk hold itself out as

9    Iron Hawk or as Smart Sync?

10             MS. SHIN:  They never use the term "Smart Sync" --

11    at least, the evidence does not show that they ever use the

12    term "Smart Sync" without Iron Hawk.  There's no evidence in

13    the record that shows Smart Sync out there alone.

14             Now, let me talk about the commercial weakness.

15    There's no evidence -- and this is Iron Hawk's evidence --

16    this is their burden to carry.  There is no evidence of any

17    meaningful marketplace exposure inside or outside of the U.S.

18    military.

19             THE COURT:  How does that affect the analysis if

20    it's Iron Hawk Smart Sync or Dropbox Smart Sync -- and those

21    are the identifiers.  The company name is a primary

22    identifier in connection with the products, because you

23    indicated that Dropbox, you know, doesn't offer the

24    functionality as a standalone.  It's always in connection

25    with Dropbox; right?

1          MS. SHIN:  That's correct, Your Honor.

2          THE COURT:  And it appears to be the same with the

3    -- with the plaintiff?

4          MS. SHIN:  Correct, Your Honor.

5          THE COURT:  Okay.  So how is that significant in

6    terms of -- of the analysis of the strength of the mark in

7    terms of likelihood of confusion.

8          MS. SHIN:  Thank you, Your Honor.  That goes to the

9    similarity of the marks.  That shows that there is no dispute

10   that in the marketplace, Iron Hawk and Dropbox use their

11   house marks in proximity.

12         THE COURT:  So if you have weakness to begin

13   with --

14         MS. SHIN:  It helps --

15         THE COURT:  -- and then you also have a

16   pre-identifier to those marks, which are distinctive, does

17   that increase or decrease the likelihood of confusion?

18         MS. SHIN:  It decreases the likelihood of

19   confusion.

20         THE COURT:  Okay.

21         MS. SHIN:  In cases like *Cohn v.  PetSmart* and

22   *Network Automation* speak to that, that incorporating a house

23   mark reduces the potential of confusion by quote -- and this

24   is Network Automation, a

25   Central District case by "Conditioning consumers to recognize

1    defendant as the source of its software products."

2         And just to go back and talk more about Iron Hawk's

3    commercial weakness, there is no evidence that even its end

4    users see the Smart Sync mark, and that's because the

5    Smart Sync product is bundled with other software.  So the

6    person on the navy ship is not seeing Iron Hawk.

7         THE COURT:  Sure.  But the consumer is the navy,

8    not the person sitting at a console.  The customer is the

9    navy.

10        MS. SHIN:  The consumer is the navy.

11        THE COURT:  So why does it matter that it's not

12   outward facing to somebody that might be looking at a

13   computer or working on a particular -- working at a

14   particular device.

15        MS. SHIN:  Sure.  Well, here's where it matters:

16   Is because in this instance again, it helps Dropbox.  In

17   terms of the, you know, affirmative confusion, there is no

18   evidence that any Dropbox consumers or subscribers are going

19   onto the Dropbox website and thinking that they're purchasing

20   Iron Hawk.  The mark just isn't out there.

21        THE COURT:  Well, I understand that; but I thought

22   your point was that it's not visible to folks that are

23   working with the program in -- that might be on a ship.

24        MS. SHIN:  And you're right, Your Honor, the

25   ultimate consumer are the navies or the Government

1    contractors.

2              THE COURT:  So, therefore, I didn't understand your

3    point.

4              MS. SHIN:  My point probably wasn't clear.

5              THE COURT:  Okay.

6              MS. SHIN:  It was just an atmosphere point I'm

7    making, but also it does go into play when we're talking

8    about whether or not there were any overlapping customers,

9    which is another factor when talking about the relatedness of

10   the goods.  There are no overlapping customers.  Iron Hawk

11   sells only -- it's two customers right now.

12             THE COURT:  You said that already.

13             MS. SHIN:  Okay.  So then I will not repeat myself.

14             THE COURT:  Thank you.

15             MS. SHIN:  Let me also talk in terms of the

16   commercial weakness about the sales.  Iron Hawk -- well, not

17   sales but marketing and advertising.

18             THE COURT:  I'm sorry?  I missed that.

19             MS. SHIN:  Marketing and advertising.

20             THE COURT:  Yeah.

21             MS. SHIN:  That Iron Hawk has averaged about $2,000

22   a year on marketing and advertising since 2012.  And it's

23   never surpassed $3,000 in any year since 2014.  And the cases

24   show that where plaintiff has not demonstrated extensive

25   advertising to strengthen an otherwise weak mark like we have

1    here, this factor alone weighs in favor or against confusion.

2          Let me turn to the relatedness of goods.  And I

3    talked a bit about that; but again, three factors there, use

4    in function; second, class of purchasers; third, whether the

5    offerings were complimentary.

6          They're entirely different uses.  Iron Hawk's

7    software bandwidth reduction.  Its CTO In re Exhibit 31

8    stated, "Briefly, Iron Hawk engineering has one goal, to

9    provide bandwidth efficient data distribution."  It's CTO

10   when asked at his deposition, this is re Exhibit 4,

11          "Question, What was the selling point.

12          "Answer, That we could synchronize and replicate.

13   Replicate data efficiently and massive reduction and

14   bandwidth.  I think the bandwidth reduction is our biggest

15   selling feature."

16          Iron Hawk does not provide cloud storage.  That is

17   undisputed.  Its CEO when asked at his deposition, "Question,

18   When you say the cloud, does Iron Hawk provide the cloud

19   storage here?

20          "Answer, No."

21          THE COURT:  What does "synchronization" mean in the

22   context of Iron Hawk's product?  Does it mean that it's

23   compressed and then it's uncompressed at the other end, and

24   therefore, it is, in effect, synchronized with the original

25   uncompressed data at the other end of the stream?  Is that

 1   what that means, or does it mean something else?

 2           MS. SHIN:  Well, they also talk about one two-way

 3   synchronization, but what they talk about is the replication

 4   of data where they're distributing the large amounts of data

 5   in limited bandwidth environments.

 6           THE COURT:  I get that.  I was just asking whether

 7   synchronization just referred to the -- the matching of

 8   the input to the output of the data.

 9           MS. SHIN:  That is our understanding based on the

10   deposition testimony, Your Honor.

11           And one other thing in terms of the use, Iron Hawk

12   develops custom configurations.  So none of the products are

13   off the shelf the way Dropbox's Smart Sync product feature

14   is.

15           THE COURT:  Sure.  And what do they sell for?

16           MS. SHIN:  Sometimes, at least over thousands of

17   dollars.  You can factor it in terms of per use or per

18   license or what the amount is; but if you see in their -- in

19   their re Exhibit 10 which is a product listing.  It shows

20   these products listed for hundreds, even thousands of

21   dollars.  Dropbox's product feature is also quite expensive.

22   The standard subscription plans include -- for Smart Sync

23   range from say $120 a year per user to $240 per user.  Some

24   of the business subscription plans which also offer

25   Smart Sync can go up to $720 a year.  So these are expensive

1     products.  And, of course, the cases, like *Network Automation*

2     say that consumer searching for expensive products online, to

3     be even more sophisticated.  And to go to the degree of care,

4     of course, here we have not just regular people buying

5     Iron Hawk products, you have Government contractors; right?

6     Iron Hawk is a military supplier, and so that's another

7     factor -- another undisputed fact.

8             THE COURT:  Dropbox isn't in the business of

9     helping people deal with limited bandwidth as a business

10    model.

11            MS. SHIN:  Exactly.  They're not -- and, in fact,

12    they're not marketing -- there's no evidence that they're

13    focusing on marketing the military at all.  There's no

14    evidence that the military is a consumer or a customer of

15    Dropbox.

16            Let me move -- well, let me finish by saying,

17    Dropbox as Your Honor noted, again, unlike Iron Hawk's

18    product, it's a -- it's -- it's premised on Cloud storage,

19    unlike Iron Hawk's product, it's an off-the-shelf feature;

20    and it's focusing on saving hard drive space.

21            I talked about the customers, but there's no

22    evidence -- this case has been going on for nearly two years

23    now.  And there's no evidence of any overlap between

24    Iron Hawk's military customers and Dropbox's individual and

25    enterprise customers.

```
 1            THE COURT:  Do you want to talk about the strength
 2    of the mark?
 3            MS. SHIN:  Oh, I -- that was the commercial and
 4    conceptual strength.
 5            THE COURT:  Sure.  In terms of the continuum from a
 6    generic suggestive descriptive, et cetera.
 7            MS. SHIN:  Sure.  So Dropbox -- I mean, Iron Hawk
 8    itself has said at minimum, it's suggestive.  We think it's
 9    descriptive for the reasons noted.  The term "Smart" and
10    "Sync" describe both parties' offerings.
11            As noted, focusing on Dropbox's Smart Sync, if you
12    look at the marketing materials, Dropbox, for instance, says
13    "open a file," and it automatically syncs to your hard drive.
14    It's that simple.  In recommending the name "Smart Sync," the
15    product namers send around an e-mail when they are
16    recommending Smart Sync after doing customer -- you know,
17    focus groups.  And what they said is Smart Sync was preferred
18    by the vast majority of users.  This is what they said then;
19    not in litigation but at the time they were recommending the
20    name.  And they said, "It generated positive first
21    impressions."
22            THE COURT:  So do you think it's suggestive or
23    descriptive?
24            MS. SHIN:  Descriptive.  It's descriptive.  It
25    automatically syncs.
```

1          THE COURT:  You say that, even though it weakens

2     the strength of your own mark.

3          MS. SHIN:  Well, I'm not here to talk about whether

4     it does or not.

5          THE COURT:  Well, that's the effect of it.  So

6     that's why I would -- it would seem that you're saying that,

7     because you think it's true and recognizing that it might

8     have that effect, you still think it's still the right

9     answer.

10          MS. SHIN:  We do.  And, Your Honor, at the time

11     Dropbox chose the mark, that was actually discussed.  And

12     what was discussed is that the term "Smart Sync" was a

13     product feature.  It was used to describe this product

14     feature.  And it was discussed the company but not take

15     enforcement actions against other companies.  There was a

16     search.  The search found numerous other uses of the term,

17     including in this field.  And that search, including

18     Iron Hawk --

19          THE COURT:  You think it's descriptive, and you

20     think that it communicates what it needs to communicate, and

21     it was -- you know, and that was part of the mix that caused

22     you to -- caused your client to pick that name.

23          MS. SHIN:  That's correct.

24          THE COURT:  Okay.  Why don't I do this:  Let me

25     come back to you.  I think I understand the gist of what

1    you're saying.  Your briefs are thorough, unless there's one

2    or two more quick points you want to make.  I don't need a

3    reiteration of what's in your brief.

4            MS. SHIN:  I would like to make one point.

5            THE COURT:  Go ahead.

6            MS. SHIN:  And that's about what this case is

7    about.  There are two types of theories here.  There's

8    forward confusion and there's reverse confusion; right?

9    There's no evidence -- again, after two years of litigation,

10   no evidence that Drop Box consumers mistakenly believe that

11   Iron Hawk is the source of its product.

12           In terms of the reverse confusion theory, again, no

13   evidence.  In fact, what evidence there is, the depositions

14   have shown were fabricated.

15           THE COURT:  I don't know about the word

16   "fabricated," but I understand the argument in terms of how

17   those -- those examples were processed.

18           MS. SHIN:  But, Your Honor, just -- I'm not

19   speaking in hyperbole here.  I would just like to read one

20   portion of the deposition testimony to explain why I do use

21   the term "fabricated."

22           THE COURT:  Go ahead.

23           MS. SHIN:  Douglas Stanley is one of the people on

24   whose behalf Mr. Gomes drafted an e-mail.  At the end of the

25   e-mail that Mr. Gomes drafted, one of the lines says, "I know

 1    you've heard me bring up this concern in the past, but the

 2    increased level of confusion since Dropbox released their

 3    Dropbox for business with Smart Sync, now forces me to bring

 4    this to your attention formally."  That's a statement that

 5    Mr. Gomes wrote on behalf of Mr. Stanley.  At deposition,

 6    Mr. Stanley was asked, "That's a sentence Mr. Gomes wrote, as

 7    well; correct?

 8              "Answer, Correct.

 9              "Question, This concern had not been brought up by

10    you in the past; correct?

11              "Answer, Correct.

12              "Question, And you were not aware of an increased

13    level of confusion; correct?

14              "Answer, Correct.

15              "Question, You would not even been aware that

16    Dropbox had released a product called "Smart Sync"; correct?

17              "Answer, Correct."

18              That's why I use "fabricated."  It's not just

19    ghostwritten to reflect Mr. Stanley's impression or

20    understanding.  It was -- it was drafted to reflect a record

21    that Mr. Gomes tried to create to pursue his litigation.

22              THE COURT:  Okay.  Thank you.

23              MS. SHIN:  Thank you.

24              MR. WESLEY:  I would like to start by reminding the

25    Court that we're here on summary judgment.  So when Dropbox

```
 1    says we only market or sell to the military, and we have
 2    evidence showing that we have marketed and continue to market
 3    extensively outside the military under summary judgment, our
 4    evidence and inferences should be credited, and theirs should
 5    be rejected.  So while Ms. Shin told a very compelling story.
 6    I think it's a story for trial, not for summary judgment.
 7              Both companies here are using the exact same mark,
 8    Smart Sync, for the same class of goods, computer software.
 9    In fact, the parties' respective software is used to address
10    the same problem, transferring large quantities of data.
11    Dropbox's Smart Sync is used to share data without taking up
12    space on a user's hard drive.  Iron Hawk's Smart Sync is used
13    to compress large quantities of data to ensure it is
14    transferred quickly and efficiently.  In other words,
15    Iron Hawk's Smart Sync very well could be a feature within
16    Dropbox's portfolio.  Iron Hawk undisputedly used the mark
17    first --
18              THE COURT:  It might be a feature, but it might not
19    be proprietary.  Companies have used compression technologies
20    forever in different contexts.
21              MR. WESLEY:  No doubt.  And this isn't about the
22    technology.  This is simply about the fact that when
23    somebody -- when we're pitching somebody our Smart Sync
24    compression technology, somebody may think --
25              THE COURT:  Doesn't your technology deal with --
```

1   maybe I'm wrong in terms of conceptualizing this, but it

2   just -- you know, it seems to me that you have these ships --

3   I've been on some navy ships -- and some of them have been

4   designed and are still in service maybe from the '70's or

5   '80's.  And they have various, you know, computer systems

6   that are used to operate lots of things.  And it's not always

7   easy, I'm guessing to upgrade your bandwidth capabilities,

8   and it may create all sorts of compatibility issues with

9   the -- the sort of information infrastructure on a ship.  So

10  it just seems to me that given the sort of strength that a

11  lot of new network type devices might put on the physical

12  constraints of bandwidth, it makes sense to have some

13  compression technologies in that very, very specialized

14  environment.  So I guess I'm just not sure how that -- if I'm

15  correct in terms of thinking about it, how that really

16  translates to the same universe at all of this sort of mass

17  consumer company that -- like Dropbox where they're -- you

18  know, they're just -- they're dealing with, you know, folks

19  that want to store stuff remotely on other servers for

20  various collaborative purposes, and sort of given the fairly

21  massive bandwidth that's available to most people now, that

22  bandwidth issues might slow you down a little bit, but it's

23  not sort of mission sensitive.

24          MR. WESLEY:  Two responses, Your Honor:  Number

25  one, I don't think there's anything in the record indicating

1    that there's enough bandwidth in commercial sectors all

2    around.  So there's no evidence of that.

3         THE COURT:  I'm applying a little sort of general

4    commonsense to the way the world is now and speaking just

5    very generally.  I'm just trying to understand the -- the

6    environment that both these companies operate in.

7         MR. WESLEY:  Sure.  Let me read to you straight

8    from our CEO, David Gomes, as is paragraph 13 of his

9    declaration:  "However, Dropbox's use of Smart Sync has

10   damaged the Iron Hawk business.  We have historically sought

11   to and continue to attempt to expand Smart Sync's use in the

12   commercial sector.  For instance, in the past, smart sync has

13   been implemented within CVS pharmacies to transfer point of

14   sale data.  Today in addition to efforts to expand into the

15   oil and gas industry, among others, very relevantly,

16   Iron Hawk has discussed implementations of Smart Sync with

17   box.com and Goggle Drive, two of Dropbox's biggest

18   competitors; but today Iron Hawk has not been able to

19   consummate either of those relationships.  It is my belief

20   that Dropbox's prominent use of Smart Sync is an impediment

21   to its competitors, incorporating a product called "Smart

22   Sync" into their platforms.

23        THE COURT:  Okay.

24        MR. WESLEY:  So we have to parties marketing and

25   selling the same class of goods under the same mark.

1          THE COURT:  Does it matter that they're the same

2     class, but that they do different things?

3          MR. WESLEY:  I don't think for purposes of summary

4     judgment it does.  You know, we -- we've -- we've cited --

5          THE COURT:  So is the class computer software or

6     computer goods and services?  How is it defined specifically

7     in terms of your registration?  What is it for?

8          MR. WESLEY:  I -- I can't recall if it's computer

9     software or computer devices.

10          THE COURT:  Okay.  But....

11          MR. WESLEY:  But I do think it's significant,

12     because we've seen cases, and we cited a fairly lengthy

13     string site of cases where the Ninth Circuit has reversed

14     where the types of goods have been different than simply

15     computer technology and computer software.  We've had cases

16     with goods that are far more different but use the same exact

17     mark and the Court's have said there's at least an issue of

18     fact as to whether there is a likelihood of confusion.  So

19     let me just run through our evidence on the -- on the

20     *Sleekcraft* factors, if the Court --

21          THE COURT:  Go ahead.

22          MR. WESLEY:  Strength of the mark:  Conceptual

23     strength, they're internal Dropbox documents, indicating that

24     the mark is "evocative, catchy and resonates with consumers."

25     It's not just conceptually just describing an Apple as an

1    apple.  It's catchy.  Consumers will like it.  The USPTO

2    registered our mark for our goods without proof of secondary

3    meaning.  In other words, the person in the U.S. Patent and

4    Trademark Office who does this on a daily basis, took a look

5    at the word; took a look at our goods and said this is

6    inherently distinctive.  It can be registered.  We don't need

7    to put it on the supplemental register or require secondary

8    meaning.  They say this is a crowded field; but here's what

9    the Ninth Circuit says about that:  This is the *JL Beverage*

10   *Company v. Jim Beam Brands* case 828 F.3d 1099.  It's a 2016

11   case, "The impact of a crowded field is not dispositive in

12   determining a mark's conceptual strength, rather it is but

13   one factor a Court considers in evaluating the overall

14   strength of the mark."  And in the *Riordan* case from 2012,

15   the district court had rejected a crowded -- or I'm sorry --

16   the Court of Appeals rejected a crowded field of over 840

17   uses of the mark Riordan and said that's just not enough;

18   that if they're not close enough and if we don't know how

19   those third parties are actually using the mark, we're not

20   going to grant summary judgment in that circumstance.

21          Commercial strength, they pooh-pooh our commercial

22   use, and granted, we concede entirely that we're not Dropbox.

23   We don't have a $10 million budget every quarter, but we've

24   done pretty well for ourselves.  We've been using the mark

25   for over 15 years.  And the trademark office five years of

1    continuous use --

2            THE COURT:  How many actual different paying

3    customers have there been in 15 years?

4            MR. WESLEY:  Over a dozen I would say.  And it

5    depends on how you slice --

6            THE COURT:  Do you know?

7            MR. WESLEY:  I don't have the exact number.

8            THE COURT:  Well, we should talk about what's in

9    the record -- what's before the Court.  What's the evidence

10   of actual separate -- we know about the navy -- separate

11   customers of your client, other than the navy?

12           MR. WESLEY:  I don't have a -- an exact number.

13   But what we do know is there's --

14           THE COURT:  Well, do you have an inexact number?

15           MR. WESLEY:  Well, I know that they've had over a

16   dozen customers between the army, the navy, CVS.

17           THE COURT:  What about in the last five years?

18           MR. WESLEY:  I don't know offhand.

19           THE COURT:  Do you think they've had more than five

20   customers in the last five years?

21           MR. WESLEY:  I don't know, but I think the most

22   important thing is, to note that the case law on likelihood

23   of confusion does not just prohibit confusion as to current

24   customers.  One of the real problems here --

25           THE COURT:  I understand that.  I'm just trying to

```
 1    get a sense of scale.
 2              MR. WESLEY:  Well, one of the problems here,
 3    Your Honor, is that we're in each business right now.  We
 4    sell to the military -- and that's great.  We do fine.  And
 5    we -- we're okay; but the big market has always been the
 6    commercial sector.  And we've been working hard for years.
 7    In fact, we even met with Dropbox to get into that commercial
 8    sector, and that's the real danger here by allowing them to
 9    use the Smart Sync mark, the same mark we've done -- we've
10    named our entire product catalog based on.  They're blocking
11    us from the commercial sector.
12              THE COURT:  What does your product do?
13              MR. WESLEY:  Well, it compresses and -- and
14    transmits data.  In other words, if there's limited bandwidth
15    or somebody wants faster data transfer -- and it's also
16    secure.  So we were transferring data quickly, more
17    efficiently than -- than without the product.
18              THE COURT:  Sure.  So you're -- sure your product
19    is -- helping consumers solve the problem of data bandwidth
20    resources.
21              MR. WESLEY:  Yes, just as Dropbox is; but in a
22    different way.
23              THE COURT:  Just as they're doing it but
24    differently.
25              MR. WESLEY:  Yes, because Dropbox -- a common way
```

```
 1    that people use Dropbox is if you have attachments that are
 2    too large to send by e-mail, they send it by a shared file or
 3    a Dropbox file.  So there's -- the data is too large for --
 4            THE COURT:  It's not a bandwidth issue though.
 5    It's just that the -- the -- the companies like Google may
 6    have a limit on the size of an attachment.  It's not
 7    bandwidth.  They just don't want folks sending unlimited
 8    giant files as an e-mail attachment.
 9            MR. WESLEY:  Well, it's a -- it's a large data
10    transfer issue, I guess, would be more accurate than a
11    bandwidth issue.
12            THE COURT:  Sure.  And there's -- there's already
13    compression technologies that are used with attachments on
14    common platforms like Google.  I mean, you can compress music
15    files, photos, anything you want -- those are -- that
16    technology is pretty well-known.  People do that all the
17    time; right?
18            MR. WESLEY:  Yes.  And if this were a patent case
19    or a copyright case --
20            THE COURT:  I understand.  I'm just trying to
21    understand the sort of different possible worlds that these
22    companies exist in.
23            MR. WESLEY:  Yeah.
24            THE COURT:  Go ahead.
25            MR. WESLEY:  So then for a commercial strength,
```

1    we've had over 28,000,000 in revenue.  And the Gomes'

2    declaration describes --

3              THE COURT:  And that's over what period of time?

4              MR. WESLEY:  That's a 15-year period.

5              THE COURT:  Okay.

6              MR. WESLEY:  So it's on average a little less than

7    2,000,000.  It's a small business, but it's -- it's national

8    in scope; but for commercial strength, we're also here on a

9    reverse confusion case.  And so we look on Dropbox's

10   commercial strength.  And there, I don't think there can be

11   any doubt that Dropbox has extensive commercial strength.

12   They've spent millions on ads for the launch of Smart Sync.

13   They're the top search result now, including a pay data for

14   Smart Sync; and they have tens of millions of customers.

15   Here's what the Ninth Circuit said in *JL Beverage*.  The --

16   this is a case with Jim Beam involving reverse confusion.

17   The national recognition of the Jim Beam mark increases the

18   likelihood that consumers will believe they're doing business

19   with Jim Beam, not JL Beverage when they purchase Johnny Love

20   Vodka.  In other words, when counsel says, we always have

21   Dropbox near Smart Sync and that's going to eliminate any

22   confusion from the reverse confusion standpoint, it actually

23   exacerbates the problem.  It's telling our customers that

24   Smart Sync is now Dropbox.

25             Actual confusion -- we don't need to provide any

```
1     actual confusion.  It's not a requirement for purposes of
2     likelihood of confusion; but there is evidence of it, and
3     it's in the Gomes declaration, paragraphs 15 through 18 where
4     he describes various -- various confused customers and
5     potential customers.
6              In addition, the Peyton and Indermill testimony
7     which they, I believe, falls under their "fabricated
8     evidence," term, that actually is evidence of actual
9     confusion, and they stood by exactly what was written in the
10    e-mails that Mr. Gomes wrote after speaking with them.
11             Consumers:  The price is not as high as counsel
12    says.  For purposes of summary judgment, we have evidence in
13    the Gomes' declaration, paragraph 21, that we sell as low as
14    a dollar 66 per month, and Dropbox sells as low as 12.50 a
15    month.
16             Finally, intent:  The parties met to describe
17    Iron Hawk and its Smart Sync in 2015.  There's even a
18    reference to Iron Hawk in a December 16 deal flowchart which
19    is around the time -- which is the month before they launch
20    their Smart Sync.  There's no e-mails from their corporate
21    development team; and in deposition, they seemed to have
22    collective amnesia about what happened.  Then counsel
23    discovers Iron Hawk and sees a risk and suggests ways to
24    mitigate it.  For example, "Don't capitalize Smart Sync.
25    Just call it the feature."  Dropbox ignores her.  This is at
```

```
 1    least as strong as the evidence that created an issue of

 2    material fact in JL Beverage.  There, the Jim Beam legal team

 3    discovered the plaintiffs mark through a trademark search.  A

 4    Jim Beam employee was aware of the mark prior to joining

 5    Jim Beam.  Jim Beam continued its nationwide rollout even

 6    after the PTO denied a trademark application due to the

 7    similarity of the marks.  And the final factor which is

 8    particularly important in this case is expansion.  Our big

 9    concern here is now on one foul swoop, despite knowing of our

10    registration, knowing of our private use, they've now limited

11    it us to our niche of a couple combat ships that they say

12    pejoratively --

13              THE COURT:  They haven't limited you to anything.

14    You sued them.  They're not suggesting that you can't do

15    whatever you want to do.

16              MR. WESLEY:  No doubt.  But try walking in to a

17    box.com office and say we've spent 15 years developing a

18    Smart Sync and -- and one of their primary competitors

19    already has the Smart Sync.

20              THE COURT:  Except they do different things.  And I

21    know we're not dealing with sort of functionality analysis,

22    but it just seems so unlikely that, you know -- that there's

23    going to be much overlap, given the very different kinds of

24    businesses.  You sort of couple that with the descriptive

25    nature, do you think the term "Smart Sync" is descriptive?
```

| | |
|---|---|
| 1 | MR. WESLEY:  No.  No, it isn't. |
| 2 | THE COURT:  What does "sync" mean? |
| 3 | MR. WESLEY:  "Sync" can mean anything you want it. |
| 4 | THE COURT:  Well, I mean, there's a kitchen sink, |
| 5 | but what does "sync" mean? |
| 6 | MR. WESLEY:  I think of sync when I'm in my car, |
| 7 | syncing to my blue tooth, and I'm struggling to -- to hear |
| 8 | the person on the other line.  I mean, there's -- "sync" |
| 9 | could mean a whole lot of different things.  And they've |
| 10 | presented evidence of sync -- |
| 11 | THE COURT:  Well, isn't it short for something?  Or |
| 12 | has it lost that root? |
| 13 | MR. WESLEY:  Well, I -- I imagine it was originally |
| 14 | short for synchronization, although, I haven't studied the |
| 15 | derivation of "sync." |
| 16 | THE COURT:  Was it spelled like synchronization? |
| 17 | MR. WESLEY:  Is our smart "Smart Sync" spelled |
| 18 | like -- |
| 19 | The court:  Yeah.  You don't spell it S-I-N-K, do |
| 20 | you? |
| 21 | MR. WESLEY:  Right.  No, no, no. |
| 22 | THE COURT:  So is it spelled like synchronization? |
| 23 | MR. WESLEY:  Like the first four letters of |
| 24 | synchronization. |
| 25 | THE COURT:  Okay.  So you don't think it's sort of |

1   evident that it means synchronization?

2          MR. WESLEY:  Well, our -- our product that we use

3   it with is not a synchronization product.  It's a --

4          THE COURT:  Isn't that part of your product

5   description though, that it's it a synchronization on the

6   front end and on the back end so the data is the same after

7   it's transmitted.

8          MR. WESLEY:  It's been used loosely in that -- in

9   that manner, Your Honor.

10         THE COURT:  Okay.  And what about "Smart"?  Do you

11  think that -- what does that -- what is particularly

12  distinctive about "Smart"?  Don't you think that is also

13  descriptive?

14         MR. WESLEY:  Well, in isolation, no.  I actually

15  don't.  I don't know what product "Smart" is.

16         THE COURT:  So how should the Court think about

17  Smart Sync in terms of generic, descriptive, suggestive and

18  arbitrary?  Where should I think about it?

19         MR. WESLEY:  It's suggestive for several reasons.

20  Number one, the PTO registered it as inherently distinctive;

21  and it didn't need secondary meaning.  And number two, we

22  have Dropbox's own documents calling it "evocative."  They

23  did their own spectrum of marks.

24         THE COURT:  Sure.  So what does that mean when you

25  have a marketing person say it's evocative.  Is that

1    something that I should worry about?  Somebody that's

2    offering a -- maybe a -- maybe an artistic opinion about a

3    brand?

4            MR. WESLEY:  I think on summary judgment when the

5    Court is reviewing the evidence and all inferences in a light

6    most favorable to us, that that would be significant -- and

7    significant against summary judgment.

8            THE COURT:  What about all these other companies

9    that are using the Smart Sync, are any of them in computer

10   goods or services or software?

11           MR. WESLEY:  Well, we don't -- we don't know,

12   because, although, Dropbox has raised this argument, they

13   didn't go out and depose any of them.  They didn't get any

14   evidence from them.  We have some stray screen shots from the

15   web; but there's really no foundation to know what their --

16   what their business is from those -- and how long they've

17   been using it or how extensively they've been using it.  So

18   we don't know, but --

19           THE COURT:  How do you see your client being hurt

20   by Dropbox's using, you know, Dropbox Smart Sync as a way for

21   folks to -- how do you see that affecting your client's

22   ability to either expand or -- maintain or expand the same

23   kinds of customers like the navy that it already has?

24           MR. WESLEY:  Our client picked the name in 2004.

25   It spent the last 15 years putting out catalogs, going to

1    trade shows, talking to people, having a website, and

2    everything was surrounded by the word "Smart Sync."

3           THE COURT:  Are your clients' customers essentially

4    corporate consumers like the navy -- or you mention CVS?  Is

5    that who they are?

6           MR. WESLEY:  Currently, yes.

7           THE COURT:  And have you ever marketed to any

8    individuals who are, you know, the types of folks that might

9    use something like Dropbox as a way of sharing data among

10   different users or storing data?

11          MR. WESLEY:  Well, we haven't -- we haven't to date

12   marketed to individual consumers in their individual consumer

13   capacity; however, the people who work for the enterprises

14   that we sell to, the navy, CVS, other businesses, their

15   people, they -- they are exposed to Dropbox just like any

16   other person.  So when Your Honor asked -- how we are being

17   harmed, we picked this mark in 2004, and we really have been

18   building the entire business around it.  Paragraph 11 of the

19   Gomes declaration says, "Iron Hawk's customers identify with

20   the Smart Sync brand.  Many of our customers simply know us

21   as the Smart Sync guys, and oftentimes, when I go into a

22   customer's briefing room, only Smart Sync will be up on the

23   board.  So they spent the last decade and a half building a

24   business, building a brand around this trademark and now if

25   the Court grants summary judgment, there's no way we can use

```
 1    it anymore.

 2            THE COURT:  That's not true.

 3            MR. WESLEY:  From a business perspective, there's

 4    no way we can use it.

 5            THE COURT:  That's not true.  I don't understand

 6    that.  You continue to use it.  Dropbox doesn't do what --

 7    you know, doesn't provide a product that does what you do.

 8    Even if they did, you can still -- you could still sell your

 9    product under the -- under the name "Smart Sync."

10            MR. WESLEY:  When somebody Googles the brand we've

11    spent 15 years building, we don't want the first seven

12    results to be Dropbox.  When we walk into a room and we say,

13    we're the Smart Sync guys, we don't want the -- the people in

14    that room to say oh, you're with Dropbox or tell us about

15    Dropbox.  That's what trademark law is supposed to prevent.

16    And in our view, viewing the evidence in our favor and

17    disregarding contrary evidence, we believe summary judgment

18    should be denied.

19            THE COURT:  Okay.  Fair enough.

20            MR. WESLEY:  Thank you.

21            THE COURT:  Thank you.  Like three minutes.

22            MS. SHIN:  Sure.  I just want to -- recognizing the

23    Court is familiar already with the record, I just want to

24    respond to some of the questions that were asked.  First,

25    about the customers, it's only commercial customer in the
```

1    history of Iron Hawk is CVS.  And the last time that customer

2    generated any revenue was 2013.  In addition to that, we

3    believe based on the record, that there have only been four

4    military customers -- four military customers other than the

5    two current ones, Lockheed Martin and the navy.

6           Second, in response to the question of whether

7    software is a sufficient relatedness, *M2 Software v.*

8    *M2 Communications*, a Federal Circuit case said no -- said

9    that one cannot presume relatedness, given the pervasiveness

10   of software and software-related goods in society.

11          Third, this Court in *Reserve Media* found that five

12   other companies using similar marks over a range of

13   businesses was significant.  Here, the record has many more

14   than five.

15          I want to address the notion of injury.  As counsel

16   noted, Iron Hawk has been using Smart Sync since 2004.

17   Dropbox launched its Smart Sync feature in January 2017.  The

18   idea that Dropbox is somehow responsible for Iron Hawk's

19   failure to actually get a concrete commitment from any

20   commercial customer since CVS in 2013, just cannot be

21   countenanced.  It's untethered from the factual record.

22          Fourth, with respect to whether sales information

23   matters, the answer is no, not on its own.

24          Central district case law, including

25   *Glow Industries v. Lopez* and *Aurora World v. TY, Inc.,* says

1    whether a volume of sales is significant, varies with the

2    product and the market.

3              Iron Hawk has submitted zero evidence on the size

4    of the U.S. military software market.  So the sales

5    information is irrelevant.

6              Finally, this notion that Dropbox is responsible

7    for carrying Iron Hawk's burden of proof, also should not be

8    countenanced.

9              THE COURT:  Sorry.  I could not follow what you

10   just said.  If you could slow down a little bit....

11             MS. SHIN:  And thank you for helping me out here in

12   terms of my pace.  But the idea that Dropbox is somehow

13   responsible for carrying its burden of proof, including on

14   the relatedness of the other company's using the Smart Sync

15   software, let's just put aside the evidence that Dropbox

16   submitted.  Iron Hawk in this case produced cease and desist

17   letters that it sent to other uses of Smart Sync, saying that

18   their uses in the field of data software were "likely to

19   cause confusion with Iron Hawk."  That's the Venezia

20   declaration, Exhibit Z.

21             Finally, this notion of confusion, counsel talked

22   about supposed queries about Dropbox received from unknown --

23   and that's a term used by Mr. Gomes himself, unknown -- trade

24   show attendees, and an existing customer cannot demonstrate

25   confusion, if they're unidentified.  There is no declaration

```
 1    from these individuals.  They don't even have a name.  So how

 2    can we take the declaration of the CEO of the company that's

 3    suing Dropbox at his word?

 4              One --

 5              THE COURT:  You said "final."

 6              MS. SHIN:  I did.  And I lied.  I have one final

 7    point -- just one final point.  I can't stop myself.  The

 8    notion of the dollar 66 number or the 12.50 number, if you --

 9    if you actually do the math, the total annual cost, even

10    using counsel's math of Dropbox offerings will exceed a

11    hundred dollars.  That's more than sufficient to presume a

12    high degree of care.  And with that, Your Honor, I'll submit.

13              THE COURT:  Thank you.

14              Anything else?  I mean, there are other motions, as

15    well.  I think I'm inclined just to tell you that I've read

16    your briefs, and I don't need argument on those; but if

17    there's anything further that Iron Hawk wants to say in

18    response or you may submit or -- or -- we're good to go.

19              MR. WESLEY:  We'll submit, Your Honor.

20              THE COURT:  Okay.  Appreciate the arguments.  Thank

21    you.  It's submitted.

22              MS. SHIN:  Thank you, Your Honor.

23              THE COURT:  Okay.

24              (Whereupon proceeding adjourned.)

25                        - - -
```

UNITED STATES DISTRICT COURT

1

2                              **C E R T I F I C A T E**

3

4

5

6      IRONHAWK TECHNOLOGIES, INC.        :

7                       vs.              :   No. CV 18-01481-DDP

8      DROPBOX, INC.                     :

9

10

11    I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

12    UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

13    CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

14    TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

15    CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

16    PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

17    TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

18    OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

19    FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

20    REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

21    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

22

23    /S/_____          //____

24    MARIA R. BUSTILLOS                   DATE
      OFFICIAL REPORTER
25

## $

**$10** [1] - 23:23
**$120** [1] - 13:23
**$2,000** [1] - 11:21
**$240** [1] - 13:23
**$3,000** [1] - 11:23
**$720** [1] - 13:25

## '

**'80's** [1] - 20:5

## /

**/S** [1] - 38:23

## 1

**10** [1] - 13:19
**100** [1] - 6:11
**1099** [1] - 23:10
**11** [1] - 33:18
**110** [1] - 7:10
**11:17** [1] - 4:3
**12.50** [2] - 28:14, 37:8
**12254** [1] - 1:22
**13** [1] - 21:8
**15** [6] - 23:25, 24:3, 28:3, 29:17, 32:25, 34:11
**15-year** [1] - 27:4
**16** [1] - 28:18
**18** [3] - 7:19, 7:22, 28:3
**18-01481-DDP** [3] - 1:10, 4:5, 38:7
**1ST** [1] - 1:23

## 2

**2,000,000** [1] - 27:7
**2000** [1] - 7:18
**2004** [3] - 32:24, 33:17, 35:16
**2007** [2] - 5:13, 5:20
**2009** [1] - 7:15
**2012** [2] - 11:22, 23:14
**2013** [2] - 35:2, 35:20
**2014** [1] - 11:23
**2015** [1] - 28:17
**2016** [1] - 23:10
**2017** [1] - 35:17
**2019** [2] - 1:18, 4:1
**21** [1] - 28:13
**2121** [2] - 2:5, 2:10
**213** [1] - 1:24
**28** [1] - 38:14
**28,000,000** [1] - 27:1
**2800** [3] - 2:6, 2:10, 2:11

## 3

**31** [1] - 12:7
**310)274-7100** [2] - 2:7, 2:11
**350** [1] - 1:23
**36** [1] - 6:25

## 4

**4** [2] - 3:4, 12:10
**40** [1] - 7:19
**415** [2] - 2:15, 2:16
**415)591-6000** [1] - 2:21
**4455** [1] - 1:23
**45** [2] - 2:19, 7:21

## 5

**5** [1] - 7:14
**500,000,000** [1] - 5:18
**5400** [2] - 2:15, 2:20
**591-6000** [1] - 2:16

## 6

**66** [2] - 28:14, 37:8

## 7

**7** [2] - 1:18, 4:1
**70's** [1] - 20:4
**753** [1] - 38:13

## 8

**828** [1] - 23:10
**840** [1] - 23:16
**894-2739** [1] - 1:24

## 9

**90012** [1] - 1:24
**90067** [1] - 2:6
**9105** [1] - 2:20
**94105** [1] - 2:16

## A

**A.M** [1] - 4:3
**ability** - 32:22
**able** [1] - 21:18
**ABOVE** [1] - 38:16
**ABOVE-ENTITLED** [1] - 38:16
**access** [1] - 5:16
**accurate** [1] - 26:10
**actions** [1] - 16:15
**actual** [1] - 24:2,
24:10, 27:25, 28:1, 28:8
**add** [1] - 7:7
**addition** [3] - 21:14, 28:6, 35:2
**address** [1] - 19:9, 35:15
**adjourned** [1] - 37:24
**ads** [1] - 27:12
**advertising** [4] - 11:17, 11:19, 11:22, 11:25
**affect** [1] - 8:19
**affecting** [1] - 32:21
**ahead** [5] - 5:8, 17:5, 17:22, 22:21, 26:24
**allowing** [1] - 25:8
**allows** [1] - 5:22
**alone** [2] - 8:13, 12:1
**amnesia** [1] - 28:22
**amount** [1] - 13:18
**amounts** [2] - 6:6, 13:4
**analysis** [3] - 8:19, 9:6, 29:21
**AND** [3] - 38:11, 38:14, 38:16
**AND/OR** [1] - 38:20
**ANGELES** [5] - 1:17, 1:24, 2:6, 2:11, 4:1
**Anita** [1] - 4:11
**announced** [1] - 5:21
**annual** [1] - 37:9
**answer** [8] - 12:12, 12:20, 16:9, 18:8, 18:11, 18:14, 18:17, 35:23
**answered** [1] - 7:7
**ANY** [1] - 38:19
**Appeals** [1] - 23:16
**appearances** [1] - 4:6
**Apple** [1] - 22:25
**apple** [1] - 23:1
**application** [2] - 5:15, 29:6
**applications** [1] - 7:19
**applying** [1] - 21:3
**appreciate** [1] - 37:20
**arbitrary** [1] - 31:18
**ARE** [1] - 38:20
**argument** [3] - 17:16, 32:12, 37:16
**arguments** [1] - 37:20
**army** [1] - 24:16
**artistic** [1] - 32:2
**aside** [1] - 36:15
**assisted** [1] - 7:6
**AT** [1] - 4:3
**atmosphere** [1] - 11:6
**attachment** [2] - 26:6, 26:8
**attachments** [2] - 26:1, 26:13
**attempt** [1] - 21:11
**attendees** [1] - 36:24

**attention** [2] - 7:14, 18:4
**Aurora** [1] - 35:25
**automatically** [2] - 15:13, 15:25
**Automation** [4] - 9:22, 9:24, 14:1
**available** [1] - 20:21
**AVENUE** [2] - 2:5, 2:10
**average** [1] - 27:6
**averaged** [1] - 11:21
**aware** [3] - 18:12, 18:15, 29:4

## B

**bandwidth** [18] - 6:5, 6:7, 12:7, 12:9, 12:14, 13:5, 14:9, 20:7, 20:12, 20:21, 20:22, 21:1, 25:14, 25:19, 26:4, 26:7, 26:11
**based** [3] - 13:9, 25:10, 35:3
**basis** [2] - 5:20, 23:4
**Beam** [8] - 23:10, 27:16, 27:17, 27:19, 29:2, 29:4, 29:5
**begin** [3] - 6:14, 6:16, 9:12
**BEHALF** [2] - 2:4, 2:13
**behalf** [2] - 17:24, 18:5
**belief** [1] - 21:19
**between** [3] - 8:5, 14:23, 24:16
**Beverage** [4] - 23:9, 27:15, 27:19, 29:2
**big** [2] - 25:5, 29:8
**biggest** [2] - 12:14, 21:17
**billion** [1] - 5:19
**bit** [2] - 12:3, 20:22
**bit...** [1] - 36:10
**blocking** [1] - 25:10
**blue** [1] - 30:7
**board** [1] - 33:23
**Box** [1] - 17:10
**box.com** [2] - 21:17, 29:17
**brand** [4] - 32:3, 33:20, 33:24, 34:10
**Brands** [1] - 23:10
**brief** [1] - 17:3
**briefing** [1] - 33:22
**Briefly** [1] - 12:8
**briefs** [2] - 17:1, 37:16
**bring** [2] - 18:1, 18:3
**brought** [1] - 18:9
**BROWN** [1] - 2:4
**BROWNE** [1] - 2:8
**budget** [1] - 23:23
**build** [1] - 5:14

**building** [4] - 33:18, 33:23, 33:24, 34:11
**bundled** [1] - 10:5
**burden** [3] - 8:16, 36:7, 36:13
**BURLING** [2] - 2:14, 2:18
**Burling** [1] - 4:8
**business** [12] - 13:24, 14:8, 14:9, 18:3, 21:10, 25:3, 27:7, 27:18, 32:16, 33:18, 33:24, 34:3
**businesses** [3] - 29:24, 33:14, 35:13
**BUSTILLOS** [3] - 1:21, 38:11, 38:24
**but...** [1] - 22:10
**buying** [1] - 14:4
**BY** [4] - 2:5, 2:9, 2:14, 2:18

## C

**C.S.R** [1] - 1:22
**CA** [4] - 2:6, 2:11, 2:16, 2:20
**CALIFORNIA** [5] - 1:2, 1:17, 1:24, 4:1, 38:13
**cannot** [3] - 35:9, 35:20, 36:24
**capabilities** [1] - 20:7
**capacity** [1] - 33:13
**capitalize** [1] - 28:24
**car** [1] - 30:6
**care** [2] - 14:3, 37:12
**carry** [1] - 8:16
**carrying** [2] - 36:7, 36:13
**case** [18] - 6:2, 6:19, 6:20, 9:25, 14:22, 17:6, 23:10, 23:11, 23:14, 24:22, 26:18, 26:19, 27:9, 27:16, 29:8, 35:8, 35:24, 36:16
**cases** [6] - 9:21, 11:23, 14:1, 22:12, 22:13, 22:15
**catalog** [1] - 25:10
**catalogs** [1] - 32:25
**catchy** [2] - 22:24, 23:1
**caused** [2] - 16:21, 16:22
**cease** [2] - 8:1, 36:16
**central** [1] - 35:24
**Central** [1] - 9:25
**CENTRAL** [2] - 1:2, 38:12
**CEO** [4] - 7:3, 12:17, 21:8, 37:2
**CERTIFY** [1] - 38:13
**cetera** [1] - 15:6

139

**CHARGED** [1] - 38:19
**chooses** [1] - 7:1
**chose** [1] - 16:11
**CIRCUIT** [1] - 38:19
**Circuit** [4] - 22:13, 23:9, 27:15, 35:8
**circumstance** [1] - 23:20
**cited** [2] - 22:4, 22:12
**claiming** [1] - 8:2
**CLARA** [1] - 2:14
**Clara** [1] - 4:7
**class** [6] - 12:4, 19:8, 21:25, 22:2, 22:5
**clear** [1] - 11:4
**client** [5] - 4:10, 16:22, 24:11, 32:19, 32:24
**client's** [1] - 32:21
**clients'** [1] - 33:3
**close** [1] - 23:18
**cloud** [7] - 5:16, 5:20, 5:24, 5:25, 12:16, 12:18
**Cloud** [1] - 14:18
**CODE** [1] - 38:14
**Cohn** [1] - 9:21
**collaborative** [1] - 20:20
**colleague** [1] - 4:15
**colleagues** [1] - 4:9
**collective** [1] - 28:22
**combat** [1] - 29:11
**commercial** [18] - 6:15, 8:14, 10:3, 11:16, 15:3, 21:1, 21:12, 23:21, 25:6, 25:7, 25:11, 26:25, 27:8, 27:10, 27:11, 34:25, 35:20
**commitment** [1] - 35:19
**common** [2] - 25:25, 26:14
**commonsense** [1] - 21:4
**communicate** [1] - 16:20
**communicates** [1] - 16:20
**Communications** [1] - 35:8
**companies** [9] - 7:16, 16:15, 19:7, 19:19, 21:6, 26:5, 26:22, 32:8, 35:12
**Company** [1] - 23:10
**company** [7] - 6:10, 7:18, 8:4, 8:21, 16:14, 20:17, 37:2
**company's** [1] - 36:14
**compatibility** [1] - 20:8
**compelling** [1] - 19:5
**competitors** [3] - 21:18, 21:21, 29:18

**complimentary** [1] - 12:5
**compress** [2] - 19:13, 26:14
**compressed** [1] - 12:23
**compresses** [2] - 6:6, 25:13
**compression** [5] - 7:2, 19:19, 19:24, 20:13, 26:13
**computer** [11] - 8:6, 10:13, 19:8, 20:5, 22:5, 22:6, 22:8, 22:9, 22:15, 32:9
**concede** [1] - 23:22
**conceptual** [4] - 6:15, 15:4, 22:22, 23:12
**conceptualizing** [1] - 20:1
**conceptually** [1] - 22:25
**concern** [3] - 18:1, 18:9, 29:9
**concrete** [1] - 35:19
**Conditioning** [1] - 9:25
**CONFERENCE** [2] - 38:18, 38:21
**configurations** [1] - 13:12
**CONFORMANCE** [2] - 38:17, 38:20
**confuse** [1] - 5:5
**confused** [1] - 28:4
**confusion** [27] - 5:8, 8:3, 9:7, 9:17, 9:19, 9:23, 10:17, 12:1, 17:8, 17:12, 18:2, 18:13, 22:18, 24:23, 27:9, 27:16, 27:22, 27:25, 28:1, 28:2, 28:9, 36:19, 36:21, 36:25
**connection** [2] - 8:22, 8:24
**consequences** [1] - 6:21
**considers** [1] - 23:13
**console** [1] - 10:8
**constraints** [1] - 20:12
**consumer** [7] - 10:7, 10:10, 10:25, 14:2, 14:14, 20:17, 33:12
**consumers** [1] - 5:4, 9:25, 10:18, 17:10, 22:24, 23:1, 25:19, 27:18, 28:11, 33:4, 33:12
**consummate** [1] - 21:19
**context** [2] - 5:12, 12:22
**contexts** [1] - 19:20
**continue** [3] - 19:2, 21:11, 34:6

**continued** [1] - 29:5
**continuous** [1] - 24:1
**continuum** [1] - 15:5
**contractors** [2] - 11:1, 14:5
**contrary** [1] - 34:17
**copyright** [1] - 26:19
**corporate** [2] - 28:20, 33:4
**CORRECT** [1] - 38:15
**Correct** [4] - 18:8, 18:11, 18:14, 18:17
**correct** [10] - 7:6, 7:7, 9:1, 9:4, 16:23, 18:7, 18:10, 18:13, 18:16, 20:15
**cost** [1] - 37:9
**counsel** [6] - 4:6, 27:20, 28:11, 28:22, 28:15, 36:21
**counsel's** [1] - 37:10
**countenanced** [2] - 35:21, 36:8
**couple** [2] - 29:11, 29:24
**course** [2] - 14:1, 14:4
**COURT** [90] - 1:1, 1:21, 4:3, 4:12, 4:16, 4:20, 4:25, 5:6, 8:8, 8:19, 9:2, 9:5, 9:12, 9:15, 9:20, 10:7, 10:11, 10:21, 11:2, 11:5, 11:12, 11:14, 11:18, 11:20, 12:21, 13:6, 13:15, 14:8, 15:1, 15:5, 15:22, 16:1, 16:5, 16:19, 16:24, 17:5, 17:15, 17:22, 18:22, 19:18, 19:25, 21:3, 21:23, 22:1, 22:5, 22:10, 22:21, 24:2, 24:6, 24:8, 24:14, 24:17, 24:19, 24:25, 25:12, 25:18, 25:23, 26:4, 26:12, 26:20, 26:24, 27:3, 27:5, 29:13, 29:20, 30:2, 30:4, 30:11, 30:16, 30:22, 30:25, 31:4, 31:10, 31:16, 31:24, 32:8, 32:19, 33:3, 33:7, 34:2, 34:5, 34:19, 34:21, 36:9, 37:5, 37:13, 37:20, 37:23, 38:11, 38:12
**court** [2] - 23:15, 30:19
**Court** [10] - 18:25, 22:20, 23:13, 23:16, 24:9, 31:16, 32:5, 33:25, 34:23, 35:11
**Court's** [2] - 7:14, 22:17
**COURTHOUSE** [1] - 1:22

**COURTROOM** [1] - 4:4
**COVINGTON** [2] - 2:14, 2:18
**Covington** [1] - 4:8
**create** [2] - 18:21, 20:8
**created** [1] - 29:1
**credited** [1] - 19:4
**crowded** [6] - 7:11, 7:23, 23:8, 23:11, 23:15, 23:16
**CTO** [2] - 12:7, 12:9
**current** [2] - 24:23, 35:5
**custom** [1] - 13:12
**customer** [7] - 10:8, 14:14, 15:16, 34:25, 35:1, 35:20, 36:24
**customer's** [1] - 33:22
**customers** [23] - 6:9, 11:8, 11:10, 11:11, 14:21, 14:24, 14:25, 24:3, 24:11, 24:16, 24:20, 24:24, 27:14, 27:23, 28:4, 28:5, 32:23, 33:3, 33:19, 33:20, 34:25, 35:4
**CV** [3] - 1:10, 4:5, 38:7
**CVS** [6] - 21:13, 24:16, 33:4, 33:14, 35:1, 35:20

# D

**daily** [2] - 5:19, 23:4
**damaged** [1] - 21:10
**danger** [1] - 25:8
**data** [27] - 6:6, 7:2, 7:3, 7:6, 7:22, 8:5, 12:9, 12:13, 12:25, 13:4, 13:8, 19:10, 19:11, 19:13, 21:14, 25:14, 25:15, 25:16, 25:19, 26:3, 26:9, 27:13, 31:6, 33:9, 33:10, 36:18
**DATE** - 38:24
**date** [1] - 33:11
**dated** [1] - 7:15
**David** [1] - 21:8
**DAVIDSON** [1] - 2:19
**Davidson** [1] - 4:9
**deal** [2] - 14:9, 19:25, 28:18
**dealing** [2] - 20:18, 29:21
**DEAN** [1] - 1:5
**decade** [1] - 33:23
**December** [1] - 28:18
**declaration** [9] - 7:25, 21:9, 27:2, 28:3, 28:13, 33:19, 36:20, 36:25, 37:2
**decrease** [1] - 9:17

**decreases** [1] - 9:18
**defendant** [1] - 10:1
**Defendants** [1] - 1:13
**DEFENDANTS** [1] - 2:13
**Defense** [1] - 4:17
**defined** [1] - 22:6
**degree** [2] - 14:3, 37:12
**demonstrate** [1] - 36:24
**demonstrated** [1] - 11:24
**denied** [2] - 29:6, 34:18
**depose** - 32:13
**DEPOSIT** [1] - 38:20
**deposition** [7] - 7:4, 12:10, 12:17, 13:10, 17:20, 18:5, 28:21
**depositions** [1] - 17:13
**DEPUTY** [1] - 4:4
**derivation** [1] - 30:15
**derived** [1] - 6:11
**describe** [4] - 8:4, 15:10, 16:13, 28:16
**describes** [4] - 6:17, 6:23, 27:2, 28:4
**describing** [1] - 22:25
**description** [1] - 31:5
**descriptive** [10] - 15:6, 15:9, 15:23, 15:24, 16:19, 29:24, 29:25, 31:13, 31:17
**designed** [1] - 20:4
**desist** [2] - 8:1, 36:16
**despite** [1] - 29:9
**determining** [1] - 23:12
**developing** [1] - 29:17
**development** [1] - 28:21
**develops** [1] - 13:12
**device** [1] - 10:14
**devices** [4] - 5:17, 8:7, 20:11, 22:9
**different** [12] - 12:6, 19:20, 22:2, 22:14, 22:16, 24:2, 25:22, 26:21, 29:20, 29:23, 30:9, 33:10
**differently** [1] - 25:24
**DiMuzio** [1] - 4:11
**discovered** [1] - 29:3
**discovers** [1] - 28:23
**discussed** [4] - 16:11, 16:12, 16:14, 21:16
**discussing** [1] - 7:15
**dispositive** [1] - 23:11
**dispute** [1] - 9:9
**disputing** [2] - 6:20, 6:21
**disregarding** [1] - 34:17

distinctive [4] - 9:16, 23:6, 31:12, 31:20
distributed [1] - 6:7
distributing [1] - 13:4
distribution [2] - 7:9, 12:9
DISTRICT [5] - 1:1, 1:2, 1:5, 38:12
district [2] - 23:15, 35:24
District [1] - 9:25
DIVISION [1] - 1:3
DO [1] - 38:13
documents [2] - 22:23, 31:22
dollar [2] - 28:14, 37:8
dollars [3] - 13:17, 13:21, 37:11
done [2] - 23:24, 25:9
doubt [3] - 19:21, 27:11, 29:16
Douglas [1] - 17:23
down [2] - 20:22, 36:10
download [1] - 6:1
dozen [2] - 24:4, 24:16
drafted [3] - 17:24, 17:25, 18:20
drive [3] - 14:20, 15:13, 19:12
Drive [1] - 21:17
drives [1] - 5:25
Drop [1] - 17:10
Dropbox [55] - 4:5, 4:8, 4:10, 5:13, 5:18, 5:20, 5:22, 5:23, 6:22, 8:20, 8:23, 8:25, 9:10, 10:16, 10:18, 10:19, 14:8, 14:15, 14:17, 15:7, 15:12, 16:11, 16:12, 18:3, 18:16, 18:25, 20:17, 22:23, 23:22, 25:7, 25:21, 25:25, 26:1, 26:3, 27:11, 27:21, 27:24, 28:14, 28:25, 32:12, 32:20, 33:9, 33:15, 34:6, 34:12, 34:14, 34:15, 35:17, 35:18, 36:6, 36:12, 36:15, 36:22, 37:3, 37:10
DROPBOX [3] - 1:12, 2:14, 38:8
Dropbox's [13] - 4:19, 13:13, 13:21, 14:24, 15:11, 19:11, 19:16, 21:9, 21:17, 21:20, 27:9, 31:22, 32:20
due [1] - 29:6
dynamically [1] - 7:1

**E**

e-mail [6] - 7:14,

15:15, 17:24, 17:25, 26:2, 26:8
e-mails [2] - 28:10, 28:20
early [1] - 7:18
easy [2] - 20:7
effect [3] - 12:24, 16:5, 16:8
efficient [1] - 12:9
efficiently [2] - 12:13, 19:14, 25:17
efforts [1] - 21:14
eight [2] - 5:10, 6:22
either [2] - 21:19, 32:22
Elena [1] - 4:11
eliminate [1] - 27:21
employee [1] - 29:4
enables [1] - 5:15
end [6] - 10:3, 12:23, 12:25, 17:24, 31:6
enforcement [1] - 16:15
engineering [1] - 12:8
ensure [1] - 19:13
enterprise [2] - 7:3, 14:25
enterprises [1] - 33:13
entire [2] - 25:10, 33:18
entirely [2] - 12:6, 23:22
ENTITLED [1] - 38:16
environment [2] - 20:14, 21:6
environments [2] - 6:7, 13:5
ESQ [3] - 2:5, 2:9, 2:18
essentially [1] - 33:3
et [1] - 15:6
evaluating [1] - 23:13
evidence [32] - 8:11, 8:12, 8:15, 8:16, 10:3, 10:18, 14:12, 14:14, 14:22, 14:23, 17:9, 17:10, 17:13, 19:2, 19:4, 21:2, 22:19, 24:9, 28:2, 28:8, 28:12, 29:1, 30:10, 32:5, 32:14, 34:16, 34:17, 36:3, 36:15
evident [1] - 31:1
evocative [3] - 22:24, 31:22, 31:25
exacerbates [1] - 27:23
exact [4] - 19:7, 22:16, 24:7, 24:12
exactly [2] - 14:11, 28:9
example [1] - 28:24
examples [2] - 6:8, 17:17

exceed [1] - 37:10
except [1] - 29:20
Exhibit [7] - 6:25, 7:14, 7:25, 12:7, 12:10, 13:19, 36:20
exist [1] - 26:22
existing [1] - 36:24
expand [4] - 21:11, 21:14, 32:22
expansion [1] - 29:8
expensive [3] - 13:21, 13:25, 14:2
explain [1] - 17:20
exposed [1] - 33:15
exposure [1] - 8:17
extensive [1] - 11:24, 27:11
extensively [2] - 19:3, 32:17
eyes [1] - 7:2

**F**

F.3d [1] - 23:10
fabricated [5] - 17:14, 17:16, 17:21, 18:18, 28:7
facing [1] - 10:12
fact [8] - 14:7, 14:11, 17:13, 19:9, 19:22, 22:18, 25:7, 29:2
factors [9] - 5:8, 5:10, 5:13, 6:14, 6:18, 6:22, 12:3, 22:20
facts [3] - 6:18, 6:20, 7:10
factual [1] - 35:21
failure [1] - 35:19
fair [1] - 34:19
fairly [2] - 20:20, 22:12
falls [1] - 28:7
familiar [1] - 34:23
far [1] - 22:16
faster [1] - 25:15
favor [3] - 6:22, 12:1, 34:16
favorable [1] - 32:6
feature [12] - 5:22, 6:2, 12:15, 13:13, 13:21, 14:19, 16:13, 16:14, 19:15, 19:18, 28:25, 35:17
Federal [1] - 35:8
FEE [1] - 38:19
feeders [1] - 6:8
FEES [1] - 38:19
field [9] - 7:11, 7:13, 7:17, 7:24, 16:17, 23:8, 23:11, 23:16, 36:18
file [4] - 7:17, 15:13,

26:2, 26:3
files [8] - 5:15, 5:17, 5:19, 5:24, 6:1, 26:8, 26:15
final [4] - 29:7, 37:5, 37:6, 37:7
finally [3] - 28:16, 36:6, 36:21
fine [1] - 25:4
finish [1] - 14:16
first [10] - 4:17, 5:11, 5:14, 6:14, 7:12, 15:20, 19:17, 30:23, 34:11, 34:24
five [2] - 23:25, 24:17, 24:19, 24:20, 35:11, 35:14
flowchart [1] - 28:18
focus [6] - 6:18, 7:13, 15:17
focusing [3] - 14:13, 14:20, 15:11
folks [6] - 7:15, 10:22, 20:18, 26:7, 32:21, 33:8
follow [1] - 36:9
FOR [3] - 38:11, 38:12, 38:19
forces [1] - 18:3
FOREGOING [1] - 38:14
forever [1] - 19:20
formally [1] - 18:4
FORMAT [1] - 38:17
formats [1] - 7:3
forward [1] - 17:8
foul [1] - 29:9
foundation [1] - 32:15
four [3] - 30:23, 35:3, 35:4
fourth [1] - 35:22
frame [1] - 5:12
FRANCISCO [2] - 2:16, 2:20
front [1] - 31:6
function [1] - 12:4
functionality [2] - 8:24, 29:21

**G**

gas [1] - 21:15
general [1] - 21:3
generally [1] - 21:5
generated [2] - 15:20, 35:2
generic [2] - 15:6, 31:17
GEORGE [2] - 2:4, 2:8
ghostwritten [1] - 18:19
giant [1] - 26:8
gist [1] - 16:25
given [4] - 20:10, 20:20, 29:23, 35:9

Glow [1] - 35:25
goal [1] - 12:8
Goggle [1] - 21:17
gomes [1] - 17:24
Gomes [9] - 17:25, 18:5, 18:6, 18:21, 21:8, 28:3, 28:10, 33:19, 36:23
Gomes' [2] - 27:1, 28:13
goods [12] - 7:20, 11:10, 12:2, 19:8, 21:25, 22:6, 22:14, 22:16, 23:2, 23:5, 32:10, 35:10
Google [3] - 7:20, 26:5, 26:14
Googles [1] - 34:10
Government [2] - 10:25, 14:5
grant [1] - 23:20
granted [1] - 23:22
grants [1] - 33:25
great [1] - 25:4
groups [1] - 15:17
guess [2] - 20:14, 26:10
guessing [1] - 20:7
guys [2] - 33:21, 34:13

**H**

half [1] - 33:23
hard [5] - 5:25, 14:20, 15:13, 19:12, 25:6
harmed [1] - 33:17
Hawk [39] - 6:17, 6:23, 7:12, 7:15, 7:23, 8:1, 8:3, 8:8, 8:9, 8:12, 8:20, 9:10, 10:6, 10:20, 11:10, 11:16, 11:21, 12:8, 12:16, 12:18, 13:11, 14:5, 14:6, 15:7, 16:18, 17:11, 19:16, 21:10, 21:16, 21:18, 28:17, 28:18, 28:23, 35:1, 35:16, 36:3, 36:16, 36:19, 37:17
Hawk's [13] - 6:4, 8:15, 10:2, 12:6, 12:22, 14:17, 14:19, 14:24, 19:12, 19:15, 33:19, 35:18, 36:7
hear [2] - 4:16, 30:7
heard [1] - 18:1
HEARING [2] - 1:16, 3:4
HELD [1] - 38:16
helping [3] - 14:9, 25:19, 36:11
helps [2] - 9:14, 10:16
HEREBY [1] - 38:13
high [2] - 28:11, 37:12
himself [1] - 36:23

historically [1] - 21:10
history [1] - 35:1
hold [1] - 8:8
Honor [19] - 4:7, 4:13, 4:18, 5:2, 9:1, 9:4, 9:8, 10:24, 13:10, 14:17, 16:10, 17:18, 20:24, 25:3, 31:9, 33:16, 37:12, 37:19, 37:22
HONORABLE [1] - 1:5
house [2] - 9:11, 9:22
hundred [1] - 37:11
hundreds [1] - 13:20
hurt [1] - 32:19
hyperbole [1] - 17:19

**I**

idea [2] - 35:18, 36:12
identifier [2] - 8:22, 9:16
identifiers [1] - 8:21
identify [1] - 33:19
ignores [1] - 28:25
imagine [1] - 30:13
impact [2] - 6:21, 23:11
impediment [1] - 21:20
implementations [1] - 21:16
implemented [1] - 21:13
important [2] - 24:22, 29:8
impression [1] - 18:19
impressions [1] - 15:21
IN [5] - 4:3, 38:11, 38:16, 38:17, 38:20
INC [6] - 1:7, 1:12, 2:4, 2:14, 38:6, 38:8
Inc [4] - 4:5, 4:8, 35:25
inclined [1] - 37:15
include [1] - 13:22
included [1] - 8:3
including [6] - 6:7, 16:17, 27:13, 35:24, 36:13
incorporating [2] - 9:22, 21:21
increase [1] - 9:17
increased [2] - 18:2, 18:12
increases [1] - 27:17
Indermill [1] - 28:6
indicated [1] - 8:23
indicating [2] - 20:25, 22:23
individual [3] - 14:24, 33:12
individuals [2] - 33:8, 37:1
Industries [1] - 35:25

industry [1] - 21:15
inexact [1] - 24:14
inferences [2] - 19:4, 32:5
information [3] - 20:9, 35:22, 36:5
infrastructure [1] - 20:9
inherently [2] - 23:6, 31:20
injury [1] - 35:15
innovation [3] - 5:13, 5:14, 5:21
input [1] - 13:8
inside [1] - 8:17
instance [3] - 10:16, 15:12, 21:12
intent [1] - 28:16
internal [1] - 22:23
involving [1] - 27:16
Iron [52] - 6:4, 6:17, 6:23, 7:12, 7:15, 7:23, 8:1, 8:3, 8:8, 8:9, 8:12, 8:15, 8:20, 9:10, 10:2, 10:6, 10:20, 11:10, 11:16, 11:21, 12:6, 12:8, 12:16, 12:18, 12:22, 13:11, 14:5, 14:6, 14:17, 14:19, 14:24, 15:7, 16:18, 17:11, 19:12, 19:15, 19:16, 21:10, 21:16, 21:18, 28:17, 28:18, 28:23, 33:19, 35:1, 35:16, 35:18, 36:3, 36:7, 36:16, 36:19, 37:17
Ironhawk [1] - 4:5
IRONHAWK [3] - 1:7, 2:4, 38:6
irrelevant [1] - 36:5
IS [2] - 38:14, 38:17
isolation [1] - 31:14
issue [5] - 22:17, 26:4, 26:10, 26:11, 29:1
issues [2] - 20:8, 20:22
item [2] - 4:4, 7:4
itself [5] - 6:23, 7:12, 7:23, 8:8, 15:8

**J**

January [2] - 5:20, 35:17
Jeff [1] - 4:9
JEFFREY [1] - 2:19
Jim [8] - 23:10, 27:16, 27:17, 27:19, 29:2, 29:4, 29:5
JL [4] - 23:9, 27:15, 27:19, 29:2
Johnny [1] - 27:19
joined [1] - 4:14
joining [1] - 29:4

JUDGE [1] - 1:5
judgment [12] - 4:19, 5:3, 18:25, 19:3, 19:6, 22:4, 23:20, 28:12, 32:4, 32:7, 33:25, 34:17
JUDICIAL [2] - 38:18, 38:21
jury [1] - 5:4

**K**

Kalra [1] - 4:11
KEITH [1] - 2:5
Keith [1] - 4:14
key [1] - 5:13
kind [1] - 5:14
kinds [2] - 29:23, 32:23
kitchen [1] - 30:4
knowing [2] - 29:9, 29:10
known [1] - 26:16

**L**

large [8] - 6:6, 7:1, 13:4, 19:10, 19:13, 26:2, 26:3, 26:9
last [5] - 24:17, 24:20, 32:25, 33:23, 35:1
launch [2] - 27:12, 28:19
launched [1] - 35:17
law [4] - 5:7, 24:22, 34:15, 35:24
least [6] - 7:21, 7:22, 8:11, 13:16, 22:17, 29:1
legal [1] - 29:2
lengthy [1] - 22:12
LESS [1] - 38:19
less [1] - 27:6
letters [3] - 8:1, 30:23, 36:17
level [2] - 18:2, 18:13
library [1] - 7:1
license [1] - 13:18
lied [1] - 37:6
light [1] - 32:5
likelihood [8] - 5:8, 9:7, 9:17, 9:18, 22:18, 24:22, 27:18, 28:2
likely [3] - 5:5, 8:3, 36:18
limit [1] - 26:6
limited [6] - 6:7, 13:5, 14:9, 25:14, 29:10, 29:13
line [1] - 30:8
lines [1] - 17:25
listed [1] - 13:20
listing [1] - 13:19

litigation [3] - 15:19, 17:9, 18:21
LLP [1] - 2:4, 2:8, 2:14, 2:18
Lockheed [1] - 35:5
look [4] - 15:12, 23:4, 23:5, 27:9
looking [1] - 10:12
loosely [1] - 31:8
Lopez [1] - 35:25
LOS [5] - 1:17, 1:24, 2:6, 2:11, 4:1
lost [1] - 30:12
Love [1] - 27:19
low [2] - 28:13, 28:14

**M**

M2 [1] - 35:7, 35:8
mail [6] - 7:14, 15:15, 17:24, 17:25, 26:2, 26:8
mails [2] - 28:10, 28:20
maintain [1] - 32:22
majority [1] - 15:18
manner [1] - 31:9
MARIA [3] - 1:21, 38:11, 38:24
mark [27] - 6:15, 6:16, 9:6, 9:23, 10:4, 10:20, 11:25, 15:2, 16:2, 16:11, 19:7, 19:16, 21:25, 22:17, 22:22, 22:24, 23:2, 23:14, 23:17, 23:19, 23:24, 25:9, 27:17, 29:3, 29:4, 33:17
mark's [1] - 23:12
market [3] - 19:1, 19:2, 25:5, 36:2, 36:4
marketed [3] - 19:2, 33:7, 33:12
marketing [9] - 6:24, 11:17, 11:19, 11:22, 14:12, 14:13, 15:12, 21:24, 31:25
marketplace [2] - 8:17, 9:10
marks [5] - 9:9, 9:11, 9:16, 29:7, 31:23, 35:12
Martin [1] - 35:5
mass [1] - 20:16
massive [2] - 12:13, 20:21
matching [1] - 13:7
material [1] - 29:2
materials [3] - 6:24, 6:25, 15:12
math [2] - 37:9, 37:10
matter [2] - 10:11, 22:1
MATTER [1] - 38:16

matters [2] - 10:15, 35:23
MATTHEW [2] - 2:9, 2:18
Matthew [2] - 4:9, 4:15
mean [13] - 12:21, 12:22, 13:1, 15:7, 26:14, 30:2, 30:3, 30:4, 30:5, 30:8, 30:9, 31:24, 37:14
meaning [3] - 23:3, 23:8, 31:21
meaningful [1] - 8:17
means [2] - 13:1, 31:1
Media [1] - 35:11
mention [1] - 33:4
met [2] - 25:7, 28:16
might [8] - 10:12, 10:23, 16:7, 19:18, 20:11, 20:22, 33:8
military [12] - 6:12, 8:18, 14:6, 14:13, 14:14, 14:24, 19:1, 19:3, 25:4, 35:4, 36:4
million [2] - 23:23
millions [2] - 27:12, 27:14
minimum [1] - 15:8
minutes [1] - 34:21
missed [1] - 11:18
mission [1] - 20:23
MISSION [2] - 2:15, 2:19
mistakenly [1] - 17:10
mitigate [1] - 28:24
mix [1] - 16:21
model [1] - 14:10
MONDAY [2] - 1:18, 4:1
month [3] - 28:14, 28:15, 28:19
morning [4] - 4:7, 4:12, 4:13, 4:16
most [3] - 20:21, 24:21, 32:6
MOTION [2] - 1:16, 3:4
motion [1] - 4:19
motions [1] - 37:14
move [1] - 14:16
MR [47] - 4:13, 18:24, 19:21, 20:24, 21:7, 21:24, 22:3, 22:8, 22:11, 22:22, 24:4, 24:7, 24:12, 24:15, 24:18, 24:21, 25:2, 25:13, 25:21, 25:25, 26:9, 26:18, 26:23, 26:25, 27:4, 27:6, 29:16, 30:1, 30:3, 30:6, 30:13, 30:17, 30:21, 30:23, 31:2, 31:8, 31:14, 31:19, 32:4, 32:11, 32:24, 33:6, 33:11, 34:3, 34:10, 34:20, 37:19

**MS** [40] - 4:7, 4:18, 4:23, 5:2, 5:9, 8:10, 9:1, 9:4, 9:8, 9:14, 9:18, 9:21, 10:10, 10:15, 10:24, 11:4, 11:6, 11:13, 11:15, 11:19, 11:21, 13:2, 13:9, 13:16, 14:11, 15:3, 15:7, 15:24, 16:3, 16:10, 16:23, 17:4, 17:6, 17:18, 17:23, 18:23, 34:22, 36:11, 37:6, 37:22
**music** [1] - 26:14

**N**

**name** [8] - 7:16, 8:21, 15:14, 15:20, 16:22, 32:24, 34:9, 37:1
**named** [1] - 25:10
**namers** [1] - 15:15
**national** [2] - 27:7, 27:17
**nationwide** [1] - 29:5
**nature** [1] - 29:25
**navies** [1] - 10:25
**navy** [16] - 6:8, 6:10, 6:11, 7:5, 10:6, 10:7, 10:9, 10:10, 20:3, 24:10, 24:11, 24:16, 32:23, 33:4, 33:14, 35:5
**near** [1] - 27:21
**nearly** [2] - 7:21, 14:22
**need** [7] - 5:6, 17:2, 23:6, 27:25, 31:21, 37:16
**needs** [1] - 16:20
**Network** [3] - 9:22, 9:24, 14:1
**network** [1] - 20:11
**never** [2] - 8:10, 11:23
**new** [2] - 5:21, 20:11
**niche** [1] - 29:11
**Ninth** [3] - 22:13, 23:9, 27:15
**none** [1] - 13:12
**note** [1] - 24:22
**noted** [4] - 14:17, 15:9, 15:11, 35:16
**notion** [4] - 35:15, 36:6, 36:21, 37:8
**number** [9] - 4:4, 20:24, 24:7, 24:12, 24:14, 31:20, 31:21, 37:8
**numerous** [2] - 8:1, 16:16

**O**

**OCTOBER** [2] - 1:18,
4:1
**OF** [12] - 1:2, 1:15, 2:4, 2:5, 2:10, 2:13, 38:12, 38:15, 38:18, 38:21
**off-the-shelf** [1] - 14:19
**offer** [2] - 8:23, 13:24
**offered** [2] - 5:23
**offering** [1] - 32:2
**offerings** [4] - 5:12, 12:5, 15:10, 37:10
**offers** [1] - 6:10
**offhand** [1] - 24:18
**Office** [1] - 23:4
**office** [2] - 23:25, 29:17
**OFFICIAL** [3] - 1:21, 38:11, 38:24
**oftentimes** [1] - 33:21
**oil** [1] - 21:15
**ON** [2] - 2:4, 2:13
**one** [21] - 6:24, 7:16, 12:8, 13:2, 13:11, 17:1, 17:4, 17:19, 17:23, 17:25, 20:25, 23:13, 24:24, 25:2, 29:9, 29:18, 31:20, 35:9, 37:4, 37:6, 37:7
**ones** [1] - 35:5
**online** [1] - 14:2
**open** [1] - 15:13
**operate** [2] - 20:6, 21:6
**opinion** [1] - 32:2
**original** [1] - 12:24
**originally** [1] - 30:13
**otherwise** [1] - 11:25
**ourselves** [1] - 23:24
**output** [1] - 13:8
**outside** [2] - 8:17, 19:3
**outward** [1] - 10:12
**overall** [1] - 23:13
**overlap** [1] - 14:23, 29:23
**overlapping** [2] - 11:8, 11:10
**own** [6] - 5:23, 6:24, 16:2, 31:22, 31:23, 35:23

**P**

**pace** [2] - 4:21, 36:12
**PAGE** [2] - 3:3, 38:17
**paragraph** [3] - 21:8, 28:13, 33:18
**paragraphs** [1] - 28:3
**part** [2] - 16:21, 31:4
**particular** [2] - 10:13, 10:14
**particularly** [2] - 29:8, 31:11

**parties** [7] - 5:5, 6:19, 6:20, 7:21, 21:24, 23:19, 28:16
**parties'** [2] - 15:10, 19:9
**past** [3] - 18:1, 18:10, 21:12
**patent** [1] - 26:18
**Patent** [1] - 23:3
**pay** [1] - 27:13
**paying** [1] - 24:2
**pejoratively** [1] - 29:12
**people** [10] - 14:4, 14:9, 17:23, 20:21, 26:1, 26:16, 33:1, 33:13, 33:15, 34:13
**per** [3] - 13:17, 13:23, 28:14
**percent** [1] - 6:11
**period** [2] - 27:3, 27:4
**permits** [1] - 8:5
**person** [6] - 10:6, 10:8, 23:3, 30:8, 31:25, 33:16
**perspective** [1] - 34:3
**pervasiveness** [1] - 35:9
**petSmart** [1] - 9:21
**Peyton** [1] - 28:6
**pharmacies** [1] - 21:13
**photos** [1] - 26:15
**physical** [1] - 20:11
**pick** [1] - 16:22
**picked** [2] - 32:24, 33:17
**pitching** [1] - 19:23
**plaintiff** [3] - 4:14, 9:3, 11:24
**Plaintiffs** [1] - 1:8
**plaintiffs** [1] - 29:3
**PLAINTIFFS** [1] - 2:4
**plans** [2] - 13:22, 13:24
**platforms** [2] - 21:22, 26:14
**play** [1] - 11:7
**point** [9] - 10:22, 11:3, 11:4, 11:6, 12:11, 17:4, 21:13, 37:7
**points** [1] - 17:2
**pooh** [2] - 23:21
**pooh-pooh** [1] - 23:21
**portfolio** [1] - 19:16
**portion** [1] - 17:20
**positive** [1] - 15:20
**possible** [2] - 5:3, 26:21
**potential** [2] - 9:23, 28:5
**pre** [1] - 9:16
**pre-identifier** [1] - 9:16
**preferred** [1] - 15:17

**PREGERSON** [1] - 1:5
**premised** [1] - 14:18
**presented** [1] - 30:10
**PRESIDING** [1] - 1:5
**pressured** [2] - 4:23, 4:25
**presume** [2] - 35:9, 37:11
**pretty** [2] - 23:24, 26:16
**prevent** [1] - 34:15
**price** [1] - 28:11
**primary** [2] - 8:21, 29:18
**private** [1] - 29:10
**probable** [2] - 5:3, 5:4
**problem** [3] - 19:10, 25:19, 27:23
**problems** [2] - 24:24, 25:2
**proceeding** [1] - 37:24
**PROCEEDINGS** [2] - 1:15, 38:16
**processed** [1] - 17:17
**procure** [1] - 7:5
**produced** [1] - 36:16
**product** [28] - 5:22, 6:2, 6:5, 10:5, 12:22, 13:13, 13:19, 13:21, 14:18, 14:19, 15:15, 16:13, 17:11, 18:16, 18:21, 25:10, 25:12, 25:17, 25:18, 31:2, 31:3, 31:4, 31:15, 34:7, 34:9, 36:2
**products** [8] - 6:10, 8:22, 10:1, 13:12, 13:20, 14:1, 14:2, 14:5
**program** [1] - 10:23
**prohibit** [1] - 24:23
**prominent** [1] - 21:20
**proof** [3] - 23:2, 36:7, 36:13
**proprietary** [1] - 19:19
**provide** [5] - 12:9, 12:16, 12:18, 27:25, 34:7
**proximity** [1] - 9:11
**PTO** [2] - 29:6, 31:20
**purchase** [1] - 27:19
**purchasers** [1] - 12:4
**purchasing** [1] - 10:19
**purposes** [4] - 20:20, 22:3, 28:1, 28:12
**PURSUANT** [1] - 38:13
**pursue** [1] - 18:21
**put** [3] - 20:11, 23:7, 36:15
**putting** [1] - 32:25

**Q**

**quantities** [2] - 19:10,

19:13
**quarter** [1] - 23:23
**queries** [1] - 36:22
**questions** [1] - 34:24
**quick** [1] - 17:2
**quickly** [3] - 4:22, 19:14, 25:16
**quite** [1] - 13:21
**quote** [2] - 6:25, 9:23

**R**

**raised** [1] - 32:12
**range** [2] - 13:23, 35:12
**rather** [1] - 23:12
**re** [5] - 6:25, 7:14, 12:7, 12:10, 13:19
**read** [3] - 17:19, 21:7, 37:15
**real** [2] - 24:24, 25:8
**really** [3] - 20:15, 32:15, 33:17
**reasonable** [1] - 5:4
**reasons** [2] - 15:9, 31:19
**received** [1] - 36:22
**recognition** [1] - 27:17
**recognize** [1] - 9:25
**recognized** [1] - 7:23
**recognizing** [2] - 16:7, 34:22
**recommending** [3] - 15:14, 15:16, 15:19
**record** [8] - 8:13, 18:20, 20:25, 24:9, 34:23, 35:3, 35:13, 35:21
**reduce** [1] - 7:2
**reduces** [1] - 9:23
**REDUCTION** [1] - 38:20
**reduction** [4] - 6:5, 12:7, 12:13, 12:14
**reference** [1] - 28:18
**referred** [1] - 13:7
**reflect** [2] - 18:19, 18:20
**register** [1] - 23:7
**registered** [3] - 23:2, 23:6, 31:20
**registration** [2] - 22:7, 29:10
**registrations** [1] - 7:19
**regular** [1] - 14:4
**REGULATIONS** [2] - 38:17, 38:20
**reiteration** [1] - 17:3
**rejected** [3] - 19:5, 23:15, 23:16
**related** [2] - 7:20, 35:10
**relatedness** [5] - 11:9,

12:2, 35:7, 35:9, 36:14
**relationships** [1] - 21:19
**released** [2] - 18:2, 18:16
**relevantly** [1] - 21:15
**reminder** [1] - 4:20
**reminding** [1] - 18:24
**remotely** [1] - 20:19
**repeat** [1] - 11:13
**replicate** [2] - 12:12, 12:13
**replication** [2] - 7:9, 13:3
**REPORTED** [1] - 38:15
**REPORTER** [3] - 1:21, 38:11, 38:24
**REPORTER'S** [1] - 1:15
**representatives** [1] - 4:10
**require** [1] - 23:7
**requirement** [2] - 28:1
**Reserve** [1] - 35:11
**resonates** [1] - 22:24
**resources** [1] - 25:20
**respect** [1] - 35:22
**respective** [1] - 19:9
**respond** [1] - 34:24
**response** [2] - 35:6, 37:18
**responses** [1] - 20:24
**responsible** [3] - 35:18, 36:6, 36:13
**result** [1] - 27:13
**results** [1] - 34:12
**revenue** [2] - 27:1, 35:2
**revenues** [1] - 6:11
**reverse** [5] - 17:8, 17:12, 27:9, 27:16, 27:22
**reversed** [1] - 22:13
**reviewing** [1] - 32:5
**Riordan** [2] - 23:14, 23:17
**risk** [1] - 28:23
**rollout** [1] - 29:5
**room** [3] - 33:22, 34:12, 34:14
**root** [1] - 30:12
**ROSS** [2] - 2:4, 2:8
**run** [1] - 22:19

## S

**sale** [1] - 21:14
**sales** [5] - 11:16, 11:17, 35:22, 36:1, 36:4
**SAN** [2] - 2:16, 2:20
**saved** [2] - 5:19, 5:25
**saving** [1] - 14:20

**scale** [1] - 25:1
**scope** [1] - 27:8
**screen** [1] - 32:14
**search** [5] - 16:16, 16:17, 27:13, 29:3
**searches** [1] - 7:21
**searching** [1] - 14:2
**second** [2] - 12:4, 35:6
**secondary** [3] - 23:2, 23:7, 31:21
**SECTION** [1] - 38:13
**sector** [4] - 21:12, 25:6, 25:8, 25:11
**sectors** [1] - 21:1
**secure** [1] - 25:16
**see** [5] - 5:24, 10:4, 13:18, 32:19, 32:21
**seeing** [1] - 10:6
**seem** [1] - 16:6
**sees** [1] - 28:23
**sell** [6] - 13:15, 19:1, 25:4, 28:13, 33:14, 34:8
**selling** [3] - 12:11, 12:15, 21:25
**sells** [2] - 11:11, 28:14
**send** [3] - 15:15, 26:2
**sending** [1] - 26:7
**sense** [2] - 20:12, 25:1
**sensitive** [1] - 20:23
**sent** [2] - 8:1, 36:17
**sentence** [1] - 18:6
**separate** [2] - 24:10
**servers** [1] - 20:19
**service** [1] - 20:4
**services** [3] - 7:20, 22:6, 32:10
**SESSION** [1] - 4:3
**set** [1] - 5:11
**seven** [1] - 34:11
**several** [1] - 31:19
**share** [1] - 19:11
**shared** [1] - 26:2
**shareware** [1] - 7:17
**sharing** [1] - 33:9
**shelf** [2] - 13:13, 14:19
**SHIN** [41] - 2:14, 4:7, 4:18, 4:23, 5:2, 5:9, 8:10, 9:1, 9:4, 9:8, 9:14, 9:18, 9:21, 10:10, 10:15, 10:24, 11:4, 11:6, 11:13, 11:15, 11:19, 11:21, 13:2, 13:9, 13:16, 14:11, 15:3, 15:7, 15:24, 16:3, 16:10, 16:23, 17:4, 17:6, 17:18, 17:23, 18:23, 34:22, 36:11, 37:6, 37:22
**shin** [1] - 19:5
**Shin** [1] - 4:7
**ship** [3] - 10:6, 10:23, 20:9

**ships** [4] - 6:8, 20:2, 20:3, 29:11
**short** [2] - 30:11, 30:14
**shots** [1] - 32:14
**show** [4] - 7:21, 8:11, 11:24, 36:24
**showing** [1] - 19:2
**shown** [1] - 17:14
**shows** [4] - 8:13, 9:9, 13:19, 33:1
**side** [1] - 4:17
**significant** [6] - 9:5, 22:11, 32:6, 32:7, 35:13, 36:1
**similar** [1] - 35:12
**similarity** [2] - 9:9, 29:7
**simple** [1] - 15:14
**simply** [3] - 19:22, 22:14, 33:20
**sink** [1] - 30:4
**SINK** [1] - 30:19
**site** [1] - 22:13
**sitting** [1] - 10:8
**size** [2] - 26:6, 36:3
**Sleekcraft** [6] - 5:7, 5:13, 6:13, 6:18, 6:22, 22:20
**slice** [1] - 24:5
**slow** [2] - 20:22, 36:10
**small** [1] - 27:7
**Smart** [69] - 5:21, 6:3, 6:4, 7:1, 7:5, 7:13, 7:16, 7:18, 7:20, 7:22, 8:2, 8:4, 8:9, 8:10, 8:12, 8:13, 8:20, 10:4, 10:5, 13:13, 13:22, 13:25, 15:9, 15:11, 15:14, 15:16, 15:17, 16:12, 18:3, 18:16, 19:8, 19:11, 19:12, 19:15, 19:23, 21:9, 21:11, 21:16, 21:20, 21:21, 25:9, 27:12, 27:14, 27:21, 27:24, 28:17, 28:20, 28:24, 29:18, 29:19, 29:25, 30:17, 31:10, 31:12, 31:15, 31:17, 32:9, 32:20, 33:2, 33:20, 33:22, 33:22, 34:9, 34:13, 35:16, 35:17, 36:14, 36:17
**smart** [3] - 6:16, 21:12, 30:17
**society** [1] - 35:10
**software** [22] - 5:14, 6:17, 6:24, 7:5, 7:13, 7:20, 7:23, 10:1, 10:5, 12:7, 19:8, 19:9, 22:5, 22:9, 22:15, 32:10, 35:7, 35:10, 36:4, 36:15, 36:18

**Software** [1] - 35:7
**software-related** [2] - 7:20, 35:10
**solve** [1] - 25:19
**sometimes** [1] - 13:16
**sophisticated** [1] - 14:3
**sorry** [3] - 11:18, 23:15, 36:9
**sort** [11] - 4:21, 20:9, 20:10, 20:16, 20:20, 20:23, 21:3, 26:21, 29:21, 29:24, 30:25
**sorts** [1] - 20:8
**sought** [1] - 21:10
**source** [2] - 10:1, 17:11
**space** [2] - 14:20, 19:12
**speaking** [3] - 17:19, 21:4, 28:10
**specialized** [1] - 20:13
**specifically** [1] - 22:6
**spectrum** [1] - 31:23
**spell** [1] - 30:19
**spelled** [3] - 30:16, 30:17, 30:22
**spent** [5] - 27:12, 29:17, 32:25, 33:23, 34:11
**standalone** [1] - 8:24
**standard** [1] - 13:22
**standpoint** [1] - 27:22
**Stanley** [3] - 17:23, 18:5, 18:6
**Stanley's** [1] - 18:19
**STARS** [2] - 2:5, 2:10
**start** [4] - 4:18, 4:21, 6:13, 18:24
**statement** [1] - 18:4
**STATES** [6] - 1:1, 1:22, 38:12, 38:14, 38:18, 38:21
**STENOGRAPHICALLY** [1] - 38:15
**still** [5] - 16:8, 20:4, 34:8
**stood** [1] - 28:9
**stop** [1] - 37:7
**storage** [3] - 12:16, 12:19, 14:18
**store** [2] - 5:15, 20:19
**storing** [1] - 33:10
**story** [2] - 19:5, 19:6
**straight** [1] - 21:7
**stray** [1] - 32:14
**stream** [1] - 12:25
**STREET** [3] - 1:23, 2:15, 2:19
**strength** [16] - 6:14, 6:15, 9:6, 15:1, 15:4, 16:2, 20:10, 22:22, 22:23, 23:12, 23:14, 23:21, 26:25, 27:8, 27:10, 27:11

**strengthen** [1] - 11:25
**string** [1] - 22:13
**strong** [1] - 29:1
**struggling** [1] - 30:7
**studied** [1] - 30:14
**stuff** [1] - 20:19
**submit** [3] - 37:12, 37:18, 37:19
**submitted** [3] - 36:3, 36:16, 37:21
**subscribers** [4] - 5:19, 5:22, 5:24, 10:18
**subscription** [2] - 13:22, 13:24
**sued** [1] - 29:14
**sufficient** [2] - 35:7, 37:11
**suggesting** [1] - 29:14
**suggestive** [5] - 15:6, 15:8, 15:22, 31:17, 31:19
**suggests** [1] - 28:23
**suing** [1] - 37:3
**SUITE** [5] - 1:23, 2:6, 2:10, 2:15, 2:20
**summary** [12] - 4:19, 5:2, 18:25, 19:3, 19:6, 22:3, 23:20, 28:12, 32:4, 32:7, 33:25, 34:17
**supplemental** [1] - 23:7
**supplier** [1] - 14:6
**supposed** [2] - 34:15, 36:22
**surpassed** [1] - 11:23
**surrounded** [1] - 33:2
**swoop** [1] - 29:9
**Sync** [65] - 5:21, 6:3, 6:4, 7:1, 7:5, 7:13, 7:16, 7:18, 7:20, 7:22, 8:2, 8:4, 8:9, 8:10, 8:12, 8:13, 8:20, 10:4, 10:5, 13:13, 13:22, 13:25, 15:10, 15:11, 15:14, 15:16, 15:17, 16:12, 18:3, 18:16, 19:8, 19:11, 19:12, 19:15, 19:23, 21:9, 21:16, 21:20, 21:22, 25:9, 27:12, 27:14, 27:21, 27:24, 28:17, 28:20, 28:24, 29:18, 29:19, 29:25, 30:17, 31:17, 32:9, 32:20, 33:2, 33:20, 33:21, 33:22, 34:9, 34:13, 35:16, 35:17, 36:14, 36:17
**sync** [9] - 6:17, 21:12, 30:2, 30:3, 30:5, 30:6, 30:8, 30:10, 30:15
**Sync's** [1] - 21:11
**synced** [1] - 5:18
**synchronization** [15] -

7:6, 7:8, 7:17, 7:22, 12:21, 13:3, 13:7, 30:14, 30:16, 30:22, 30:24, 31:1, 31:3, 31:5
**synchronize** [2] - 8:5, 12:12
**synchronized** [1] - 12:24
**syncing** [1] - 30:7
**syncs** [2] - 15:13, 15:25
**systems** [1] - 20:5

**T**

**table** [1] - 5:11
**team** [2] - 28:21, 29:2
**techniques** [1] - 7:2
**TECHNOLOGIES** [3] - 1:7, 2:4, 38:6
**technologies** [3] - 19:19, 20:13, 26:13
**Technologies** [1] - 4:5
**technology** [6] - 8:4, 19:22, 19:24, 19:25, 22:15, 26:16
**tens** [1] - 27:14
**term** [12] - 7:12, 7:18, 8:2, 8:10, 8:12, 15:9, 16:12, 16:16, 17:21, 28:8, 29:25, 36:23
**terms** [15] - 6:16, 9:6, 9:7, 10:17, 11:15, 13:11, 13:17, 15:5, 17:12, 17:16, 20:1, 20:15, 22:7, 31:17, 36:12
**testimony** [3] - 13:10, 17:20, 28:6
**THAT** [2] - 38:13, 38:16
**THE** [101] - 2:4, 2:5, 2:10, 2:13, 4:12, 4:16, 4:20, 4:25, 5:6, 8:8, 8:19, 9:2, 9:5, 9:12, 9:15, 9:20, 10:7, 10:11, 10:21, 11:2, 11:5, 11:12, 11:14, 11:18, 11:20, 12:21, 13:6, 13:15, 14:8, 15:1, 15:5, 15:22, 16:1, 16:5, 16:19, 16:24, 17:5, 17:15, 17:22, 18:22, 19:18, 19:25, 21:3, 21:23, 22:1, 22:5, 22:10, 22:21, 24:2, 24:6, 24:8, 24:14, 24:17, 24:19, 24:25, 25:12, 25:18, 25:23, 26:4, 26:12, 26:20, 26:24, 27:3, 27:5, 29:13, 29:20, 30:2, 30:4, 30:11, 30:16,

30:22, 30:25, 31:4, 31:10, 31:16, 31:24, 32:8, 32:19, 33:3, 33:7, 34:2, 34:5, 34:19, 34:21, 36:9, 37:5, 37:13, 37:20, 37:23, 38:11, 38:12, 38:14, 38:15, 38:16, 38:17, 38:18, 38:20, 38:21
**theirs** [1] - 19:4
**theories** [1] - 17:7
**theory** [1] - 17:12
**therefore** [2] - 11:2, 12:24
**they've** [7] - 24:15, 24:19, 27:12, 29:10, 30:9, 32:16, 32:17
**thinking** [2] - 10:19, 20:15
**third** [4] - 7:21, 12:4, 23:19, 35:11
**THIS** [1] - 38:19
**thorough** [1] - 17:1
**thousands** [2] - 13:16, 13:20
**three** [2] - 12:3, 34:21
**TITLE** [1] - 38:14
**TO** [1] - 38:13
**today** [4] - 5:18, 6:9, 21:14, 21:18
**took** [2] - 23:4, 23:5
**tooth** [1] - 30:7
**top** [1] - 27:13
**total** [1] - 37:9
**trade** [2] - 33:1, 36:23
**trademark** [6] - 7:19, 23:25, 29:3, 29:6, 33:24, 34:15
**Trademark** [1] - 23:4
**TRANSCRIPT** [4] - 1:15, 38:15, 38:17, 38:19
**transfer** [4] - 8:5, 21:13, 25:15, 26:10
**transferred** [1] - 19:14
**transferring** [2] - 19:10, 25:16
**translates** [1] - 20:16
**transmissions** [1] - 7:2
**transmits** [1] - 25:14
**transmitted** [1] - 31:7
**trial** [1] - 19:6
**tried** [1] - 18:21
**true** [3] - 16:7, 34:2, 34:5
**TRUE** [1] - 38:14
**try** [1] - 29:16
**trying** [3] - 21:5, 24:25, 26:20
**turn** [1] - 12:2
**two** [13] - 4:4, 4:10, 6:9, 11:11, 13:2, 14:22, 17:2, 17:7,

17:9, 20:24, 21:17, 21:21, 35:5
**two-way** [1] - 13:2
**TV** [1] - 35:25
**type** [1] - 20:11
**types** [4] - 7:3, 17:7, 22:14, 33:8

**U**

**U.S** [3] - 8:17, 23:3, 36:4
**ultimate** [2] - 7:4, 10:25
**uncompressed** [2] - 12:23, 12:25
**under** [5] - 19:3, 21:25, 28:7, 34:9
**undisputed** [5] - 6:4, 6:19, 7:9, 12:17, 14:7
**undisputedly** [1] - 19:16
**unidentified** [1] - 36:25
**UNITED** [6] - 1:1, 1:22, 38:12, 38:14, 38:18, 38:21
**universe** [1] - 20:16
**unknown** [2] - 36:22, 36:23
**unless** [2] - 6:1, 17:1
**unlike** [2] - 14:17, 14:19
**unlikely** [1] - 29:22
**unlimited** [1] - 26:7
**untethered** [1] - 35:21
**up** [6] - 6:9, 13:25, 18:1, 18:9, 19:11, 33:22
**upgrade** [1] - 20:7
**user** [2] - 13:23
**user's** [1] - 19:12
**users** [4] - 8:5, 10:4, 15:18, 33:10
**uses** [6] - 7:16, 12:6, 16:16, 23:17, 36:17, 36:18
**USPTO** [1] - 23:1

**V**

**varies** [1] - 36:1
**variety** [1] - 7:3
**various** [4] - 20:5, 20:20, 28:4
**vast** [1] - 15:18
**Venezia** [3] - 4:15, 7:25, 36:19
**VENEZIA** [1] - 2:9
**VERDIN** [1] - 2:18
**Verdin** [1] - 4:9
**view** [1] - 34:16
**viewing** [1] - 34:16

**visible** [1] - 10:22
**Vodka** [1] - 27:20
**volume** [1] - 36:1
**vs** [2] - 1:10, 38:7

**W**

**walk** [1] - 34:12
**walking** [1] - 29:16
**wants** [2] - 25:15, 37:17
**war** [1] - 6:8
**ways** [1] - 28:23
**weak** [2] - 6:16, 11:25
**weakens** [1] - 16:1
**weakness** [4] - 8:14, 9:12, 10:3, 11:16
**web** [1] - 32:15
**website** [2] - 10:19, 33:1
**weigh** [1] - 6:22
**weighs** [1] - 12:1
**well-known** [1] - 26:16
**Wesley** [1] - 4:14
**WESLEY** [48] - 2:5, 4:13, 18:24, 19:21, 20:24, 21:7, 21:24, 22:3, 22:8, 22:11, 22:22, 24:4, 24:7, 24:12, 24:15, 24:18, 24:21, 25:2, 25:13, 25:21, 25:25, 26:9, 26:18, 26:23, 26:25, 27:4, 27:6, 29:16, 30:1, 30:3, 30:6, 30:13, 30:17, 30:21, 30:23, 31:2, 31:8, 31:14, 31:19, 32:4, 32:11, 32:24, 33:6, 33:11, 34:3, 34:10, 34:20, 37:19
**WEST** [1] - 1:23
**WESTERN** [1] - 1:3
**whole** [1] - 30:9
**WITH** [2] - 38:17, 38:20
**word** [4] - 17:15, 23:5, 33:2, 37:3
**words** [5] - 5:17, 6:5, 19:14, 23:3, 25:14, 27:20
**World** [1] - 35:25
**world** [2] - 5:16, 21:4
**worlds** [1] - 26:21
**worry** [1] - 32:1
**written** [1] - 28:9
**wrote** [3] - 18:5, 18:6, 28:10

**Y**

**year** [4] - 11:22, 11:23, 13:23, 13:25

**years** [11] - 14:22, 17:9, 23:25, 24:3, 24:17, 24:20, 25:6, 29:17, 32:25, 34:11
**yourself** [1] - 4:21

**Z**

**zero** [1] - 36:3